# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CHANCERY DIVISION - COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | No. 2018-CH-  2018CH04248 |
| v. | ) ) ) | CALENDAR/ROOM 13 TIME 00:00 |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company registered to do business in Illinois, | ) ) ) ) | Declaratory Jdgmt |
| Defendant. | ) | |

### VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff, Webster Place Athletic Club, LLC ("Tenant"), by and through its attorneys,

Burke, Warren, MacKay & Serritella, P.C., complains against defendant, Ramco-Webster Place,

LLC, a Delaware limited liability company ("Landlord"), as follows:

### INTRODUCTION

1.    Tenant operates a 32,000 square foot full-service athletic club in what is known as

the Clybourn Corridor in Chicago, near Western and Clybourn Avenues on the north side of the

city. The Clybourn Corridor is a major destination for shopping and retail and serves as an arterial

connection between Chicago's west side and Lincoln Park. Traffic congestion is heavy, and

parking is limited.

2.    Many, if not most, of Tenant's members commute to the athletic club by

automobile. Tenant chose the Clybourn Corridor location because under the Lease, defined below,

it was able to provide free parking for up to four hours to its members in parking areas owned and

controlled by Landlord. But for Landlord's contractual agreement to provide free parking for

Tenant's members, Tenant would not have entered into the Lease.

3.      The parking areas owned by Landlord are also used by patrons of other area businesses who pay for use of the lots, which generates revenue for the Landlord.

4.      Despite its contractual agreement to do so, Landlord failed to provide Tenant with a system under which its members can validate their parking tickets so that they can obtain free parking, resulting in the rejection of validated tickets submitted by Tenant's members, and long lines at the parking exits. Those members often must resort to seeking help from Landlord or Tenant employees to exit the parking areas, and often end up having to pay for parking.

5.      Landlord's failure to provide reliable free parking for Tenant's members has led to numerous complaints by members to Tenant's club and forced Tenant to provide costly concessions to members. At the same time, membership at Tenant's club has declined while membership at Tenant's affiliates, where members are provided with free, reliable parking, have seen increases in membership.  Tenant has demanded that Landlord cure the breach of its obligation to provide free parking to its members, but Landlord has failed to do so.

6.      In addition to breaching the Lease by failing to provide the free parking critical to attracting and retaining members, which Tenant expressly negotiated for in entering into the Lease, Landlord has breached and continues to breach its Lease obligations to maintain the roof, other structural elements, and HVAC systems, resulting in, among other things, water damage to the Premises, the growth of mold and other damages, which have actually made certain portions of the Premises unusable.

7.      Tenant has also been damaged by Landlord's breach of its obligations under the Lease to provide HVAC to the Tenant, as the temperature in the Premises fluctuates between extremes in hot or cold, making it uncomfortable for Tenant's members to work out or use other

facilities in the Premises, such as the shower or locker rooms, further leading to membership cancellations.

8.      Landlord has failed to cure any of these breaches despite repeated notices and complaints, in writing and verbally, from Tenant.

9.      Tenant now brings this action seeking: (i) a declaration that Tenant's performance under the Lease is excused by Landlord's ongoing material breaches (Count 1); and (ii) rescission of the Lease (Count 2).

## PARTIES

10.     Landlord is a Delaware limited liability company doing business in Illinois and the owner of property located at 1455 W. Webster Avenue, Chicago, Illinois, otherwise known as the "Webster Place Shopping Center" (the "Shopping Center").

11.     Tenant is an Illinois limited liability company doing business in Cook County, Illinois.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue, under 735 ILCS 5/2-209 and 735 ILCS 5/2-101, are proper in Cook County because the Property is located in the State of Illinois, and this is the county in which the transaction or some part thereof occurred out of which the cause of action arose and where the Property as defined below, that is the subject of the Lease is located.

## FACTS

13.     Pursuant to a certain shopping center lease dated December 5, 2014, as amended by the First Amendment to Lease dated January 28, 2015 ("First Am.") and side letter agreement dated February, 2017 (the "Side Letter") (collectively the "Lease"), Tenant leases certain ground

3

floor ("Ground Floor") and second floor office space ("Second Floor") known as Stores 4 and 5

and certain basement space at the Shopping Center (collectively, the "Premises") from certain

limited liability companies, as set forth in the Lease (The Lease is attached hereto as Exh. 1.)

14.     Landlord purchased the Shopping Center, including the Premises, on or around

February 2017 and is the successor in interest under the Lease, and as such is bound by the

obligations under the Lease pursuant to Section 15.11 of the Lease which states, in part:

> The terms, covenants, agreements, obligations and conditions contained herein,
> except as otherwise specifically provided, shall extend to, bind and inure to the
> benefit of the partier hereto and their respective personal representative, heirs,
> successor and assigns...Landlord, at any time and from time to time, may make an
> assignment of its interest in this Lease....

(Id., §15.11).

15.     Tenant, a single entity LLC, is affiliated with the Chicago Athletic Clubs (see

Lease, §1.1.6.), which operates seven (7) other upscale, full-service athletic clubs in the Chicago

area, in addition to its club in the Clybourn Corridor.

16.     Tenant entered into the Lease for the sole and express purpose of operating an

upscale, full-service athletic club at the Premises (the "Club"). (Id., §1.1.16.)

17.     Tenant's current annual Base Rent under the Lease is $780,504.30, with monthly

Base Rent in the amount of $65,041.92. (Id. §1.1.13.)

18.     The Lease commenced on August 1, 2015 and terminates on June 30, 2031 (the

"Lease Term"). (See Exh. 1, First Am., ¶1, and Lease, §1.1.19.)

19.     The Lease provides that the prevailing party in any litigation between the Tenant

and Landlord is entitled to recover its expenses, including attorneys' fees and costs. Specifically,

Section 12.11 of the Lease states, in part:

> In the event of litigation between the parties, the non-prevailing party shall, on
> demand, pay or reimburse the other party for the payment of the prevailing party's
> expenses, including, but not limited to, reasonable attorneys' fees, expenses and

4

administrative hearing and court costs, in both the trial and any and all appellate
proceedings, incurred either directly or indirectly in enforcing any obligation under
this Lease...The covenants of this Section 12.11 shall survive the expiration or
termination of this Lease due to the lapse of time or otherwise.

(*Id.,* §12.11).

A.   **Parking Issues**

20.     The Shopping Center is located in an area that is commonly known as the Clybourn

Corridor, an affluent, densely populated, congested area of Chicago near the Lincoln Park

neighborhood with extremely limited free public parking.

21.     The Shopping Center contains four parking areas available to the public for a fee,

identified as the Main Garage, Shakespeare Lot, Shakespeare Garage, and Main Surface Lot in the

Site Plan attached to the Lease as Exhibit C (collectively referred to herein as the "Parking Areas").

(*Id.,* Exh. C.)

22.     The Parking Areas are used as a revenue stream by the Landlord, which charges the

public for parking.

23.     Running an athletic club in the area of the Shopping Center is extremely

competitive. Parking is a crucial consideration for customers. Without parking, Tenant cannot

maintain or grow its membership base and the Club will fail. Tenant selected the Premises when

searching for property in the area to operate an athletic club in reliance upon the Landlord's

promise to include convenient free parking in the Parking Areas.

24.     As a significant feature of the Lease, Tenant negotiated Section 5.6 ("Tenant's

Parking Rights") which entitles it to free parking for its members, patrons and customers (referred

to herein as "Free Tenant Parking") in the Parking Areas, at no additional cost to Tenant as set

forth specifically below:

> **Tenant's Parking Rights.**   During the Term, and subject to the terms and
> conditions set forth in the Lease, Landlord shall provide to Tenant's members,

5

> patrons and customers, at no additional cost to Tenant, and so long as Tenant is operating the Premises for the Health Club Use: (i) free 4-hour non-reserved, non-exclusive parking, on a first-come, first-served basis, in the Main Garage, Shakespeare Lot and Shakespeare Garage, as such garages and lot are generally depicted on the Site Plan; and (ii) during the hours of 4:45 a.m. through 1:00 p.m., free 90 minute non-reserved, non-exclusive parking, on a first-come first-served basis in the Main Surface Lot, as such lot is generally shown on the Site Plan. The free parking described in clauses (i) and (ii) of this Section 5.6 is referred to in this Lease as "Tenant's Parking Rights," and shall be subject to, and provided by Landlord in according with Landlord's Parking Validation Program described in the Rules and Regulations contained in Exhibit 1, as may from time to time modified; provided, however, *no modifications of the Rules and Regulations shall deprive Tenant of, or materially interfere with, Tenant's Parking Rights under Section 5.6…*

(*Id.*, §5.6) (emphasis added).

25.     Pursuant to the Side Letter, the Free Tenant Parking in the Main Surface Lot was

extended from 90 minutes, as allowed under the Lease, to four (4) hours, and the time restrictions

were removed, as set forth below:

> Notwithstanding anything to the contrary contained in the Lease, Landlord agrees that Tenant has the right to no-reserved, non-exclusive parking on a first-come, first-served basis, in the Main Surface Lot, as such lot is generally depicted on the Site Plan attached to the Lease, for a period not to exceed four (4) hours per vehicle parked, at no additional charge to Tenant. Furthermore, any reference in the Lease to restricting the time of day of tenant's right to use the Main Surface Lot shall be deleted.

*(See* Exh. 1, *Side Letter*, p. 1.)

26.     Tenant has marketed the Club, and sold memberships, by promising that free

parking would be available to members.

27.     Most of Tenant's members, guests and patrons drive to Tenant's club (collectively,

the "Tenant's Parkers"), and generally park at the Main Surface Lot, which is outside of the

entrance to the club and the most visible and convenient parking for Tenant members and other

visitors.

6

28.    Under the current parking system, implemented and maintained by Landlord, the entrance to the Parking Areas is blocked by a gate. A driver who wishes to park in any of the Parking Areas is required to pull a paper ticket out of a ticket machine for the gate to lift, allowing the driver to enter the Parking Areas and park his or her car. When the parker seeks to leave the Parking Area, he or she must insert the ticket into the pay stations located at the exit to the Parking Area, and then pay the parking fee with his or her credit card. Once payment is accepted, the gate will lift allowing the parker to exit.

29.    Under the Parking Validation Program referenced in Section 5.6 of the Lease, the Landlord provides certain Parking Validation Ticketing Equipment, as defined therein, to Tenant to enable Tenant's Parkers to validate their parking tickets so that they may exit the Parking Areas without making any payment or encountering any further delay. (*See Id.*, Exh. I, *Webster Place Shopping Center Rules and Regulations* (the "Shopping Center Rules"), ¶12.)

30.    Since the commencement of the Lease, however, and despite Landlord's contractual obligations to do so, a significant number of Tenant's members have not received free parking.

31.    Instead, the pay stations regularly, and frequently, fail to recognize properly validated tickets, thus preventing Tenant's members from exiting the Parking Areas, forcing them to either call and wait for Parking Lot attendants or use their own credit cards to pay for parking and incur an additional expense that Tenant's members do not expect to incur, in addition to their monthly membership fees. (The "Parking Validation Failures.") In addition to inconveniencing the exiting Tenant's members, the Parking Validation Failures also cause traffic back-ups at the Parking Areas exits, preventing other users of the Parking Areas from exiting the Parking Areas

timely and efficiently. (Photos depicting some of the back-ups that occur in the Parking Areas as a result of the Parking Validation Failures are attached hereto as Group Exh. 2.)

32.   Despite Tenant's complaints to Landlord regarding the Parking Validation Failures, the failures persist, effecting numerous members of Tenant's club each day.

33.   Further compounding the problem, the Parking Areas attendants, who are Landlord's employees and/or agents, are often rude and verbally criticize Tenant's Parkers when Tenant's Parkers use the call/help button on the pay stations to request help in exiting the Parking Areas when their validated parking tickets do not work.

34.   As a result of the failure of the Free Tenant Parking, Tenant has, in turn, been unable to provide free member parking, and has also been forced to grant concessions to members, including free guest passes. Furthermore, membership in the Club has declined, impacting Tenant's profitability and preventing it from paying its Rent, while membership at the other Chicago Athletic Clubs, which have convenient and free parking, has increased.

35.   In addition, the Parking Areas lack clear signage and direction and are poorly designed, making it difficult and frustrating for Tenant's members to find parking in the other Parking Areas when the Main Surface Lot is full.

36.   By discouraging Tenant's members from parking at no cost in the Parking Areas, Landlord benefits as more parking spaces may be available for paying parkers.

37.   Without free and accessible parking for its members, the market value of the Lease has been reduced significantly.

B.   **Water and Structural Issues**

38.   Under Section 9.1 of the Lease, Landlord is required to "keep the foundations, bearing walls, concealed plumbing serving more than the Premises...the exterior of the Premises

8

and roof of the Premises, and the structural soundness of exterior walls thereof...in good order, repair and condition." (*See* Exh. 1, Lease, §9.1.)

39.    Landlord breached Section 9.1 of the Lease, resulting in extensive water and other damage to the Premises, which the Landlord has failed to repair.

40.    On April 1, 2017, the ground water pumps located in the Premises which, on information and belief, are used to pump groundwater seeping into the Premises from the parking lot and other common areas, and thus Landlord is obligated to maintain, failed, causing the Tenant's pump room and back stairway of the Premises to fill with standing water, which water seeped into the Premises' weight room. Due to the urgency of the matter and to prevent additional damage, Tenant had to have the pumps repaired at its own expense.

41.    In addition, water regularly leaks into the Premises due to defects in the roof of the Shopping Center, and, on information and belief, from condensation from the HVAC system, which water has caused the ceiling of the office on the Second Floor to collapse, destroyed the carpeting and drywall in the Second Floor, and caused mold to grow, among other damages, making the Second Floor of the Premises unusable. Landlord has failed to repair the Second Floor, despite numerous requests from Tenant. (*See* photo attached hereto as Exh. 3.)

42.    The water leaking from the Second Floor has also leaked down to the Ground Floor of the Premises, causing mold, drywall and other damage to the back dock, the boiler room, and the electrical rooms. (*See* photos attached hereto as Exh. 4.)

43.    In addition, the loading dock is defective and as a result, often unusable, causing disruption to deliveries to the Premises, including requiring deliveries to, at times, be brought in by hand through member areas of the Premises, disrupting Tenant's operations.

44.    Other structural problems with the Premises have also gone unaddressed. For example, the framing of the exterior side door to the Premises is defective, which in addition to being unsightly, allows rats and other vermin to infest the Premises.

C.    **HVAC Issues**

45.    Pursuant to Section 8.2 of the Lease, Landlord covenanted to "provide heat and air conditioning to the Premises." (*See* Exh. 1, Lease, §8.2.)

46.    Having an acceptable temperature at an athletic club is crucial to its operation because current members will leave, and have left, and prospective members will not join if the athletic club is, for example, too hot for cardio workouts or too cold for yoga sessions.

47.    The Landlord has failed to comply with Section 8.2 of the Lease, as the Premises are often too hot or too cold. For example, at times the temperature of parts of the Premises have been in the low 60 degrees for days.

48.    As a result of the failure to properly regulate the heating and air conditioning, Tenant has received numerous member complaints, members have cancelled their memberships, and prospective members have declined to join the athletic club

D.    **Communications With Landlord Failed To Resolve Issues.**

49.    Tenant has made numerous and multiple complaints, in writing and verbally, to Landlord about the Parking Issues, the Water and Structural Issues, and the HVAC Issues, including by meeting personally with Landlord, but the issues have not been addressed or resolved. (*See* Exh. 5.)

## COUNT I
## DECLARATORY JUDGMENT THAT TENANT IS EXCUSED FROM PERFORMANCE OF LEASE

50.    Tenant incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth in this Paragraph 50.

51.   Landlord has materially breached the Lease by failing to provide Free Tenant Parking, required maintenance to prevent and resolve the Water and Structural Issues, and HVAC (collectively, the "Breaches").

52.   Despite multiple complaints by Tenant, Landlord has not cured the Breaches.

53.   Tenant has failed to receive the benefit of its bargain under the Lease as a result of Landlord's continuous and ongoing Breaches and its refusal to cure the Breaches, particularly the promise of Free Tenant Parking.

54.   Landlord's Breaches have resulted in a decline in membership, and in the inability to utilize a significant portion of the Premises. The economic loss suffered by Tenant, which has continued unabated for months, has essentially eliminated the benefit of the bargain Tenant obtained under the Lease.

55.   Landlord's failure to and refusal to perform its obligations under the Lease excuse Tenant from further performance of its obligations under the Lease.

56.   The Breaches cannot be remedied by monetary damages.

WHEREFORE, plaintiff, Webster Place Athletic Club, LLC, an Illinois limited liability company, requests that the Court enter an order declaring that Webster Place Athletic Club, LLC's performance under the Lease to defendant, Ramco-Webster Place, LLC, a Delaware limited liability company, is excused, and grant such other relief as this Court deems just and equitable.

## COUNT II
### RESCISSION – MATERIAL BREACH OF LEASE

57.   Tenant incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth in this Paragraph 57.

58.    Tenant would not have entered into the Lease had Landlord's failure to honor its obligations under the Lease been anticipated. The promise of Free Tenant Parking was material to Tenant's business and a benefit used to sell memberships in Tenant's club.

59.    Rescission is an appropriate remedy because there is no adequate remedy at law because Landlord's breaches are material and because there is no adequate remedy at law.

60.    Landlord has materially breached the Lease by failing to provide Free Tenant Parking, required maintenance to prevent and resolve the Water and Structural Issues, and HVAC (collectively, the "Breaches").

61.    Despite multiple complaints by Tenant, Landlord has not cured the Breaches.

62.    Tenant has failed to receive the benefit of its bargain under the Lease as a result of Landlord's continuous and ongoing the Material Breaches.  and its refusal to cure the Breaches.

63.    Landlord's failure to and refusal to perform its obligations under the Lease are material breaches of the Lease.

64.    The status quo can be restored if rescission is granted because Tenant will vacate the Premises and restore possession of the Premise to Landlord

65.    As a result of Landlord's Breaches. of the Lease, Tenant is entitled to rescind the Lease.

WHEREFORE, plaintiff, Webster Place Athletic Club, LLC, an Illinois limited liability company, requests that the Court enter an order declaring that Webster Place Athletic Club, LLC's performance under the Lease to defendant, Ramco-Webster Place, LLC, a Delaware limited liability company, that the Lease is rescinded, and such other relief as this Court deems just and equitable.

12

WEBSTER ATHLETIC CLUB, LLC
an Illinois limited liability company
Plaintiff

By:_____

One of its attorneys

Aaron H. Stanton (*astanton@burkelaw.com*)
Madeleine W. Milan (*mmilan@burkelaw.com*)
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
Telephone: (312) 840-7000
Firm ID No. 41704

## VERIFICATION

I, Patrick Cunningham, being first duly sworn on oath, depose and state that I am a Manager of Plaintiff, Webster Place Athletic Club, LLC, an Illinois limited liability company; that I have read the foregoing Verified Complaint for Rescission and Other Relief; that under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I certify that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

Dated: March 30, 2018

_____
Patrick Cunningham, Manager

# EXHIBIT 1

WEBSTER PLACE
SHOPPING CENTER LEASE

TENANT:            Webster Place Athletic Club LLC, an Illinois limited liability company

ADDRESS:          1455 W. Webster Avenue, Chicago, Illinois

STORE NUMBERS:    4 and 5

DATE:             December 5, 2014

LP 5142039.7 \ 28730-98464

## TABLE OF CONTENTS

ARTICLE I.
BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS........................................................4
    Section 1.1     Basic Lease Provisions and Definitions....................................................................4
    Section 1.2     Significance of Basic Lease Provisions and Definitions.....................................7
    Section 1.3     Enumeration of Exhibits .............................................................................................7

ARTICLE II.
PREMISES AND TERM ..............................................................................................................................7
    Section 2.1     Shopping Center .............................................................................................................7
    Section 2.2     Premises............................................................................................................................7
    Section 2.3     Term...................................................................................................................................7
    Section 2.4     Intentionally Omitted ..................................................................................................8
    Section 2.5     Reservation of Rights by Landlord .......................................................................8
    Section 2.6     Tenant's Right to Measure Premises.....................................................................9

ARTICLE III.
DELIVERY OF PREMISES AND THE PERFORMANCE OF TENANT'S WORK.......................10
    Section 3.1     Plans and Specifications for Tenant's Work ...................................................10
    Section 3.2     Condition of the Premises .......................................................................................10
    Section 3.3     Failure to Deliver Possession.................................................................................10
    Section 3.4     Obligations of Tenant Before the Term Begins .............................................10
    Section 3.5     Landlord's Contribution to Tenant's Work.....................................................11

ARTICLE IV.
RENT.............................................................................................................................................................12
    Section 4.1     Rent..................................................................................................................................12
    Section 4.2     Operating Year ............................................................................................................12

ARTICLE V.
COMMON AREAS AND OPERATING COSTS ....................................................................................12
    Section 5.1     Common Areas and Facilities................................................................................12
    Section 5.2     Use of Common Areas ..............................................................................................12
    Section 5.3     Operating Costs...........................................................................................................13
    Section 5.4     Tenant's Pro Rata Share .........................................................................................14
    Section 5.5     Payment of Operating Costs ..................................................................................14
    Section 5.6     Tenant's Parking Rights..........................................................................................15

ARTICLE VI.
REAL ESTATE TAXES ............................................................................................................................16
    Section 6.1     Real Estate Taxes.......................................................................................................16
    Section 6.2     Tenant's Pro Rata Share..........................................................................................16
    Section 6.3     Payment of Real Estate Taxes...............................................................................17

ARTICLE VII.
INDEMNITY ..............................................................................................................................................17
    Section 7.1     Tenant's Indemnity....................................................................................................17
    Section 7.2     Landlord's Indemnity................................................................................................17

ARTICLE VIII.
UTILITY SERVICES AND HEATING, VENTILATING AND AIR CONDITIONING ................17
    Section 8.1     Utilities ...........................................................................................................................17
    Section 8.2     Heating, Ventilating and Air Conditioning .....................................................18
    Section 8.3     Heating, Ventilating, and Air Conditioning Charges ..................................18
    Section 8.4     Tenant's Pro Rata Share...........................................................................................18

LP 5142039.7 \ 28730-98464

Section 8.5        Payment of HVAC Charges ...................................................................18

ARTICLE IX.
LANDLORD'S COVENANTS.................................................................................................19
    Section 9.1        Repairs by Landlord.....................................................................19
    Section 9.2        Quiet Enjoyment...........................................................................19
    Section 9.3        Environmental Condition of Shopping Center and Premises...............20
    Section 9.4        Tenant's Exclusive.......................................................................20

ARTICLE X.
TENANT'S ADDITIONAL COVENANTS...............................................................................21
    Section 10.1        Affirmative Covenants.................................................................21
    Section 10.2        Negative Covenants......................................................................25

ARTICLE XI.
DAMAGE OR TAKING AND RESTORATION......................................................................28
    Section 11.1        Fire, Explosion or Other Casualty................................................28
    Section 11.2        Eminent Domain...........................................................................29
    Section 11.3        Election to Terminate...................................................................30

ARTICLE XII.
DEFAULT AND REMEDIES ...................................................................................................30
    Section 12.1        Defaults by Tenant.......................................................................30
    Section 12.2        Termination Upon Default............................................................31
    Section 12.3        Repossession Upon Default..........................................................31
    Section 12.4        Duty to Mitigate ..........................................................................32
    Section 12.5        Bankruptcy Default ......................................................................32
    Section 12.6        Interest and Late Charge on Late Payment ..................................33
    Section 12.7        Holdover by Tenant .....................................................................33
    Section 12.8        Landlord's Right to Cure Defaults................................................33
    Section 12.9        Effect of Waiver of Default; Valuation Laws ..............................33
    Section 12.10       Remedies Cumulative...................................................................33
    Section 12.11       Costs of Collection ......................................................................34
    Section 12.12       Security Deposit ..........................................................................34
    Section 12.13       Landlord's Default.......................................................................36

ARTICLE XIII.
AMERICANS WITH DISABILITIES.......................................................................................37

ARTICLE XIV.
LANDLORD'S INSURANCE ...................................................................................................37

ARTICLE XV.
MISCELLANEOUS PROVISIONS ..........................................................................................37
    Section 15.1        Mutual Waiver of Claims and Subrogation...................................37
    Section 15.2        Notices.........................................................................................37
    Section 15.3        Brokerage ....................................................................................38
    Section 15.4        Relationship of the Parties ..........................................................38
    Section 15.5        Subordination...............................................................................38
    Section 15.6        Attornment ..................................................................................38
    Section 15.7        Estoppel Certificates....................................................................39
    Section 15.8        Applicable Law and Construction................................................39
    Section 15.9        Time of the Essence.....................................................................39
    Section 15.10       Execution of Lease by Landlord...................................................39
    Section 15.11       Binding Effect of Lease................................................................39
    Section 15.12       Agency or Independent Contractor...............................................40

ii

Section 15.13    Financial Statements.................................................................................40
Section 15.14    Project Management Space.........................................................................40
Section 15.15    Riders and Exhibits....................................................................................40
Section 15.16    Force Majeure.............................................................................................40
Section 15.17    Recording.....................................................................................................40
Section 15.18    Limitation of Liability................................................................................41
Section 15.19    Personal Property Taxes.............................................................................41
Section 15.20    Easements.....................................................................................................41
Section 15.21    Corporate Authority...................................................................................41
Section 15.22    Landlord Consents......................................................................................41
Section 15.23    Legal Requirements....................................................................................41
Section 15.24    Guaranty of Completion............................................................................41

LP 5142039.7 \ 28730-98464

### WEBSTER PLACE SHOPPING CENTER
### LEASE

#### ARTICLE I.
#### BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS

Section 1.1     **Basic Lease Provisions and Definitions.** The following terms whenever used in this Lease shall have the meanings set forth in this Article unless otherwise limited or expanded elsewhere in this Lease.

1.1.1     DATE OF THIS LEASE: December 5, 2014.

1.1.2     LANDLORD AND LANDLORD'S ADDRESS: Those certain limited liability companies listed on Exhibit A as tenant-in-common owners of the Shopping Center, each c/o Syndicated Equities Group, LLC, 350 N. LaSalle Street, Suite 800, Chicago, IL 60654.

1.1.3     LANDLORD'S AGENT AND ADDRESS: JEROME H. MEYER & CO., 640 North LaSalle Street, Suite 605, Chicago, Illinois 60654, Email: howard@JMHproperties.com and rene@syneq.com, subject to change in the discretion of Landlord and upon notice to Tenant.

1.1.4     TENANT: Webster Place Athletic Club LLC, an Illinois limited liability company

1.1.5     ADDRESS OF TENANT: c/o Marc Realty, 55 East Jackson Blvd., Suite 500, Chicago, Illinois 60604, Attention: Laurence Weiner.

1.1.6     TENANT'S TRADE NAME: Chicago Athletic Clubs

1.1.7     SHOPPING CENTER: Webster Place

1.1.8     PREMISES: (i) that certain ground floor area in the Shopping Center known as Store Numbers 4 and 5, which, for all purposes of this Lease, shall be deemed to consist, in the aggregate, of 23,045 square feet and shall include certain second floor office area, as generally shown on Exhibit D-1 (the "First Floor Space"); and (ii) that certain basement area, which, for all purposes of this Lease, shall be deemed to consist of 9,893 square feet, as generally shown on Exhibit D-2 (the "Basement Space"); provided, the square footage of the Premises shall be subject to remeasurement in accordance with, and subject to, Section 2.6.

1.1.9     INTENTIONALLY OMITTED

1.1.10   DELIVERY DATE: The date that is the later of (i) the date that is three (3) business days from the date Landlord has delivered to Tenant a Subordination, Non-Disturbance, and Attornment Agreement (the "SNDA") executed by the current Mortgagee (as hereinafter defined) of the Shopping Center, and (ii) December 1, 2014.

1.1.11   COMMENCEMENT DATE: July 1, 2015.

1.1.12   TERM: That period of time commencing with the Commencement Date and ending with the Termination Date.

1.1.13   ANNUAL BASE RENT:

PRIMARY TERM

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 1 | $0.00 psf | | $0.00 psf | | $0 |
| 2-6 | $27.00 psf | $622,215.00 | $16.00 psf | $158,288.00 | $780,503.00 |

LP 5142039.7 \ 28730-98464

4

| 7-11 | $29.03 psf | $668,996.35 | $17.20 psf | $170,159.60 | $839,155.95 |
| 12-16 | $31.20 psf | $719,004.00 | $18.49 psf | $182,921.57 | $901,925.57 |

FIRST OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 17-21 | $33.54 | $772,929.30 | $19.88 psf | $196,672.84 | $969,602.14 |

SECOND OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 22-26 | $36.05 | $830,772.25 | $21.37 psf | $211,413.41 | $1,042,185.66 |

THIRD OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 27-31 | $38.75 | $892,993.75 | $22.97 psf | $227,242.21 | $1,120,235.96 |

1.1.14   PERCENTAGE RENT RATE: Not Applicable.

1.1.15   PERCENTAGE RENT PERIOD: Not Applicable.

1.1.16   TENANT'S USE: The Premises shall only be used only for (i) the operation of a full service health club for adults and teenagers (14 years and older) (except to the extent a portion of the Premises is used for Ancillary Child Activities (as hereinafter defined)), providing physical and occupational therapy and rehabilitation services, weight and aerobic training, racquet sports, swimming pool, sauna and whirlpool activities, group exercise classes including yoga and Pilates, free weights, circuit training, spinning, personal and sports training and massage therapy, together with the right to use the Premises for such incidental uses customary to a health club facility including, but not limited to, a pro shop, limited vitamin and nutritional supplements sales as customary for a health club facility, weight loss and related programs, golf instruction, swim lessons, food and beverage service for patrons of the health club facilities (so long as, and provided that, the area in which such food and beverage service is operated does not exceed 5,000 square feet), and Ancillary Child Activities (the uses and purposes described in this clause (i) being collectively referred to in this Lease as (the "Health Club Use") and (ii) subject to, and in accordance with, Section 10.1.2, Other Permitted Retail Uses (as hereinafter defined), and for no other use or purpose. "Ancillary Child Activities" means babysitting and activities (including ballet) ancillary to Tenant's operation of a health club facility on the Premises offered only to children of patrons of the health club facilities while such patrons are present on the Premises (except for occasional/periodic "date night" special events offered only to health club members). Notwithstanding anything contained in this Section 1.1.16, in no event shall Tenant separately market or advertise the availability of Ancillary Child Activities on the Premises, and Tenant shall immediately cease use of any portion of the Premises for Ancillary Child Activities if such use violates any of the Existing Exclusives (as defined in Section 10.2.4).

1.1.17   GUARANTOR (for completion of Tenant's Work): Laurence H. Weiner, Gerald L. Nudo, and Patrick Cunningham.

1.1.18   SECURITY DEPOSIT: $1,000,000.

1.1.19   TERMINATION DATE: June 30, 2031, as the Termination Date may be extended by virtue of Tenant's exercise of the Extension Options (as hereinafter defined) in accordance with Section 2.3 hereof.

1.1.20   THE LEASING BROKER(S): Mid-America Real Estate Corporation

1.1.21    TENANT'S PRO RATA PERCENTAGES:

| | |
|---|---|
| (a) Tenant's Pro Rata Share of Operating Costs: | 17.1556% |
| (b) First Floor Space Real Estate Tax Percentage: | 17.1556% |
| (c) Basement Space Real Estate Tax Percentage: | 7.3548% |
| (d) Tenant's HVAC Percentage: | 50.7676% |

The foregoing Pro Rata Percentages shall be adjusted as necessary as a result of any remeasurement of the Premises pursuant to Section 2.6. Further, in the event of a change in the floor area of the Premises and/or the rentable area of the Shopping Center, Tenant's Pro Rata Percentages shall be adjusted accordingly by Landlord.

1.1.22    MORTGAGEE AND MORTGAGEE'S ADDRESS (as of the date hereof, subject to change): WELLS FARGO BANK N.A., as trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2005-MCP1, Commercial Mortgage Pass-Through Certificates, Series 2005-MCP1, c/o Midland Loan Service, Inc. P.O. Box 25965, Shawnee Mission, KS 66225-5965, Loan #030251845.

1.1.23    OTHER DEFINITIONS AND REFERENCES                    SEE SECTION

Ancillary Child Activities .................................................................................................. 1.1.16
City........................................................................................................................................2.5
Common Areas ......................................................................................................................5.1
Comparable Properties..........................................................................................................5.1
Default Rate ........................................................................................................................12.6
Event of Default...................................................................................................................12.1
Existing Exclusives...........................................................................................................10.2.4
Force Majeure ....................................................................................................................15.16
Future Exclusive Rights....................................................................................................10.2.4
Health Club Use................................................................................................................1.1.16
HVAC Charges .....................................................................................................................8.3
Incurred annually ..................................................................................................................6.1
Interior Alterations...........................................................................................................10.2.2
Landlord's Work ...................................................................................................................3.1
Legal Requirements ...........................................................................................................14.23
Management Fee....................................................................................................................5.3
Monthly Base Rent ...............................................................................................................4.1
Mortgage .............................................................................................................................14.6
Mortgagee ...........................................................................................................................14.6
Offset Limit....................................................................................................................... 3.5(g)
Operating Year .....................................................................................................................4.2
Operating Costs ....................................................................................................................5.3
Other Permitted Retail Uses .............................................................................................10.1.2
Owner's Entities ...............................................................................................................10.1.8
Permit Filing Date.................................................................................................................3.1
Permits ..................................................................................................................................3.1
Plans and Specifications .......................................................................................................3.1
Real Estate Taxes .................................................................................................................6.1
Repeated Default ................................................................................................................12.4
Repeatedly ..........................................................................................................................12.1
Required Opening Date .....................................................................................................10.1.4
Security Deposit ................................................................................................................12.12
Site Plan ................................................................................................................................2.5
Tenant's Parking Rights .......................................................................................................5.6
Tenant's Pro Rata Share of HVAC Charge ..........................................................................8.4
Tenant's Pro Rata Share of Operating Costs ........................................................................5.4
Tenant's Pro Rata Share of Real Estate Taxes .....................................................................6.2

Tenant's Pro Rata Share of Shopping Center Insurance ................................................. 7.2
Tenant's Use ......................................................................................................................... 1.1.16
Tenant's Work ..................................................................................................................... 3.1
Term ..................................................................................................................................... 2.3

Section 1.2     **Significance of Basic Lease Provisions and Definitions.** Each reference in this Lease to any of the Basic Lease Provisions and Definitions contained in Section 1.1 shall be deemed and construed to incorporate all of the terms provided under each Basic Lease Provision and Definition.

Section 1.3     **Enumeration of Exhibits.** The exhibits enumerated in this section and attached to this Lease are incorporated in this Lease by this reference and are to be construed as a part of this Lease.

| Exhibit A | List of Landlord Entities |
|---|---|
| Exhibit B | Legal Description of Shopping Center. |
| Exhibit C | Site Plan of the Shopping Center |
| Exhibit D-1 | Floor Plan of the First Floor Space |
| Exhibit D-2 | Floor Plan of the Basement Space |
| Exhibit E | Intentionally Omitted |
| Exhibit F | Form of Letter of Credit |
| Exhibit G | Sign Criteria |
| Exhibit H | Sign Rendering with Approved Lettering |
| Exhibit I | Webster Place Shopping Center Rules and Regulations |
| Exhibit J | Completion and Performance Guaranty |
| Exhibit K | Statement as to Remeasurement |
| Exhibit L | Existing Exclusives/ Prohibited Uses |
| Exhibit M | Pre-Existing Leases |

## ARTICLE II.
## PREMISES AND TERM

Section 2.1     **Shopping Center.** Landlord is the owner of a tract of land legally described on Exhibit B which is being operated as the shopping center depicted on Exhibit C and defined in Section 1.1.7, and referred to in this Lease as the Shopping Center set forth in Section 1.1.7.

Section 2.2     **Premises.** Landlord hereby leases to Tenant, and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms, covenants and conditions of this Lease, the Premises described in Subsection 1.1.8.

Section 2.3     **Term.** TO HAVE AND TO HOLD the Premises for the period commencing on the Commencement Date and ending on the Termination Date, unless sooner terminated by lapse of time or otherwise pursuant to the terms of this Lease (the "Term").

2.3.1     **Primary Term.** The primary sixteen (16)-Operating Year term of this Lease (the "Primary Term") shall commence on the Commencement Date and end on the Termination Date (as set forth in Section 1.1.19), unless sooner terminated by lapse of time or otherwise pursuant to the terms of this Lease.

2.3.2     **Option Term.**

(a)     Provided that no Event of Default arising out of Tenant's failure to pay Monthly Base Rent (as defined in Section 4.1) exists at the time of the giving of the required notice set forth herein or at the time of commencement of the First Option Term (defined herein), Tenant shall have the option (the "First Extension Option") to extend the Term for a five (5)-Operating Year period (the "First Option Term"), commencing on the day immediately following the last day of the Primary Term. The First Extension Option shall be exercised by written notice from Tenant to Landlord, given not later than twelve (12) months prior to the last day of the Primary Term, and shall state that Tenant elects to extend the Primary Term for the First Option Term. Annual Base Rent for each

LP 5142039.7 \ 28730-98464

year of the First Option Term shall be as set forth in Section 1.1.13. Upon Tenant's proper exercise of the First Extension Option, the Termination Date shall become the last day of the Twenty-First (21st) Operating Year. No further documentation of Tenant's exercise of the First Extension Option shall be required; provided however, Tenant shall deliver a written statement confirming the extension of the Term into the First Option Term on the terms set forth herein if requested by Landlord.

(b)     Provided that no Event of Default arising out of Tenant's failure to pay Monthly Base Rent exists at the time of the giving of the required notice set forth herein or at the time of commencement of the Second Option Term (defined herein), Tenant shall have the option (the "Second Extension Option") to extend the Term for an additional five (5)-Operating Year period (the "Second Option Term"), commencing on the day immediately following the last day of the Twenty-First (21st) Operating Year. The Second Extension Option shall be exercised by written notice from Tenant to Landlord given not later than twelve (12) months prior to the last day of the First Option Term, and shall state that Tenant elects to extend the Term for the Second Option Term. Annual Base Rent for each year of the Second Option Term shall be as set forth in Section 1.1.13. Upon Tenant's proper exercise of the Second Extension Option, the Termination Date shall become the last day of the Twenty-Sixth (26th) Operating Year. No further documentation of Tenant's exercise of the Second Extension Option shall be required; provided however, Tenant shall deliver a written statement confirming the extension of the Term into the Second Option Term on the terms set forth herein if requested by Landlord.

(c)     Provided that no Event of Default arising out of Tenant's failure to pay Monthly Base Rent exists at the time of the giving of the required notice set forth herein or at the time of commencement of the Third Option Term (defined herein), Tenant shall have the option (the "Third Extension Option") to extend the Term for an additional five (5)-Operating Year period (the "Third Option Term"), commencing on the day immediately following the last day of the Twenty-Sixth (26th) Operating Year. Such Third Extension Option shall be exercised by written notice from Tenant to Landlord given not later than twelve (12) months prior to the last day of the Second Option Term, and shall state that Tenant elects to extend the Term for the Third Option Term. Annual Base Rent for each year of the Third Option Term shall be set forth in Section 1.1.13. Upon Tenant's proper exercise of the Third Extension Option, the Termination Date shall become the last day of the Thirty-First (31st) Operating Year. No further documentation of Tenant's exercise of the third Extension Option shall be required; provided however, Tenant shall deliver a written statement confirming the extension of the Term into the Third Option Term on the terms set forth herein if requested by Landlord.

(d)     Notwithstanding anything contained in Section 2.3.2(a) or Section 2.3.2(b), or in Section 2.3.2(c) to the contrary, if Tenant shall not have effectively exercised the First Extension Option, the Second Extension Option, or the third Extension Option (as applicable) by giving the aforementioned twelve (12)-month prior written notice to Landlord, then, so long as no Event of Default arising out of Tenant's failure to pay Monthly Base Rent then exists, Tenant shall have the right until the expiration of the "Extended Deadline" to exercise its option to exercise the First Extension Option, the Second Extension Option or the Third Extension Option (as applicable). The "Extended Deadline" is the date that is the fifteenth (15th) day following receipt by Tenant of notice from Landlord referring to this Section 2.3.2, and stating that Landlord has not, as of the date of giving said notice to Tenant, received effective notice from Tenant of Tenant's election to exercise the First Extension Option, the Second Extension Option or the Third Extension Option (as applicable). In no event shall Tenant have the right to extend its right to exercise the First Extension Option, the Second Extension Option or the Third Extension Option beyond the applicable Extended Deadline.

(e)     During the First Option Term, the Second Option Term and the Third Option Term, unless otherwise modified in writing by Landlord and Tenant, the terms and provisions of this Lease shall not be otherwise modified and shall continue in full force an effect. Notwithstanding any provisions of this Lease to the contrary, in no event shall Tenant have the right to extend or renew the Term of this Lease beyond the last day of the Thirty-First (31st) Operating Year.

Section 2.4     **Intentionally Omitted**

Section 2.5     **Reservation of Rights by Landlord.**  Notwithstanding anything to the contrary contained in this Lease, but subject to the restrictions set forth in clauses (i), (ii) and (iii) of this Section 2.5, Landlord reserves the right to change the name of the Shopping Center, the size of the Shopping Center, the number,

8

configuration, size and location of buildings therein, the dimensions of such buildings, the number of floors in any of the buildings, dimensions of stores in such buildings and the identity and type of other stores and tenancies in the Shopping Center. Landlord reserves to itself the use of the exterior walls, the roof, the air space above the roof, the space below the floor and above the ceiling and the exclusive right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Shopping Center in locations which will not materially interfere with Tenant's Use. Landlord shall not be in violation of the foregoing sentence if it uses or accesses structural columns or risers within the sales area of the Premises or areas above the ceiling that are located above the sales area of the Premises so long as such is done in a manner which minimizes the disruption of Tenant's business operations. Landlord further reserves the right to locate kiosks and other similar structures (whether temporary or permanent) and to make available, alter, add to or delete from common areas in the Shopping Center, provided only that (i) the Premises shall be located substantially as depicted on Exhibit D-1 and D-2; (ii) none of the foregoing shall result in any material obstruction of access to the Premises; and (iii) none of the foregoing shall result in (x) any material obstruction of the visibility of either the Premises or Tenant's storefront signage from Webster Avenue and from the perspective of south-bound Clybourn traffic (provided, however, that any obstruction of such visibility due to the theatre pylon sign (or any replacement thereof) and any other signage from time to time installed or erected by the theatre pursuant to its lease (or any subsequent lease of the theatre premises) shall be permitted), and (y) the reduction by more than seven (7) parking spaces of the parking spaces which, as of the Date of this Lease, are located within the Main Surface Lot (as the Main Surface Lot is generally shown on the Site Plan of the Shopping Center set forth in Exhibit C (the "Site Plan")), unless the reduction of the number of parking spaces in the Main Surface Lot by more than seven (7) parking spaces is due to any action by the City of Chicago (the "City") or any other governmental authority pursuant to Legal Requirements, or (z) the reduction of more than 100 parking spaces from the parking available to Tenant pursuant to this Lease. If the number of parking spaces available to Tenant pursuant to this Lease is reduced by eight (8) or more parking spaces (but by less than 100), then, (I) Landlord and Tenant agree to extend the hours beyond 1:00 p.m. during which Tenant's members, patrons and customers shall have the right to use the Main Surface Lot pursuant and subject to Section 5.6 and (II) Tenant's members, patrons and customers shall have the non-exclusive right, without charge, to use the Main Surface Lot for a ninety (90)-minutes period after 1:00 p.m., on a first-come, first-served basis pursuant and subject to Section 5.6. Notwithstanding anything to the contrary, no representation or warranty, express or implied, is made as to the accuracy of the information, scale, design, configuration or locations on Exhibit C and Exhibit D-1 and D-2, and the same is subject to errors, omissions, changes, alterations, additions and withdrawals without notice.

Section 2.6    **Tenant's Right to Measure Premises.** The square footage of the Premises shall be the area computed by measurement of the Premises to and from the center of party walls and the outside of exterior walls or exterior window lines. If, within fourteen (14) days from the Delivery Date (i) Tenant's architect measures the Premises and calculates that the square footage of the Premises is less than as set forth in Section 1.1.8, and (ii) Tenant so notifies Landlord in writing (which notice shall include the basis for Tenant's architect's computation of the square footage within the Premises), Landlord and Tenant shall cause their respective architects to act in good faith and with cooperation to achieve the correct measurement of the square footage of the Premises. If Landlord's and Tenant's respective architects are not able to agree upon a correct measurement of the square footage of the Premises within ten (10) days from the date Tenant notifies Landlord of the discrepancy as aforesaid, Landlord and Tenant shall select a third architect, reasonably acceptable to both parties, to calculate the square footage of the Premises, and such architect shall perform such measurement and notify Landlord and Tenant of same within five (5) days of such architect's appointment; provided, in no event shall square footage of the Premises be greater than that designated by Landlord's architect nor less than that designated by Tenant's architect. If the square footage of the Premises has been measured by Tenant's architect pursuant to, and in accordance with, this Section 2.6, then, Landlord and Tenant shall execute and deliver to each other a written statement in the form attached hereto as Exhibit K, which shall specify the square footage of the Premises, and if, as a result of such measurement, the square footage of the Premises is determined to differ from the square footage set forth in Section 1.1.8, such written statement shall also specify the square footage of the Premises, and shall set forth an adjustment of the amount of the Annual Base Rent and Tenant's Pro Rata Percentages set forth in Section 1.1.21 in accordance with such measurement.

## ARTICLE III.
### DELIVERY OF PREMISES
### AND THE PERFORMANCE OF TENANT'S WORK

Section 3.1    **Plans and Specifications for Tenant's Work.**  Within thirty (30) days after the date hereof, Tenant shall submit to Landlord at Tenant's sole cost and expense, Tenant's plans and specifications for Tenant's Work, as hereinafter defined (the "Plans and Specifications").  "Tenant's Work" is hereby defined to mean any and all work to be performed by Tenant necessary to render the Premises suitable for Tenant's Use.

Landlord shall respond in writing to such Plans and Specifications within ten (10) days after receipt from Tenant.  Landlord shall have the right in its reasonable discretion to object to or to approve the Plans and Specifications submitted by Tenant for Tenant's Work.  If Landlord objects to the Plans and Specifications, Tenant shall diligently proceed to modify the Plans and Specifications in order to satisfy such objections and shall resubmit the revised Plans and Specifications to Landlord for its approval, which approval Landlord shall not unreasonably withhold.  Landlord shall provide written objections with respect to such modified Plans and Specifications within twenty (20) days after receipt thereof from Tenant, and if Landlord does not provide written objections with such twenty (20) day period, then, Landlord shall be deemed to have approved such modified Plans and Specifications. Landlord shall not, by its approval of the Plans and Specifications, or any modifications thereof, be deemed to have represented that the Plans and Specifications, or any modifications thereof, are adequate or that the same comply with any applicable Legal Requirements (as defined in Section 14.2.3).

Landlord agrees to reasonably cooperate with Tenant, at no cost to Landlord, as may be necessary for Tenant to obtain from the City such building permits and approvals as necessary pursuant to applicable Legal Requirements for the construction and/or installation of Tenant's Work; provided, however, Landlord shall not be required to make any changes to the Shopping Center or any entitlements thereto in connection with the issuance of any such building permits and approvals.

Section 3.2    **Condition of the Premises.**  Tenant acknowledges that it has fully inspected the Premises, including but not limited to any and all mechanical equipment, and, subject to Landlord's covenants set forth in this Section 3.2, shall accept possession of same on the Delivery Date in its "As Is", "Where Is" condition. Tenant also acknowledges that, subject to completion of Tenant's Work, the Premises and the Shopping Center are suitable for the purposes for which the Premises is leased, in their present condition.  Tenant further acknowledges that Landlord has made no warranties or representations as to either the condition or the suitability of the Premises or the Shopping Center in terms of the use as specified in Section 1.1.16, except as set forth in this Section 3.2. Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition.  Tenant agrees that, subject to Section 5.1, Section 9.1 and the last sentence of this Section 3.2, no representations or promises to decorate, alter, repair or improve the Premises or the Shopping Center either before or after the execution hereof have been made by Landlord or its agents to Tenant.  Landlord covenants and agrees that, on the Delivery Date, the Premises shall be in broom-clean condition, and that the HVAC and any other mechanical equipment and systems serving the Premises shall be in good working order and operating condition.

Section 3.3    **Failure to Deliver Possession.**  If, after using commercially reasonable efforts, Landlord is unable to deliver the Premises to Tenant on or before the Delivery Date for any reason, Landlord shall not be subject to any liability for the failure to deliver possession on such date, and such failure to deliver possession on such date shall not affect the validity of this Lease or the obligations of Tenant hereunder.

Section 3.4    **Obligations of Tenant Before the Term Begins.**  Tenant shall observe and perform all of its obligations under this Lease (except its obligation to operate and to pay Rent (as hereinafter defined), including, but not limited to, payment of all charges for utilities furnished to or used in connection with the Premises, from the Delivery Date until the Commencement Date in the same manner as though the Term began when the Premises were delivered to Tenant; provided, however, Tenant shall not be obligated to pay any Annual Base Rent or Tenant's Pro Rata Share of Operating Costs or Tenant's Pro Rata Share of Real Estate Taxes until the Commencement Date.  Landlord shall have no liability whatsoever for loss or damage to Tenant's Work or to fixtures, equipment or other property of Tenant or Tenant's contractors occurring prior to the Commencement Date except if, and to the extent that, such loss or damage is caused by Landlord's intentional or willful acts.  Prior to the

LP 5142039.7 \ 28730-98464

Commencement Date, Tenant shall furnish detailed evidence as to the cost of Tenant's Work, that Tenant's Work has been completed and paid for in full, and that any and all liens which have been, or which may be filed, have been released or satisfied of record. Tenant shall supply to Landlord a sworn general contractor's and sworn owner's statement listing all contracts in connection with the Tenant's Work and applicable payments made and lien waivers received to date. Tenant shall be solely responsible for the payment for and the performance and quality of Tenant's Work and Landlord shall have no responsibility therefor. Tenant's Work shall be performed and completed in accordance with the Plans and Specifications approved by Landlord and shall be performed in a first class and workmanlike manner in accordance with all applicable Legal Requirements. Tenant shall not commence Tenant's Work until Landlord has been provided with insurance certificates evidencing that the contractors and subcontractors performing Tenant's Work have in full force and effect adequate worker's compensation insurance as required by the laws of the State of Illinois, public liability and builder's risk insurance in such amounts and according to terms reasonably satisfactory to Landlord. Any liability of the Landlord or of the Landlord's property for any such work or any other improvements upon the Premises by the Tenant is hereby expressly prohibited. The interest of the Landlord in and to the Premises and the Shopping Center shall not be subject to liens for improvements made in or to the Premises by Tenant or by Tenant's employees, contractors or agents.

Section 3.5      Landlord's Contribution to Tenant's Work.

(a)      So long as Tenant is not in default of any material obligations of Tenant under this Lease (the failure to pay any Annual Base Rent then due and payable being deemed to constitute a default of a material condition of Tenant under this Lease), Landlord shall pay to Tenant, as "Landlord's Contribution to Tenant's Work", Eight Hundred Seventy Five Thousand Dollars ($875,000) toward the hard and soft construction costs of Tenant's Work. Landlord shall pay Landlord's Contribution to Tenant's Work within thirty (30) days after all of the following conditions are met:

(i)      Tenant's Work shall have been substantially completed in all respects and in accordance with the provisions of this Lease, Tenant's Plans and Specifications, and applicable Legal Requirements;

(ii)      Tenant has furnished Landlord (x) an affidavit from Tenant listing all contractors and suppliers whom Tenant has contracted with in connection with Tenant's Work, together with the cost of each contract, and (y) an affidavit from Tenant's general contractor listing all subcontractors and suppliers whom the general contractor has contracted with in connection with Tenant's Work, together with the cost of each contract and the dollar amount of work each subcontractor and supplier has theretofore performed or furnished;

(iii)      Tenant shall have furnished to Landlord final unconditional lien waivers from all general contractors, subcontractors and materialmen who supplied services or material in excess of $2,000.00 in performing Tenant's Work;

(iv)      Tenant shall have opened the Premises for business as provided in this Lease;

(v)      Tenant shall have provided Landlord with copies of all necessary governmental permits, including, but not limited to, a certificate of occupancy (or its equivalent) for the operation of the Premises in accordance with this Lease, issued by the appropriate governmental entity; and

(vi)      Tenant shall have delivered to Landlord with "as built" drawings of those aspects, if any, of Tenant's Work relating to plumbing, sprinkler system, or HVAC if, and to the extent that, such "as-built" drawings are required for performance by or on behalf of Tenant of any such aspects of Tenant's Work.

(b)      If (i) Tenant is entitled to receive payment of Landlord's Contribution to Tenant's Work in accordance with, and subject to, the terms and conditions of this Section 3.5, and (ii) Landlord fails to pay to Tenant Landlord's Contribution to Tenant's Work, or any portion thereof to which Tenant is entitled, then, Tenant shall have the right, subject to the Offset Limit (as hereinafter defined), to offset against the next installments of Monthly Base Rent coming due under this Lease until the total aggregate of all such offsets, equals the amount of Landlord's

Contribution to Tenant's Work to which Tenant was entitled and which was not paid by Landlord, plus, beginning after the date on which the Landlord's Contribution to Tenant's Work is due and payable, interest at the Default Rate (as hereinafter defined) on that portion of Landlord's Contribution to Tenant's Work that remains unpaid and owing to Tenant pursuant to this Section 3.5. As used in this Lease, the "Offset Limit" means an amount equal to fifty percent (50%) of the then installment of Monthly Base Rent.

In the event Tenant has not requested payment of Landlord's Contribution to Tenant's Work within two hundred seventy (270) days of the date Tenant has opened for business, Tenant shall be deemed to have waived its right to seek payment of Landlord's Contribution to Tenant's Work.

## ARTICLE IV.
## RENT

Section 4.1    **Rent.**  Tenant agrees to pay rent, in lawful money of the United States in advance and without demand, deduction or setoff, except if, and to the extent, expressly permitted under this Lease, to the Landlord's Agent, at Landlord's Agent's Address or to such other person or at such other place as Landlord may direct by notice in writing to Tenant from time to time, on the first day of each calendar month, commencing with the Commencement Date and continuing thereafter through and including the Termination Date, an amount equal to 1/12th of the Annual Base Rent as set forth in Section 1.1.13 for such Operating Year (the "Monthly Base Rent"). If the Commencement Date is on a day prior to the first day of the first Operating Year, then, the Monthly Base Rent for such period will be prorated. As used in this Lease: (i) "Additional Rent" shall mean Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes and Tenant's Pro Rata Share of HVAC Charges; and (ii) "Rent" shall mean Monthly Base Rent, Additional Rent and all other additional rent and amounts due and payable by Tenant to Landlord under this Lease, all of which shall be deemed to be rent under this Lease.

Section 4.2    **Operating Year.**  The term "Operating Year" means a period of twelve (12) consecutive calendar months with the first Operating Year commencing on the Commencement Date, and each succeeding twelve (12)-month period thereafter which falls in whole or in part during the Term.

## ARTICLE V.
## COMMON AREAS AND OPERATING COSTS

Section 5.1    **Common Areas and Facilities.**  Landlord, at Landlord's option, may make available from time to time such areas and facilities of common benefit to the tenants and occupants of the Shopping Center as Landlord shall deem appropriate and shall at all times be subject to the exclusive control and management of the Landlord (the "Common Areas"), subject to the rights and restrictions set forth in Section 2.5. The Common Areas include any and all garage structures and parking lots and parking areas from time to time located within the Shopping Center. Landlord shall operate, manage, equip, heat, ventilate, cool, light, insure, repair and maintain the Common Areas and facilities in such manner as then customary for the operation and management of retail centers located in Chicago of a size, age and tenant-mix comparable to the Shopping Center ("Comparable Properties"). Landlord may from time to time change the size, location and nature of any Common Areas and facilities may make installations therein and move and remove such installations. Notwithstanding anything contained to the contrary in any other provision of this Lease, including, but not limited to, Exhibit C, Landlord reserves the right to increase, decrease and change the size or location of the Common Areas and/or to change the Common Areas into rentable areas, subject to the restrictions set forth in Section 2.5.

Section 5.2    **Use of Common Areas.**  Tenant and its permitted concessionaires, licensees, officers, employees, agents, customers and invitees shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has or may hereafter grant rights, to use the Common Areas as designated from time to time by Landlord, subject to the Rules and Regulations of the Webster Place Shopping Center as set forth in Exhibit I, as may be amended from time to time by Landlord and such other rules and regulations as Landlord in its reasonable discretion may from time to time establish, including, but not limited to, the designation by Landlord of specific areas in which vehicles owned by Tenant, its permitted concessionaires, licensees, officers, employees and agents must be parked. Notwithstanding anything contained in the immediately preceding sentence to the contrary, throughout the Term, Tenant's use of those Common Areas designated for parking shall be in accordance with, and subject to, the Tenant Parking Rights (as defined in Section 5.6). Tenant agrees to abide by such Rules and

12

Regulations and other regulations, and to cause its permitted concessionaires, licensees, officers, employees and agents, and to use its commercially reasonable efforts to cause its customers and invitees to conform thereto. In addition to its other rights hereunder, Landlord may at any time temporarily close any part of the Common Areas to make repairs or changes, to prevent the acquisition of public rights in such areas, to discourage non-customer parking, or for other reasonable purposes, and may do such other acts in and to the Common Areas as in its sole discretion Landlord may deem desirable, subject to the restrictions set forth in Section 2.5, and so long as any such other acts by Landlord do not materially affect the ability of Tenant to operate its business in the Premises in accordance with this Lease. Landlord shall have the right to close the Common Areas or any part thereof on such days or during such hours as Landlord shall, in its sole discretion, determine. Tenant shall, upon Landlord's request, furnish to Landlord the license numbers and description of the vehicles operated by Tenant and its permitted concessionaires, licensees, officers, employees and agents. Tenant shall not at any time interfere with the rights of the Landlord, other tenants and its and their permitted concessionaires, licensees, officers, employees, agents, customers and invitees to use any part of the Common Areas. Except for, and subject to, Tenant's Parking Rights, Landlord reserves the right to impose parking charges determined by meters or otherwise. Notwithstanding anything to the contrary, neither Landlord nor any of their respective members, managers, partners, officers, employees or agents shall have any responsibility for patrolling the Common Areas or keeping them secure.

Section 5.3     **Operating Costs.** Beginning on the Commencement Date, Tenant shall pay to Landlord, as Additional Rent hereunder, "Tenant's Pro Rata Share of Operating Costs" (as hereinafter defined). The term "Operating Costs" shall mean any and all costs and expenses of every kind and nature paid or incurred by Landlord (including appropriate reserves) in operating, managing, equipping, policing and protecting (if and to the extent provided by Landlord), insuring, servicing, lighting, repairing, replacing, cleaning and maintaining the Shopping Center (other than those facilities which Landlord is obligated to maintain at its expense pursuant to Section 9.1); all costs and expenses of security and fire protection, including, at the option of Landlord, servicing Tenant with fire extinguishers (if and to the extent such service is provided by Landlord); pedestrian and vehicular traffic direction and control; all costs and expenses of cleaning and removing of rubbish, dirt, debris, snow and ice; all costs and expenses of maintaining, planting, replanting and replacing flowers and landscaping; water and sewerage charges; premiums for liability and property damage, fire, extended coverage, malicious mischief, vandalism, sprinkler leakage, flood insurance, rent loss, wind storm, sink hole and worker's compensation, employer's liability, and any other insurance procured by Landlord in connection with the Shopping Center in such form, amounts and companies as Landlord shall, in its sole judgment; wages, unemployment taxes, social security taxes, special assessments, transportation or environmental protection taxes or levies or similar taxes or levies, and personal property taxes attributable to the Shopping Center; professional fees including, but not limited to, accounting and legal fees relating to the Shopping Center; required licenses and permits; all costs and expenses for supplies and operation of loud speakers and any other sound equipment; all costs and expenses incurred by Landlord in the testing, maintaining and repairing of sprinkler and other systems, if any, located in the Shopping Center or, at Landlord's option, in the Premises; all charges for the use and service of utility services for the Common Areas, including, but not limited to, all costs and expenses of maintaining lighting fixtures (including the cost of light bulbs and electric current); maintenance of all utility facilities not maintained by the servicing utility company; all costs, expenses, surcharges or other impositions or assessments incurred by Landlord (excluding those arising in connection with environmental protection legislation or regulations) or assessed against or imposed on the Shopping Center or any part thereof with regard or in connection with impacts on public services, facilities or infrastructure; depreciation, interest and all other costs resulting from improvements or additions imposed and required by regulatory agencies; cost of equipment, machinery and facilities not properly chargeable to capital; reasonable depreciation of equipment, machinery and facilities; rents paid for the leasing of equipment, machinery and facilities and finance charges paid for the purchase of equipment, machinery and facilities which are capital assets and are used in the operation of the Shopping Center; and a management fee (the "Management Fee") not exceeding an amount equal to five percent (5%) of the annual gross revenues of the Shopping Center from time to time; and such other costs as Landlord may reasonably determine are required for the proper operation and maintenance of the Shopping Center.

Notwithstanding the foregoing, Operating Costs shall not, however, include (i) interest and amortization on mortgages and other debt costs; (ii) improvements, repairs or alterations to spaces leased to other tenants; (iii) the cost of providing any service directly to and paid directly by, any tenant; (iv) costs of items to the extent Landlord receives reimbursement from any other tenant or from insurance proceeds or condemnation proceeds, service contracts or otherwise; (v) any duplicative charges or expenses; (vi) legal fees and commissions or other costs incurred in leasing or in disputes with other tenants, (vii) capital expenditures, as defined by generally accepted

accounting principals, except (x) costs incurred for repaving, and (y) capital expenditures made primarily to reduce Operating Costs, or to comply with future Legal Requirements, (viii) any costs of painting or decorating of any interior parts of the Shopping Center other than the Common Areas, including allowances and/or concessions furnished tenants (including Tenant) and costs and expenses (other than the cost of maintenance and repair otherwise allowable as Operating Costs) incurred in completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space for tenants (including Tenant), prospective tenants or other occupants and prospective occupants of space in the Shopping Center, or vacant, leasable space in the Shopping Center; (ix) wages, salaries, benefits and compensation paid or given to (a) executives, shareholders, officers, directors or partners of Landlord, (b) any principal or partner of the entity from time to time comprising Landlord, (c) off-site employees of the Shopping Center above the level of manager, (d) employees of any property management organization being paid a fee by Landlord for its services where such services are covered by a management fee, or (e) any employee of Landlord who is not assigned to the operation, management, maintenance or repair of the Shopping Center on a full time basis including accounting or clerical personnel; (x) rents, costs and taxes applicable to Landlord's on-site management or sales/ leasing office or spaces of Landlord or any related entity; (xi) the cost of the initial landscaping of the Shopping Center (but the installation of new landscaping after the date of this Lease or ongoing landscaping maintenance shall not be excluded); (xii) the cost of curing any violation of any Legal Requirements, which such violation is in effect on the commencement date or occurs during the Lease Term, applicable to the Shopping Center or of remediating any existing environmental condition, including the removal of, or other steps taken with respect to, asbestos located in the Shopping Center, unless such condition was caused by Tenant; (xiii) costs, fines, interest, penalties, legal fees, liens or costs of litigation incurred due to the late payments of taxes, utility bills or other costs incurred by Landlord's failure to make such payments when due; (xiv) the cost of any tap fees or one-time lump sum sewer or water connection fees for the Shopping Center payable in connection with the initial construction of the Shopping Center; (xv) costs incurred in connection with the actual or contemplated sale, financing, refinancing, mortgaging, syndicating, selling or change of ownership interest of the Shopping Center, including brokerage commissions, attorneys and accountants fees, closing costs, title insurance premiums, transfer taxes and interest charges; and (xvi) any management fees or costs in addition to the Management Fee.

Section 5.4    **Tenant's Pro Rata Share.** The term "Tenant's Pro Rata Share of Operating Costs" shall mean the product of (i) the Operating Costs for each calendar year or partial calendar year (based upon the number of days of such partial calendar year) during the Term multiplied by (ii) Tenant's Pro Rata Percentage of Operating Costs shown in Section 1.1.21(a) during such calendar year or partial calendar year.

Section 5.5    **Payment of Operating Costs.** Tenant shall pay to Landlord on account of Tenant's Pro Rata Share of Operating Costs, equal monthly installments on the first day of each calendar month during the Term, in advance, without demand or setoff, except if, and to the extent, expressly required under this Lease, in an amount reasonably estimated from time to time by Landlord to be Tenant's Pro Rata Share of Operating Costs. Notwithstanding anything contained in Section 5.3 and this Section 5.5 to the contrary, for the first Operating Year, Tenant shall not be obligated to pay any increase in Controllable Operating Costs (as hereinafter defined) which exceeds three percent (3%) of the Controllable Operating Costs for calendar year 2013; and, beginning the second Operating Year and during the balance of the Term, Tenant shall not be obligated to pay any Controllable Operating Costs with respect to any Operating Year which exceeds three percent (3%) of the Controllable Operating Costs for the immediately preceding Operating Year (the "Operating Cost Cap"). The Operating Cost Cap shall be computed on a compounded and cumulative basis throughout the Term. Accordingly, if, for any one Operating Year to the following Operating Year, the increase in Controllable Operating Costs is less than the Operating Cost Cap, then, the difference may be applied to any future increase(s) in Controllable Operating Costs from one Operating Year to the next Operating Year(s), such that the Operating Cost Cap applicable to increases in Controllable Operating Costs for future Operating Year(s) may be greater than such initial three percent (3%) Operating Cost Cap, and, further, the amount of Controllable Operating Costs that exceed such initial three percent (3%) Operating Cost Cap for an Operating Year may be included in the unused portion of the Operating Cost Cap for a future Operating Year, until such "unused portion" of the Operating Cost Cap is fully utilized. [Purely as an example, and only for purposes of illustrating the foregoing: since the initial Operating Cost Cap for Controllable Operating Costs is three percent (3%), if Tenant's obligations for Controllable Operating Costs increased by 1-1/2% from the fourth Operating Year to the fifth Operating Year, and by 5-1/2% from the fifth Operating Year to the sixth Operating Year, then, Landlord shall have the right to require Tenant to pay up to a 4-1/2% increase in Controllable Operating Expenses from the fifth Operating Lease Year to the sixth Operating Lease Year by utilizing the "unused portion" of the 3% Operating

14

Cost Cap from the fourth Operating Year to the fifth Operating Year (i.e. 1-1/2% (3% of 1-1/2% = 4-1/2%)). Any "unused portion" of the Operating Cost Cap (as adjusted to 4-1/2%) would continue to be applied against any increase in Controllable Operating Costs which exceed the initial 3% Operating Cost Cap until the entirety of such "unused portion" has been fully applied.] "Controllable Operating Costs" shall mean all Operating Costs, other than (i) costs and expenses for snow and ice removal and other weather-related costs and expenses; (ii) premiums and costs for insurance; (iii) utility costs; (iv) amortization of capital expenditures incurred to reduce Operating Costs and/or which are required under any Legal Requirements not applicable to the Shopping Center as of the Date of this Lease; (v) union labor costs; and (vi) the Management Fee. Subsequent to the end of each fiscal year, Landlord shall furnish Tenant with a statement (the "Annual Reconciliation Statement") of the actual Operating Costs paid or incurred by Landlord during such period, and there shall be an adjustment between Landlord and Tenant within thirty (30) days after delivery of such statement with payment to Landlord, or repayment or credit to Tenant (if Tenant is not in default hereunder) by Landlord, as the case may require, so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of Operating Costs for such period. The Annual Reconciliation Statement shall be considered final and binding on Tenant unless Tenant takes exception to such Annual Reconciliation Statement by written notice delivered to Landlord within one hundred twenty (120) days after Landlord provides such Annual Reconciliation Statement to Tenant, which notice from Tenant shall specify the reasons therefor. If Tenant delivers such written notice to Landlord within such one hundred twenty (120)-day period, then, Landlord shall deliver to Tenant reasonable back-up documentation regarding any item of Operating Costs referenced in such notice. If the parties are unable to resolve any dispute as to the correctness of such Annual Reconciliation Statement within thirty (30) days following such notice of objection, either party may refer the issues raised to a public accounting firm selected by Landlord and reasonably acceptable to Tenant, and the decision of such accountants shall be conclusively binding upon Landlord and Tenant. In connection therewith, Tenant and such accountants shall execute and deliver to Landlord a confidentiality agreement, in form and substance reasonably satisfactory to Landlord, whereby such parties agree not to disclose to any third party any of the information obtained in connection with such review. Tenant shall pay the fees and expenses relating to such procedure, unless such accountants determine that Landlord overstated Operating Costs in such Annual Reconciliation Statement by more than 5%, in which case Landlord shall pay such fees and expenses. Tenant acknowledges that Landlord's ability to budget and incur expenses depends on the finality of such, and Tenant accordingly agrees that time is of the essence with respect to Tenant's obligation. In no event shall the compensation to be paid to such accountants be based on a contingency. If Landlord maintains its books and records on a calendar year, or such other fiscal year as Landlord may from time to time determine, Landlord shall have the right, but not the obligation, to adjust the application of the Operating Cost Cap and the method determining the amount of Controllable Operating Costs to reflect such calendar year or other fiscal year. The covenants of this Section shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

Section 5.6    **Tenant's Parking Rights.** During the Term, and subject to the terms and conditions set forth in this Lease, Landlord shall provide to Tenant's members, patrons and customers, at no additional cost to Tenant, and so long as Tenant is operating the Premises for the Health Club Use: (i) free 4-hour non-reserved, non-exclusive parking, on a first-come, first-served basis, in the Main Garage, Shakespeare Lot and Shakespeare Garage, as such garages and lot are generally depicted on the Site Plan; and (ii) during the hours of 4:45 a.m. through 1:00 p.m., free 90-minute non-reserved, non-exclusive parking, on a first-come, first-served basis in the Main Surface Lot, as such lot is generally shown on the Site Plan. The free parking described in clauses (i) and (ii) of this Section 5.6 is referred to in this Lease as "Tenant's Parking Rights", and shall be subject to, and provided by Landlord in accordance with, Landlord's Parking Validation Program described in the Rules and Regulations contained in Exhibit I, as may be from time to time modified; provided, however, no modifications of the Rules and Regulations shall deprive Tenant of, or materially interfere with, Tenant's Parking Rights under this Section 5.6. Upon the expiration of the 4-hour period referenced above, Tenant's members, patrons and customers shall be charged, and be responsible for, the parking rates and fees from time to time charged by Landlord to the public for the use of the Main Garage, Shakespeare Lot and the Shakespeare Garage, or any of them. So long as Tenant is operating the Premises for the Health Club Use, Tenant shall have the right to allow Tenant's employees to park, on a non-reserved, non-exclusive basis, in the Shakespeare Lot and Shakespeare Garage in accordance with, and subject to, the same terms and conditions applicable to Tenant's Members, patrons and customers, including payment for such parking at the rates and fees from time to time charged by Landlord to the public; provided, however, that, so long as Tenant is operating the Premises for the Health Club Use, Tenant's employees shall not be charged for their use of the Shakespeare Lot and Shakespeare Garage during the hours such employees are working on the Premises.

15

Tenant's members, patrons and customers shall have no right to use the Main Surface Lot outside of the hours of 4:45 a.m. through 1:00 p.m., and may be subject to being towed in accordance with Legal Requirements. In the event that the parking spaces available to Tenant pursuant to this Lease is reduced by eight (8) or more parking spaces (but by less than 100) as described in Section 2.5, then, (x) Landlord and Tenant shall agree to extend the hours beyond 1:00 p.m. during which Tenant's members, patrons and customers shall have the right to use the Main Surface Lot, and (y) Tenant's members, patrons and customers shall have the non-exclusive right, without charge, to use the Main Surface Lot for a ninety (90)-minute period after 1:00 p.m. on a first-come, first-served basis. After the expiration of such ninety (90)-minute period, Tenant's members, patrons and customers shall be charged, and be responsible for, the parking rates and fees from time to time charged by Landlord to the public for the use of the Main Surface Lot. Tenant's employees shall have no right to use the Main Surface Lot, and may be subject to being towed in accordance with Legal Requirements. Landlord shall have the right to charge Tenant and Tenant shall pay to Landlord One Hundred Dollars ($100.00) per day for each car parked by any of Tenant's employees in violation of this Section 5.6.

## ARTICLE VI.
## REAL ESTATE TAXES

Section 6.1        **Real Estate Taxes.** Tenant shall pay to Landlord, as additional rent hereunder, "Tenant's Pro Rata Share of Real Estate Taxes" (as hereinafter defined) for any calendar year occurring, in whole or in part, during the Term. The term "Real Estate Taxes" means any and all real estate taxes, public, governmental and/or quasi-governmental regular and special charges, assessments, to the extent such assessments are payable in annual installments, transportation or environmental protection taxes or levies or similar tax or levy and lease taxes, attributable to the Shopping Center during the Term whether foreseen or unforeseen (less the contributions, if any, to Real Estate Taxes by any tenant which pays separately for any such charge) incurred annually by Landlord during the Term, prorated for any partial calendar year. At the time of the execution of this Lease, Real Estate Taxes in Cook County are collected in the year subsequent to the year of assessment. For purposes of this Lease, the phrases "incurred annually" or Real Estate Taxes "for" a calendar year, shall mean Real Estate Taxes accruing during any calendar year, though the same may not be due and payable or paid until a subsequent year. Real Estate Taxes shall also include, but not be limited to, all expenses, including reasonable attorneys' fees, administrative hearing and court costs incurred in contesting or negotiating the amount or rate of any such Real Estate Taxes. Landlord and Landlord's Agent shall have the exclusive right, but not the obligation, to contest or appeal any assessment of Real Estate Taxes levied on the Shopping Center. Should the state, or any political subdivision thereof or any governmental authority having jurisdiction thereover impose a tax or assessment upon or against the rentals or other charges payable to Landlord by a tenant either by way of substitution for any Real Estate Taxes or in addition thereto, or impose an income or franchise tax or any other tax in substitution for, in lieu of or in addition to any Real Estate Taxes, such taxes and assessments shall also be deemed to constitute Real Estate Taxes.

Section 6.2        **Tenant's Pro Rata Share.** The term "Tenant's Pro Rata Share of Real Estate Taxes" shall mean the sum of (i) the product derived by multiplying (x) the Real Estate Taxes for (i.e., accruing) each calendar year or partial calendar year (based upon the number of days of such partial calendar year) during the Term by (y) the First Floor Real Estate Tax Percentage shown in Section 1.1.21(b), plus (ii) the product obtained by multiplying (x) the amount, if any, by which Real Estate Taxes for each calendar year or partial calendar year (based upon the number of days of such partial calendar year), commencing the 2016 calendar year (i.e., for Real Estate Taxes accruing during calendar year 2016, and payable during calendar year 2017), exceed the Base Year Tax Amount (as hereinafter defined) by (y) the Basement Space Real Estate Tax Percentage shown in Section 1.1.21(c). As used herein, for purposes of calculating Tenant's Pro Rata Share of Real Estate Taxes with respect to the Basement Space, the "Base Year Tax Amount" shall mean the amount of Real Estate Taxes accruing during calendar year 2015 (and payable during calendar year 2016), provided, however, such amount shall be prorated on a per diem basis to reflect any partial calendar year (based on the number of days of such partial calendar year) for which Tenant's Pro Rata Share of Real Estate Taxes are payable by Tenant. The First Floor Space Real Estate Tax Percentage and the Basement Space Real Estate Tax Percentage shall be determined as of the date on which Real Estate Taxes are assessed with respect to the Shopping Center. For purposes of clarity, and the removal of doubt, Real Estate Taxes under this Lease shall be determined on an accrual basis, and not on a cash basis.

[For purposes of illustrating the method to be used in calculating Tenant's Pro Rata Share of Real Estate Taxes for each of the First Floor Space and the Basement Space: Since the Commencement Date occurs in calendar year 2015:

      (a)     Tenant's obligation to pay Tenant's Pro Rata Share of Real Estate Taxes with respect to the First Floor Space will begin in calendar year 2015 for Real Estate Taxes accruing in calendar year 2015 (payable in calendar year 2016), with such payments to be reconciled and adjusted pursuant to Section 6.3 in calendar year 2017; and

      (b)     Tenant's obligation to pay Tenant's Pro Rata Share of Real Estate Taxes with respect to the Basement Space if, and to the extent Real Estate Taxes for any Operating Year exceed the Base Year Tax Amount, will begin accruing during calendar year 2016) (for Real Estate Taxes payable in calendar year 2017), with such payments to be reconciled and adjusted pursuant to Section 6.3 in calendar year 2018].

      Section 6.3     **Payment of Real Estate Taxes.**  Beginning on the Commencement Date, Tenant shall pay to Landlord on account of Tenant's Pro Rata Share of Real Estate Taxes equal monthly installments on the first day of each calendar month in advance, without demand or setoff (except if, and to the extent, expressly permitted under this Lease) in an amount estimated from time to time by Landlord to be Tenant's Pro Rata Share of Real Estate Taxes. When the actual figures for such Real Estate Taxes are known, Landlord shall furnish Tenant with a statement reconciling Tenant's actual Pro Rata Share of Real Estate Taxes; any over or under payment of Tenant's Pro Rata Share of Real Estate Taxes shall be adjusted and paid or credited by Landlord to Tenant (so long as Tenant is not in default of any of Tenant's obligations under this Lease beyond the applicable cure period) or paid to Landlord by Tenant, as applicable, to the other, within thirty (30) days after delivery of such statement so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of Real Estate Taxes for such period. Tenant shall also be responsible for and shall pay all lease taxes or similar taxes levied on the business of Tenant in the Premises levied or assessed by any governmental entity having jurisdiction over the Premises. The covenants of this Section shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

### ARTICLE VII.
### INDEMNITY

      Section 7.1     **Tenant's Indemnity.**  Tenant shall defend (with counsel reasonably satisfactory to Landlord), indemnify and save Landlord, the Owner's Entities (as hereinafter defined) harmless from all liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) with respect of any injury to, or death of, any person, or damage, theft or destruction of any property, occurring on or about the Premises occasioned by any act or omission of Tenant, Tenant's agents, employees, contractors, sublessees, concessionaires, or licensees, or any other person or entity claiming by, through or under Tenant. The foregoing covenants shall survive the expiration or termination of this Lease.

      Section 7.2     **Landlord's Indemnity.**  Landlord shall defend (with counsel reasonably satisfactory to Tenant), indemnify and save Tenant harmless from all liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) with respect of any injury to, or death of, any person, or damage, theft or destruction of any property, whether or not occurring on or about the Premises or any other part of the Shopping Center occasioned by any act or omission of Landlord, Landlord's agents, employees, or contractors or any other person or entity claiming by, through or under Landlord. The foregoing covenants shall survive the expiration or termination of this Lease.

### ARTICLE VIII.
### UTILITY SERVICES AND HEATING, VENTILATING AND AIR CONDITIONING

      Section 8.1     **Utilities.**  Tenant, at Tenant's sole cost and expense, shall be solely responsible for and shall promptly pay all charges for use or consumption of sewer, water, gas, electricity or any other utility services to the Premises if, and to the extent that, any of the foregoing are separately metered or sub-metered to the Premises. The cost or expense with respect to any sewer, water, gas, electricity or any other utility services that are not

separately metered or sub-metered to the Premises or to any other tenant space in the Shopping Center shall be included in Operating Costs. Interruption or impairment of any such utility or related service, caused or necessitated by repairs, improvements, or other causes beyond Landlord's direct control, shall not give rise to any right or cause of action by Tenant against Landlord in damages or otherwise. Landlord shall not be liable for, and, except as hereinafter provided, Tenant shall not be entitled to, an abatement of rent in the event of any interruption in the supply of any utility or related service, and the same shall not be construed as an actual or constructive eviction of Tenant. However, other than by casualty, which is covered elsewhere in this Lease, if any utility service furnished by Landlord under this Lease is interrupted for more than seventy two (72) consecutive hours because of the negligent act of Landlord, and Tenant is unable to conduct its business in the Premises and elects to closes its store, then Base Rent and Additional Rent shall abate, on a daily basis, until such service is restored. Tenant agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's sole cost and expense in accordance with all applicable Legal Requirements, laws, regulations and ordinances and in accordance with plans and specifications to be approved in writing in advance by Landlord.

Section 8.2       **Heating, Ventilating and Air Conditioning.**  For the payment of Tenant's Pro Rata Share of HVAC Charges, Landlord shall provide heat and air conditioning to the Premises from 5:00 a.m. to 11:00 p.m., Mondays through Fridays, and from 7:00 a.m. to 9:00 p.m., Saturdays, Sundays, and holidays. Holidays (as hereinafter defined). If Tenant requires heat or air conditioning beyond the hours set forth herein, Tenant shall give Landlord two (2) days advance notice of the hours such service will be used and shall pay Landlord the cost of operating the Shopping Center's system at rates established by Landlord from time to time.

Section 8.3       **Heating, Ventilating, and Air Conditioning Charges.**  Beginning on the Commencement Date, Tenant shall pay to Landlord, as additional Rent under this Lease, "Tenant's Pro Rata Share of HVAC Charges" (as hereinafter defined). The term of "HVAC Charges" means all of Landlord's costs incurred or paid to provide heating, ventilating and air conditioning for the areas of the Shopping Center other than the Common Areas (such areas shall include all of the shops, but exclude the movie theatre) including, without limitation, the cost of electricity, gas and water, the cost of Landlord's maintenance contract (if any), and maintenance and replacement of any of the equipment which provides the heating, ventilation and/or air conditioning to the Shopping Center. Any capital expenditures, as defined by generally accepted accounting principles, comprising HVAC Charges shall be amortized over the useful life of the subject capital item, in accordance with generally accepted accounting principles. HVAC Charges shall not include the cost for a project in which the entire heating, ventilating and air conditioning system in the Shopping Center of such cost is replaced. Any HVAC Charges billed directly to tenants by the servicing utility company based upon tenants' usage shall not be included in HVAC Charges.

Section 8.4       **Tenant's Pro Rata Share.**  "Tenant's Pro Rata Share of HVAC Charges" shall mean the product of (i) HVAC Charges for each calendar year or partial calendar year (based on the number of days of such partial calendar year) during the Term multiplied by (ii) Tenant's HVAC Percentage shown in Sections 1.1.21(d).

Section 8.5       **Payment of HVAC Charges.**  Beginning on the Commencement Date, Tenant shall pay to Landlord on account of Tenant's Pro Rata Share of HVAC Charges equal monthly installments on the first day of each calendar month in advance, without demand or setoff (except if, and to the extent, expressly permitted under this Lease), in an amount estimated from time to time by Landlord to be Tenant's Pro Rata Share of HVAC Charges. Notwithstanding anything contained in Section 8.3 and this Section 8.5 to the contrary, for the first Operating Year, Tenant shall not be obligated to pay any increase in Controllable HVAC Charges (as hereinafter defined) which exceeds three percent (3%) of the Controllable HVAC Charges for calendar year 2013; and, beginning the second Operating Year and during the balance of the Term, Tenant shall not be obligated to pay any increase in Controllable HVAC Charges with respect to any Operating Year which exceeds three percent (3%) of the Controllable HVAC Charges for the immediately preceding Operating Year (the "HVAC Charge Cap"). The HVAC Charge Cap shall be computed on a compounded and cumulative basis throughout the Term. Accordingly, if, for any one Operating Year to the following Operating Year, the increase in Controllable HVAC Charges is less than the HVAC Charge Cap, then, the difference may be applied to any future increase(s) from one Operating Year to the next Operating Year(s) such that the HVAC Charge Cap applicable to increases in Controllable HVAC Charges for future Operating Year(s) may be greater than such initial three percent (3%) HVAC Charge Cap, and, further, the amount of Controllable HVAC Charges that exceed such initial three percent (3%) HVAC Charge Cap

LP 5142039.7\28730-98464

for an Operating Year may be included in the unused portion of the HVAC Charge Cap for a future Operating Year, until such "unused portion" of the HVAC Charge Cap is fully utilized. [Purely as an example, and only for purposes, of illustrating the foregoing: since the HVAC Charge Cap for Controllable HVAC Charges is three percent (3%), if Tenant's obligations for Controllable HVAC Charges increased by 1-1/2% from the fourth Operating Year to the fifth Operating Year, and by 5-1/2% from the fifth Operating Year to the sixth Operating Year, then, Landlord shall have the right to require Tenant to pay up to a 4-1/2% increase in Controllable HVAC Charges from the fifth Operating Lease Year to the sixth Operating Lease Year by utilizing the "unused portion" of the 3% Operating Cost Cap from the fourth Operating Year to the fifth Operating Year (i.e. 1-1/2% (3% + 1-1/2% = 4-1/2%) Any "unused portion" of the HVAC Charge Cap (as adjusted to 4-1/2% would continue to be applied against any increase in Controllable HVAC Charges which exceed the initial 3% HVAC Charge Cap until the entirety of such "unused portion" has been fully applied]. "Controllable HVAC Charges" shall mean all HVAC Charges, other than (i) utility costs incurred by Landlord to provide heat, ventilation and air conditioning to the Shopping Center; and (ii) the amortization of capital expenditures incurred to reduce HVAC Charges and/or which are required under any Legal Requirements not applicable to the Shopping Center as of the Date of this Lease. After the end of each calendar year Landlord uses for such purpose, Landlord shall furnish Tenant with a statement of the actual HVAC Charges paid or incurred by Landlord during such period, and there shall be an adjustment between Landlord and Tenant within thirty (30) days after delivery of such statement with payment to, or repayment by (if Tenant is not in default hereunder) Landlord, as the case may require, so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of HVAC Charges for such period. If Landlord maintains its books and records on a calendar year, or other fiscal year as Landlord may from time to time determine, Landlord shall have the right, but not the obligation, to adjust the application of the HVAC Charge Cap and the method determining the amount of Controllable HVAC Charges" to reflect such calendar year or other fiscal year. The covenants of this Section shall survive the expiration or termination of this Lease due to lapse of time or otherwise.

## ARTICLE IX.
## LANDLORD'S COVENANTS

Section 9.1    **Repairs by Landlord.**  Except for the repairs, alterations, additions or replacements required in Section 10.1.7 to be performed by Tenant, Landlord covenants at its expense to keep the foundations, bearing walls, concealed plumbing serving more than the Premises, concealed wiring serving the Premises (but excluding any wiring installed by Tenant), the exterior of the Premises and roof of the Premises, and the structural soundness of exterior walls thereof (including the structural elements, if any, of Tenant's storefront, but, in all events excluding glass, plate glass and doors), in good order, repair and condition, unless any such work is required because of damage caused by any act, omission or negligence of Tenant, any employees, agents, invitees, guests, concessionaires, licensees, sublessees or contractors of Tenant or any of their respective employees. agents, invitees, guests, concessionaires, licensees or contractors, or any person or entity claiming by, through or under Tenant, in which event, Landlord shall make such repair and be reimbursed by Tenant for such repair, as additional Rent. Landlord shall not be required to commence any such repair until a reasonable time after Landlord receives written notice from Tenant that the same is necessary, which notice shall specifically reference the required repair. The provisions of this Section 9.1 shall not apply in the case of damage or destruction by fire or other casualty or a taking under the power of eminent domain, in which event the obligations of Landlord shall be controlled by Article XI. If Landlord's failure to perform Landlord's obligations under this Section 9.1 results in an imminent threat to the safety of persons or property, Tenant shall have the right, after giving Landlord reasonable prior notice of such condition (which notice may be verbal to Landlord or to Landlord's property manager, if any), to take reasonable measures to remediate such condition. Landlord shall reimburse Tenant for the reasonable cost expended by Tenant to remediate such condition within thirty (30) days from the date on which Tenant delivers to Landlord copies of paid invoices and statements, lien waivers, cancelled checks and such other evidence of such costs reasonably requested by Landlord. Except as otherwise provided in this Section 9.1, Landlord shall not be obligated to make repairs, replacements or improvements of any kind within the Premises, or any equipment facilities or fixtures contained therein or which exclusively serve the Premises, which shall be the sole responsibility of Tenant as provided in this Lease.

Section 9.2    **Quiet Enjoyment.**  Landlord covenants and agrees that so long as no Event of Default has occurred, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject to the terms and conditions of this Lease and

LP 3142039.7\28730-98464

to any mortgages, trust deeds, ground or underlying leases, agreements and encumbrances to which this Lease is or may be subordinated.

Section 9.3    **Environmental Condition of Shopping Center and Premises.** Landlord represents and warrants to Tenant that as of the date of the Lease, Landlord has not received any notice that the Shopping Center is in violation of any Hazardous Materials Laws (as hereinafter defined). "Hazardous Materials Laws" as used herein means the Comprehensive Environmental Response, Compensation and Liability Act, any so-called "Superfund" or "Superlien" law, the Toxic Substances Control Act, and every other federal, state, or local statute, law, ordinance, code, rule, regulation, order, or decree regulating, relating to, or imposing liability or standards of conduct concerning any Hazardous Materials, as now or at any time hereafter in effect.

Section 9.4    Tenant's Exclusive.

9.4.1    Subject to the terms and conditions set forth in this Section 9.4, Landlord covenants and agrees that, during the Term, and so long as, and provided that, Tenant is operating within substantially the entirety of the Premises for the Permitted Health Club Use, Landlord shall not lease, assign, license, sell, rent or permit any space in the Shopping Center to be occupied for (i) the operation of a health club for adults; (ii) the providing of physical, occupational or massage therapy; (iii) weight and aerobic training; or (iv) racquet sports (collectively, "Tenant's Exclusive Uses"). In no event shall Tenant's Exclusive Uses include, nor shall Landlord be precluded from leasing, assigning, licensing, renting or permitting any space in the Shopping Center to be used or occupied for, the operation of an office or other facility that offers physical or occupational therapy by a medical doctor. The terms of this Section 9.4.1 shall also not apply to: (x) any tenant, subtenant or other occupant of the Shopping Center operating under a lease, sublease or license agreement which is dated prior to the Date of this Lease and listed on Exhibit M (a "Pre-Existing Lease"); (y) any renewals or extensions of the term of any Pre-Existing Lease; or (z) any successors, assignees or sublessees of any tenant under any Pre-Existing Lease.

9.4.2    If: (i) the terms of Section 9.4.1 shall be violated by Landlord; (ii) Tenant shall then be operating within substantially the entirety of the Premises for the Health Club Use; and (iii) Tenant shall not then be in default (beyond any applicable cure period) of any material provisions of this Lease, then, and only then, Tenant shall have the right to exercise any and all equitable remedies available to Tenant for Landlord's violation of Section 9.4.1 including the right to seek injunctive relief, and, during the period in which the terms of Section 9.4.1 have been violated by Landlord, the amount due and payable by Tenant as and for Monthly Base Rent shall be reduced by fifty percent (50%) during the period in which such violation continues, which reduction shall not exceed twelve (12) months of Monthly Base Rent. If the circumstances and conditions described in clauses (i), (ii) and (iii) continue for more than twelve (12) consecutive months, then, so long as Tenant shall not then be in default (beyond any applicable cure period) of any material provisions of this Lease (a default arising out of Tenant's failure to pay any Monthly Base Rent then being due and payable being deemed to constitute a default of a material provision of this Lease for purposes of this Section 9.4.2), Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination pursuant to this Section 9.4.2 within thirty (30) days immediately following the end of such twelve (12)-consecutive month period. If this Lease is not terminated by Tenant in accordance with the immediately preceding sentence, then, (x) Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this Section 9.4.2, (y) Tenant shall have no right to terminate this Lease as a result of the subject violating by Landlord of the terms of Section 9.4.1, and (z) Tenant's obligation to pay full Monthly Base Rent shall be reinstated as of the day immediately following the end of such twelve (12)-consecutive month period.

9.4.3    The provisions of Section 9.4.1 shall automatically terminate and be of no further force and affect (i) if any action or proceeding is commenced against Landlord for an alleged anti-trust or other unfair trade violation arising as a result of the provisions of Section 9.4.1; or (ii) any court of law has entered into a preliminary or final injunction or order voiding or nullifying the provisions of Section 9.4.1.

9.4.4    Anything to the contrary contained in Section 9.4.1 notwithstanding, Tenant shall have no remedy for a violation of Section 9.4.1 if: (i) a tenant, subtenant or occupant of the Shopping Center violates a provision of its lease, sublease or license agreement (as the case may be) regarding its premises, which either does not permit or specifically prohibits the operation of such premises for the Tenant's Exclusive Uses; (ii) Landlord provides notice of the lease, other sublease or license agreement (as the case may be) violation to such other tenant or occupant; and (iii) Landlord commences an action (or arbitration, if required by such lease or license agreement) against such other

20

tenant, subtenant or other occupant (as the case may be), and, thereafter, uses diligent and good faith efforts to enforce its rights under such lease, sublease or license agreement (as the case may be) and to obtain Judicial Relief. For purposes of this Section 9.4.4, "Judicial Relief" shall mean a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the violation of Section 9.4.1; provided, however, Landlord shall not be required to appeal any adverse decision denying Judicial Relief.

## ARTICLE X.
## TENANT'S ADDITIONAL COVENANTS

Section 10.1    Affirmative Covenants. Tenant covenants and agrees at its sole cost and expense at all times during the Term, such further time as Tenant occupies the Premises or any part thereof and such further time as indicated below:

10.1.1    To promptly perform all of the obligations of Tenant set forth in this Lease and to pay when due the Annual Base Rent, Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and any and all other Rent which by the terms of this Lease are to be paid by Tenant. All Rent and other charges to be paid by Tenant under this Lease shall be paid to Landlord without any setoffs or counterclaims whatsoever (except if, and to the extent, expressly permitted under this Lease). The foregoing covenant shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

10.1.2    To occupy and use the Premises only for Tenant's Use described in Section 1.1.16, and for no other uses or purposes; subject to Force Majeure (as hereinafter defined) or any fire or other casualty of remodeling of the Premises for a reasonable duration, to continuously operate its business in the Premises for Tenant's Use described in Section 1.1.16 under Tenant's Trade Name or another trade name as may be adopted by Tenant from time-to-time so long as such changed trade name is not offensive and is consistent with the operation of the Shopping Center in accordance with the operation of Comparable Properties; and to conduct its business at all times in a first class and reputable manner. Tenant shall give Landlord at least ninety (90) days prior written notice (the "Change of Use Notice") if Tenant intends to change the use of the Premises to any use constituting Other Permitted Retail Uses. "Other Permitted Retail Uses" shall mean any retail uses permitted by applicable Legal Requirements, and which (i) do not violate any restrictions recorded against title to the Property, or any portion thereof; (ii) do not violate any Existing Exclusives (as hereinafter defined) exclusive or Future Exclusive Rights (as defined in Section 10.2.4) existing as of the date Landlord receives the subject change of Use Notice; (iii) do not compete with any primary business or use being conducted by another tenant of the Shopping Center as of the date Landlord receives the subject Change of Use Notice; (iv) are not for any of the uses or purposes designated as "Prohibited Uses" on Exhibit L; and (v) are consistent and in accordance with retail businesses conducted in Comparable Properties. For purposes of this Section 10.1.2, a business of another tenant in the Shopping Center shall be deemed to be a "primary business" of such other tenant if, at least fifteen percent (15%) of the square footage of the space leased occupied by such other tenant is used for such business.

10.1.3    Intentionally omitted.

10.1.4    Subject to Force Majeure or any fire or other casualty, to initially open for business no later than the date (the "Required Opening Date") that is one-hundred twenty (120) days after the Commencement Date, and to continuously operate at all times during the Term in accordance with Section 10.1.2.

10.1.5    To conform to all rules and regulations which Landlord may reasonably make in the management and operation of the Shopping Center (a copy of the current rules and regulations are attached hereto and made a part hereof as Exhibit I), and require such conformance by Tenant's employees, agents, contractors, guests, invitees, permitted sublessees, concessionaires and licensees or any person or entity claiming by, through or under Tenant; provided, however (i) Landlord shall enforce any such rules and regulations against Tenant in a non-discriminatory manner with respect to other similarly situated tenants, and (ii) no future rules or regulations shall materially interfere with the right of Tenant to operate its business in the Premises in accordance with this Lease; to receive and deliver goods and merchandise only in the manner and at such times and in such areas as may be designated by Landlord; to keep all drains inside the Premises clean; and to store all trash and garbage in adequate containers

within the Premises which Tenant shall maintain in a neat and clean condition so as not to be visible to members of the public shopping in the Shopping Center, and so as not to create any health or fire hazard. Tenant shall not burn any trash or garbage at any time in or about the Shopping Center. Tenant shall attend to the daily disposal thereof in dumpsters provided by Landlord at the Shopping Center, and in the manner designated by Landlord. Landlord shall provide services and facilities for trash pickup, the cost of which shall be included as an Operating Cost. If the Premises are permitted to be used for the sale of food, Tenant shall maintain any and all grease traps in good condition and repair.

10.1.6    Except for repairs required in Section 9.1 to be performed by Landlord, to keep the Premises, including, but not limited to, all entrances, vestibules, partitions, windows and window frames, moldings, glass doors, lighting, HVAC equipment, which are located in the Premises or otherwise exclusively serve the Premises or any portion thereof, fixtures and equipment, fire extinguishers, any security screen, non-structural wall and/or the door and door frames of Tenant's storefront (the installation of which shall be subject to Landlord's approval) and fixtures and displays (including show windows and signs) clean, neat and safe, and in good order, repair and condition (including all necessary replacement, painting and decorating), and to keep all glass, including that in windows, doors, store fronts, fixtures and skylights, clean, neat and safe and in good order, repair and condition, and to promptly replace glass which may be damaged or broken with glass of the same quality, damage by fire or other casualty covered by Landlord's insurance or any work required because of damage caused by any act, omission or negligence of Landlord or Landlord's employees, agents or contractors excepted. If, in an emergency, it shall become necessary to promptly make any repairs or replacements required to be made by Tenant, pursuant to this Section 10.1.6 or Section 10.1.7, Landlord may enter the Premises and proceed to make such repairs or replacements and pay the cost thereof. In the case of emergency, Landlord shall attempt to give notice to Tenant of such repairs or replacements by Tenant (which notice may be verbal) as is reasonable under the circumstances. Tenant shall reimburse Landlord for the cost of any such repairs or replacements within thirty (30) days after Landlord renders a bill to Tenant, which bill shall be accompanied by copies of paid invoice and statements, lien waivers, cancelled checks and such other evidence of such costs reasonably requested by Tenant.

10.1.7    To make all repairs, alterations, additions or replacements to the Premises and all mechanical, electrical and plumbing systems located within and serving only, the Premises, or which were installed by Tenant, in accordance with Legal Requirements first enacted or applicable to the Premises subsequent to the Date of this Lease, or fire underwriters or underwriters' fire prevention engineers and to keep the Premises equipped with all safety appliances specifically required because of Tenant's Use; to procure any licenses and permits required for Tenant's Use; and to comply with all Legal Requirements directly related to, or governing the operation of, Tenant's business, and the reasonable recommendations and requirements of Landlord's insurance carriers and their underwriters.

10.1.8    To promptly pay when due the entire cost of any work in the Premises undertaken by Tenant, including, without limitation, Tenant's Work, so that the Premises shall at all times be free of liens for labor and materials; to procure all necessary permits before undertaking such work; to do all work in a first class, good and workmanlike manner employing new materials of good quality; if Landlord determines, in Landlord's sole discretion, that there is possible union or labor strife or potential protest due to the use of non-union labor, then, Tenant upon notice from Landlord, shall be required to have all work completed only by licensed union contractors previously approved in writing by Landlord; to comply with all governmental requirements, and to defend (with counsel reasonably satisfactory to Landlord), indemnify and save Landlord, Landlord's Agent, and any Mortgagee and their respective members, managers, partners, officers, directors, shareholders, employees and agents (collectively and individually, "Owner's Entities") harmless and indemnified from all liability, injury, loss, cost, damage and expense (including but not limited to, reasonable attorneys' fees and expenses) in respect of injury to, or death of, any person, or damage to, or loss or destruction of, any property occasioned by or growing out of such work. Tenant shall not commence any work, alterations or improvements in the Premises which affects or may affect the structure, structural elements or any mechanical systems or equipment of any building in the Shopping Center or which requires the issuance of a building or other permit or license under applicable Legal Requirements, until Tenant has delivered to Landlord evidence of builder's risk insurance in amount, form and issued by a company reasonably satisfactory to Landlord. Landlord's contractor shall perform such supervision. Tenant shall make such revisions to the work requested by Landlord's contractor, and Landlord nor Landlord's contractor shall be liable for the adequacy or completeness of Tenant's plans or any of such work. The foregoing covenants shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

22

10.1.9    To maintain in responsible companies approved by Landlord, public liability insurance on the Premises during the Term of this Lease, insuring Tenant as well as Landlord and its agents providing property management or advisory services to the Shopping Center as designated by Landlord, including Landlord's Agent (collectively, "Property Managers") and any Landlord's Mortgagee as additional named insureds thereunder, from and against all claims, demands or actions for injury to or death of one or more persons in an amount of not less than $2,000,000 per occurrence and for damage to property with a deductible of no more than $1,000 and in an amount not less than $500,000 made by or on behalf of any persons, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises and the businesses of all of Tenant's sublessees, concessionaires and licensees (Landlord shall have the right to direct Tenant to increase such amounts whenever Landlord considers them inadequate) and, in addition, and in like amounts, covering Tenant's contractual liability under the hold harmless provisions contained in this Section 10.1.9; to carry like coverage against loss or damage by boiler or compressor or internal explosion of boilers or compressors, if there is a boiler or compressor in or serving the Premises; to maintain plate glass insurance covering all plate glass in the Premises; to maintain all-risk insurance including but not limited to, fire, vandalism and malicious mischief, water and sewer backup or leakage, and sprinkler leakage, extended coverage, covering all of Tenants equipment, stock-in-trade, trade and other fixtures, furniture, furnishings, floor coverings and all other items of personal property of Tenant located on or within the Premises to the extent of one hundred percent (100%) of their replacement cost naming Landlord, the Property Managers, and Landlord's Mortgagee as additional named insureds; and, at any time that any portion of the Premises is being used for the sale, display, distribution or serving of alcoholic liquors (within the meaning of the Illinois Liquor Control Act, as or hereinafter amended) to maintain, at least ten (10) days before the commencement of any such activity and continuously thereafter, liquor liability insurance in form and substance and with insurers satisfactory to Landlord, with total limits of liability for bodily injury, loss of means of support and property damage because of each occurrence of not less than Three Million Dollars ($3,000,000.00), or such greater amounts as Landlord may designate. Such liquor liability insurance shall insure Landlord, Landlord's Agent, and any and all other Owner's Entities against any and all liability by virtue of the Illinois Liquor Control Act, any amendments or supplements thereto, or any kindred legislation concerning the use, sale or giving away of alcoholic liquors. During any time that the required liquor liability insurance is for any reason not in force, then, during all and any such times, no sale, merchandising, transfer, giving away, or exchange of so called "alcoholic liquors" shall be made by Tenant in, upon or from any part of the Premises. Tenant shall procure and maintain, at its expense, business interruption or extra expense insurance with coverage limits not less than those carried by a reasonably prudent tenant subject to Landlord's approval and naming Landlord, and Landlord's Mortgagee as additional named insureds but in no event less than the applicable Annual Base Rent. All insurance to be procured and maintained by Tenant pursuant to this Section 10.1.9 shall: (i) be in a form, and carried with responsible companies with a general policy rating of "A" or better and a financial class of VII or better assigned by A.M Best Company, Inc. authorized to do business in the state in which the Premises are located, each satisfactory to Landlord and its Mortgagee; (ii) provide that any release from liability or waiver of claim for recovery entered into in writing by the insured or any additional insured prior to any loss or damage shall not affect the validity of such policy or the right of any insured or additional insured to recover thereunder; (iii) contain a waiver of subrogation clause in form and content satisfactory to Landlord; (iv) provide that it will not be subject to cancellation, non-renewal, reduction or other change except after at least thirty (30) days' prior written notice to Landlord; and (v) name Landlord, the Property Managers and Landlord's Mortgagee as additional named insureds thereunder. The policies or duly executed certificates for the same (which shall evidence the insurer's waiver of subrogation) together with satisfactory evidence of the payment of the premium thereon, shall be deposited with Landlord on or before the Commencement Date and, upon renewals or replacements of such policies, not less than thirty (30) days prior to expiration of the term of such coverage. If Tenant fails to comply with such requirements, Landlord may (but shall have no obligation to) obtain such insurance and keep the same in effect, and Tenant shall pay Landlord as additional Rent due hereunder the premium cost thereof upon demand.

10.1.10    That Landlord and the other Owner's Entities shall not be liable for, and Tenant shall not be entitled to an abatement of rent in respect of, and, to the extent permissible by state law, Tenant waives all claims for damage to Tenant's property sustained by Tenant or any person or entity claiming by, through or under Tenant resulting from any accident or occurrence in or upon the Premises or the building of which they shall be a part, or any other part of the Shopping Center, including, but not limited to: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep such building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating, ventilating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, railings, elevators, escalators or

23

walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the discharge from any automatic sprinkler system; (h) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises or the building of which the Premises are a part; (i) the escape of steam or hot water; (j) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building or the Premises, or otherwise; (k) the falling of any fixture, plaster or stucco; and (l) any act, omission or negligence of Landlord, its beneficiaries or any of their authorized agents or employees, other tenants in the Shopping Center or of other persons or occupants of such buildings or of adjoining or contiguous buildings or of owners of adjacent or contiguous property.

10.1.11  To permit Landlord, Landlord's Agent, any other Owner's Entities designated by Landlord and Landlord's Mortgagees. to enter the Premises at reasonable times (except; in case of an emergency, at any time) for the purpose of inspecting the Premises, or making repairs, additions or alterations thereto or to the building in which the Premises are located, and of showing the Premises to (i) prospective purchasers, lenders and other persons having a legitimate interest in inspecting the Premises, and, during the last twelve (12) months of the Term, to prospective tenants. The provisions of this Section 10.1.11 shall not be construed to impose any obligation upon Landlord for the maintenance, repair or alteration of the Premises, Common Areas or Shopping Center except as otherwise set forth in this Lease. In the event Tenant requests that Landlord perform services after regular business hours, Tenant shall be deemed to have agreed to pay all overtime charges in connection therewith.

10.1.12  To remove, at Tenant's sole cost and expense, at the expiration or termination of this Lease due to the lapse of time or otherwise. all of Tenant's goods and effects as are not permanently affixed to the Premises: to remove Tenant's signage; to remove all of the alterations and additions made by Tenant as Landlord may request; to repair any damage caused by such removals: to deliver all keys for and all combinations on all locks. safes and vaults in the Premises to Landlord; and to peaceably yield up the Premises and all alterations and additions thereto (except such as Landlord has requested Tenant to remove) and all permanently affixed decorations (excluding Tenant's trade fixtures), affixed partitions, heating, ventilating and cooling equipment, and other equipment and floor coverings, all of which are permanently affixed to the Premises, which shall thereupon become the property of Landlord without any payment to Tenant, in clean and good order, repair and condition. damage by fire or other casualty and reasonable wear and tear excepted. Any personal property or trade fixtures of Tenant not removed within ten (10) days following such expiration or termination shall, at Landlord's option. become the property of Landlord without payment to Tenant. Tenant waives all rights to notice and all common law and statutory claims and causes of action against Landlord subsequent to such ten (10)-day period. The foregoing covenants shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

10.1.13  To remain fully obligated under this Lease notwithstanding any assignment or sublease or any indulgence granted by Landlord to Tenant, Tenant's assignee, sublessee or guarantor of Tenant's rights hereunder.

10.1.14  To give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge.

10.1.15  Intentionally Omitted.

10.1.16  To install, maintain and keep in good repair at Tenant's sole cost and expense and, except as otherwise provided in this Section 10.1.16, in accordance with the Sign Criteria (attached as Exhibit G) as amended by Landlord from time to time, all signs bearing Tenant's Trade Name on the Premises, signs visible from outside of the Premises, and Tenant's sign panels on the Shopping Center monument and pylon signs referred to in this Section 10.1.16. Landlord approves the size and style concepts on the sign rendering attached as Exhibit H, provided, however, that the specific details (e.g. illumination and method for attachment) for Tenant's building signage shall be subject to Landlord's approval, which approval Landlord shall not unreasonably withhold. Tenant shall have the right to install signage that is not in accordance with the Sign Criteria, as amended by Landlord from time to time, so long as such signage complies with Legal Requirements, and Landlord gives Tenant written approval of such signage, which approval shall not be unreasonably withheld or delayed. Upon the expiration or termination of this Lease due to lapse of time or otherwise, Tenant shall remove Tenant's signs and any other sign permitted by Landlord and Tenant shall repair any damage to the building or Shopping Center caused thereby. Prior to the Commencement Date, Landlord, subject to all signage codes and ordinances and other applicable Legal Requirements, shall (i) either replace or renovate the existing parking sign near the garage entrance on Webster

24

Avenue, and (ii) replace or renovate the existing monument sign at the Clybourn Avenue entrance of the Shopping Center. Tenant shall have the right, subject to signage codes and ordinances and all other applicable Legal Requirements (but shall not be obligated) to have (1) identification panel on each of such signs. Tenant shall reimburse Landlord, as additional Rent, for fifty percent (50%) of the costs incurred by Landlord to replace or renovate such existing signs; provided, however, Tenant shall not be obligated to reimburse Landlord for such costs if,, immediately prior to such replacement or renovation, Tenant does not have an identification panel on the sign which is being replaced or renovated. Tenant shall pay such reimbursement to Landlord within thirty (30) days from the date Landlord delivers to Tenant reasonable evidence of the costs so incurred by Landlord. In the event that Landlord erects a monument or pylon sign in addition to the existing pylon sign at the Clybourn entrance of the Shopping Center, or if Landlord replaces such existing pylon sign with a pylon or other sign that provides for more tenant signage space or panels than such existing pylon sign, then, Tenant shall be allowed, during the term of this Lease, to maintain one sign panel on such additional monument or pylon sign, or such replacement of the existing pylon sign, as the case may be. The exact size and location of such panel shall be determined by Landlord in Landlord's sole discretion. Tenant shall only be allowed to advertise the trade name of its business as identified in Section 1.1.6 herein on its sign panel. Upon Landlord's receipt and approval of Tenant's "copy" for the sign panel, Landlord shall be responsible for installing the sign panel on the pylon sign. Landlord shall thereafter be responsible the ongoing maintenance and repair of said panel, subject to reimbursement as Operating Costs as provided in Section 5.3.

10.1.17  Tenant acknowledges that Tenant has elected not to install soundproofing between the Premises and adjoining space in the Shopping Center. Tenant covenants to keep and operate the Premises, and all equipment located in the Premises: (i) free of vibration which may be transmitted beyond the Premises; and (ii) free of any sounds at a level exceeding 80 decibels (dBs) provided; however, if, at any time, Landlord notifies Tenant of complaints about the intrusion of vibration or sound or noise emanating or transferring from the Premises exceeding 60 decibels from other tenants in the Shopping Center then, Tenant shall either immediately cease all activities generating any such vibration, sound or noise, or, at Tenant's sole cost and expense, install or otherwise utilize in the Premises such insulation, sound isolation or sound attenuation applications as necessary to absorb any such objectionable vibrations or noise, and to prevent such objectionable vibrations or sound or noise at a level exceeding 60 decibels (dBs) from being emanated or transferred from the Premises. In addition, Tenant acknowledges that loud music or other loud noises may emanate from adjoining space into the Premises, and Landlord shall have no liability to Tenant because of same.

Section 10.2    **Negative Covenants.** Tenant covenants and agrees at all times during the Term and such further time as Tenant occupies the Premises or any part thereof:

10.2.1  Not to injure, overload, deface, or otherwise harm the Premises or the Shopping Center; nor commit any nuisance; nor unreasonably annoy owners or occupants of neighboring property; nor use the Premises for any extra-hazardous purpose or in any manner that will suspend, void or make inoperative or increase the cost of any policy of insurance maintained by Landlord on the Shopping Center; nor burn any trash or refuse within the Shopping Center; nor sell, display, distribute or give away any alcoholic liquor or beverages (provided, however, if the Premises is being operated for the Health Club Use, then, Tenant shall have the right to sell, display, distribute or give away alcoholic liquor or beverages to patrons of the health club facility if, and so long as, (i) Tenant maintains liquor liability insurance in accordance with and as required by, Section 10.1.9, and (ii) the sale or distribution of alcoholic liquor or beverages does not violate any Existing Exclusives); nor permit or cause odors to emanate or be dispelled from the Premises; nor solicit business in the Common Areas nor distribute advertising material to, in or upon any Common Areas; nor sell, distribute or give away any product or service which tends to create a nuisance in the Common Areas; nor make any use of the Premises which is improper, offensive or contrary to any Legal Requirements nor conduct or permit any liquidation, going-out-of-business, bankruptcy, fire, or auction sales in the Premises; nor use any advertising medium such as handbills, flashing lights, searchlights, signs, loud-speakers, phonographs, sound amplifiers or audio video receiving equipment in a manner to be seen or heard outside of the Premises other than Tenant's sign approved by Landlord; nor load, unload or park any truck or other delivery vehicle in any area of the Shopping Center other than the area designated therefore by Landlord; nor use any vestibule or entry of the Premises, sidewalks, walkways or Common Areas of the Shopping Center for the storage or disposal of trash or refuse or the keeping or displaying of any merchandise or other object, including, but, not limited to, the use of any of the foregoing for any newsstand, cigar stand, sidewalk shop or any business occupation or undertaking (such uses of such areas being reserved to Landlord and its designees); nor operate any heating or

25

cooling devices, other than the HVAC system in place at the commencement of this Lease; nor place any fence, structure, barricade, building, improvement, division rail or obstruction of any type or kind on any part of the Common Areas; nor use the courts and walks for any purpose other than pedestrian traffic; nor install or use any sign or other advertising device on the exterior of the Premises other as approved by Landlord in writing; nor use or permit the use of any portion of the Premises as living quarters, sleeping apartments or lodging rooms; nor do or permit waste or a nuisance upon the Premises nor any act tending to injure the reputation of the Shopping Center. If Tenant does any act or uses the Premises in such a manner as will increase the cost of any policy of insurance maintained by Landlord on the Shopping Center, then, without prejudice to any other remedy available to Landlord hereunder or at law or in equity for such breach, Landlord shall have the right to require Tenant to pay as additional Rent hereunder the amount by which the premiums for such insurance are increased as a result of such use.

10.2.2    Except for Interior Alterations (as hereinafter defined), not to make any alterations or additions in the Premises nor permit the making of any holes in the walls, partitions, ceilings, or floors; nor place any load on any floor in the Shopping Center or Premises which exceeds the floor load per square foot which such floor was designed to carry; nor permit any roof penetrations or alterations to the heating, ventilating or air conditioning system or the sprinkler system; nor install any electrical equipment which overloads the electrical panel to the Premises; nor permit the painting or placing of any exterior signs, placards or other advertising media, awnings, aerials, antennas, or the like, without on each occasion obtaining the prior written consent of Landlord, which consent shall depend in part upon Landlord's review and approval by Landlord of plans and specifications which are deemed necessary or appropriate by Landlord, and on each occasion complying with all applicable statutes, ordinances, regulations, codes and Landlord's sign and design criteria.  If Landlord consents to any roof penetration or alterations to the heating, ventilating or air conditioning system or the sprinkler system, Tenant shall cause such penetration or alterations to the heating, ventilating or air conditioning system or the sprinkler system to be made under and pursuant to the supervision of Landlord's roofing contractor or HVAC or sprinkler system contractor, as applicable, at Tenant's sole cost and expense.  As used in this Section 10.2.2, "Interior Alterations" means any alterations or additions which (i) do not affect the structure, structural elements or any mechanical systems or equipment of any building in the Shopping Center, and (ii) are not visible from the Common Areas, and (iii) the cost of such alterations or additions, in any one project, does not exceed $100,000.  Tenant shall give prior written notice to Landlord of any proposed alterations or additions referenced in clauses (i) or (ii) of this Section 10.2.2.

10.2.3    Except as otherwise provided in this Section 10.2.3, not to assign, sell, mortgage, pledge, hypothecate or in any manner transfer or encumber this Lease or any interest therein by operation of law or otherwise, and not to assign this Lease or sublet the Premises or any part or parts thereof, or permit occupancy by anyone with, through or under it without the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold or delay.  In connection with its review of a proposed sublease or assignment, Tenant shall provide Landlord with a copy of the proposed sublease or assignment (as applicable) agreement and financial information from the proposed subtenant or assignee (as applicable) acceptable to Landlord.  In granting or denying any such consent, Landlord shall not be deemed to have unreasonably withheld its consent should Landlord take into consideration the following non-exhaustive list of factors: (i) the business reputation, financial condition, and/or creditworthiness of the proposed transferee, subtenant or assignee; (ii) any required alteration of the Premises; (iii) the intended use of the Premises by the proposed transferee, subtenant or assignee (which use shall be limited to the Health Club Use or other Permitted Retail Uses); and (iv) any other reasonable factors which Landlord shall deem relevant with respect to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting.  Tenant shall pay to Landlord all of Landlord's costs which are incurred in reviewing Tenant's request for such consent, including, but not limited to, Landlord's attorneys' fees and expenses.  If Tenant requests Landlord's consent to an assignment of the Lease or to a sublease of all or a portion of the Premises, Landlord may, at Landlord's sole and exclusive discretion, in lieu of granting such consent or reasonably withholding the same, require that Tenant cause the proposed assignee or sublessee to enter into a direct lease with Landlord on the proposed terms of the assignment or sublease (as the case may be).  Effective on the effective date of said direct lease with the proposed assignee or sublessee, this Lease shall terminate as to that portion of the Premises which is the subject of such direct lease.  If, as a consequence thereof, this Lease terminates only as to a part of the Premises, the Annual Base Rent and Additional Rent for the remaining Operating Years or portions thereof shall be adjusted based upon the square footage of the part subleased.  If this Lease is assigned, or if the Premises or any part thereof are sublet or occupied by anyone other than Tenant, Landlord may collect any and all rent and other charges from the assignee, subtenant or occupant and apply the net amount collected to the rent and other charges due hereunder, but no such collection shall be deemed a waiver of the covenant herein against

assignment and subletting, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the complete performance by Tenant of the terms, covenants and conditions of this Lease. Notwithstanding anything contained in this Lease to the contrary, no transfer, assignment or subletting, inclusive of a Permitted Transfer (as hereinafter defined), whether or not consented to by Landlord, shall: (x) relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal and not as a guarantor or surety, to the same extent as though no transfer, assignment or sublease had been made, or (y) relieve Guarantor of its obligations under the Guaranty (as hereinafter defined).

Notwithstanding anything to the contrary contained in this Section 10.2.3, Tenant shall have the right, at any time during the Term without the consent of Landlord to:

        (I)    assign this Lease or sublet the Premises to: (1) any subsidiary, parent or affiliated corporation of Tenant; (2) any entity resulting from the reorganization, merger or consolidation affecting Tenant; or (3) any person, firm or corporation acquiring substantially all of Tenant' stock or assets;

        (II)    assign this Lease or sublet the entirety of the Premises to an affiliated entity or third party who intends to operate the Premises as a health club facility; or

        (III)    sublease up to 5,000 square feet of the Premises, provided that Tenant's right to sublease up to such square footage pursuant to this clause (III) shall be subject to the following requirements:

            (A)    if the subleased space is to be separately demised from the balance of the Premises, such separate demise is performed and maintained in accordance with Legal Requirements, and

            (B)    the use of the subleased space by the sublessee is related to the operation of Tenant's business in the balance of the Premises for the Health Club Use.

Any transfer under clauses (I), (II) or (III) above shall be referred to as "Permitted Transfer" and, in the event of a Permitted Transfer, Tenant shall promptly notify Landlord of such assignment or subletting (as the case may be), and provide Landlord with copies of the applicable transfer documents.

    10.2.4   Not to operate or use, or permit or suffer to be operated or used, all or any part of the Premises for any of the uses or purposes designated as "Prohibited Uses" on Exhibit L, or any other use or purpose other than Tenant's Use permitted hereunder nor any other use or purpose which is inconsistent with the image and standard of quality of the Shopping Center, it being mutually acknowledged that the Shopping Center is to be operated as a first class shopping center. Tenant agrees that Tenant shall not violate: (i) any exclusive rights which have been granted to other tenants of the Shopping Center as of the Date of this Lease (the "Existing Exclusives"), which Existing Exclusives are so designated on Exhibit L, or (ii) any future exclusive rights granted to other tenants of the Shopping Center ("Future Exclusive Rights") provided that, and so long as, Tenant is given written notice of such Future Exclusive Rights; provided, however, no Future Exclusive Rights shall restrict Tenant from operating the Premises for the Health Club Use.

    10.2.5   Not to suffer any mechanics', laborers' or materialmen's liens to be filed against the Premises or the Shopping Center or any interest therein by reason of any work, labor, services performed at, or materials furnished to, or claimed to have been performed at, or furnished to, the Premises, by, or at the direction or sufferance of, Tenant, or anyone holding the Premises or any portion thereof, through or under the Tenant; provided, however, that if any such liens shall, at any time, be filed or claimed, Tenant shall have the right to contest, in good faith and with reasonable diligence, any and all such liens, provided security reasonably satisfactory to Landlord is deposited with Landlord to insure payment thereof, together with all interest and other costs associated therewith, and to prevent any sale, foreclosure or forfeiture of the Premises or the Shopping Center by reason of nonpayment thereof. On final determination of the lien or claim for lien, Tenant shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released of record and any judgment satisfied. If Tenant shall fail

27

to contest the same with due diligence (having provided security to Landlord as herein provided) or shall fail to cause such lien to be discharged within thirty (30) days after being notified of the filing thereof and, in any case, before judgment of sale, foreclosure or forfeiture thereunder, then, in addition to any other remedy available to Landlord hereunder or at law or in equity, Landlord may, at its option, discharge the same by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Landlord, and the amount so paid by Landlord and all costs and expenses, including, but not limited to, reasonable attorneys' fees, expenses and court costs, incurred by Landlord in procuring the discharge of such lien or judgment shall be deemed to be additional rent and, together with the interest thereon at the Default Rate, as hereinafter defined, shall be due and payable by Tenant on demand by Landlord. Nothing in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under any jurisdiction in which the Premises are located.

10.2.6    Not to locate any fixtures, equipment, inventory, signs, placards or any other kind of advertising material in the Common Areas nor outside of the store front or store windows in the areas, if any, of the Premises between such front or windows and the border line between the Premises and the Common Areas.

10.2.7    Other than customary window displays installed in compliance with the Sign Criteria (attached as Exhibit G), as may be amended by Landlord, and Section 10.1.16 and otherwise consistent with the character and standards of the Shopping Center, not to affix, maintain or locate (1) upon the glass panes or supports of any window (or within less than twenty-four [24] inches of any window), (2) upon doors or any exterior walls including the rear of the Premises, or (3) within twenty-four (24) inches of the lease line where the Premises shall have an open or glass front, any merchandise, inventory, fixtures, equipment, signs, advertising placards, names, insignias, trademarks, descriptive material or any other such like item or items, except all such items as shall have first been approved in writing by Landlord as to size, type, color, location, copy, nature and display qualities. No signs or items shall materially obstruct the view of Tenant's store from the outside. All signs, placards or other advertising material permitted hereunder shall be professionally prepared and shall not be handwritten. Tenant shall not affix any sign to the roof or exterior of the Premises without Landlord's prior written consent, provided that Tenant shall, at its expense, cause to be prepared and installed a sign, subject to Landlord's approval, in the space provided on the front of the Premises in accordance with the Sign Criteria attached (as Exhibit G), and in accordance with, and subject to, Section 10.1.16, as Sign Criteria may be amended by Landlord from time to time. Notwithstanding anything contained in this Section 10.2.7 to the contrary, Landlord shall not require that Tenant's signage comply with the Sign Criteria, as may be amended by Landlord, so long as (i) such signage complies with Legal Requirements and the other requirements set forth in this Section 10.2.7, and (ii) Landlord gives Tenant written approval of such signage, such approval not to be unreasonably withheld or delayed. Landlord may, without notice, and without any liability, enter the Premises and remove any items installed or maintained by Tenant in violation of Section 10.2.6 and this Section 10.2.7.

## ARTICLE XI.
## DAMAGE OR TAKING AND RESTORATION

Section 11.1        Fire, Explosion or Other Casualty.

11.1.1    Except as otherwise provided in Section 11.1.2, in the event the Premises are damaged by fire, explosion or other cause or casualty to an extent which is less than fifty percent (50%) of the cost of replacement of the Premises, the damage shall be repaired by Landlord at Landlord's expense within ninety (90) days after Landlord receives notice of the occurrence of such casualty, provided that such ninety (90) day period shall be extended so long as Landlord continues to diligently prosecute the completion of such repairs. Notwithstanding anything contained in this Section 11.1.1, Landlord shall not be obligated to perform any such repair if the cost for such repair exceeds the greater of (i) One Hundred Thousand Dollars ($100,000), and (ii) the amount of the insurance proceeds (other than proceeds paid with respect to loss of rents or income) recovered and available to Landlord for such purpose. If the cost for such repair exceeds the greater of (i) One Hundred Thousand Dollars ($100,000), and (ii) the amount of the insurance proceeds recovered and available to Landlord, and Landlord elects not to repair such damage, then, Landlord shall give Tenant written notice within thirty (30) days from the occurrence of such damage that Landlord will not repair such damage, and this Lease shall terminate thirty (30) days from the giving of such written notice by Landlord. If the cost of such repair is One Hundred Thousand Dollars ($100,000) or less, and this Lease is not terminated pursuant to Section 11.1.12 or Section 11.1.13, then, Landlord

28

shall repair such damage. In no event shall Landlord be required to repair or replace Tenant's stock-in-trade, fixtures, furniture, furnishings, floor coverings, equipment and all other improvements to the Premises.

11.1.2    In the event of any such damage and (i) Landlord is not required to repair as hereinabove provided, or (ii) the Premises shall be damaged to the extent of fifty percent (50%) or more of the cost of replacement or (iii) the building of which the Premises are a part is damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, or (iv) the buildings (taken in the aggregate) in the Shopping Center shall be damaged to the extent of more than twenty-five percent (25%) of the aggregate cost of replacement, Landlord may elect either to repair or to rebuild the Premises or the building or buildings, or to terminate this Lease upon giving notice of such election in writing to the Tenant within ninety (90) days after the occurrence of the event causing such damage. If Landlord elects to terminate this Lease, such termination shall be effective thirty (30) days after such notice and, subject to Section 11.1.3, Tenant shall pay any and all rent and other charges due hereunder up to the date of such damage with an appropriate refund by Landlord of such rent or other charges as may have been paid in advance for any period subsequent to the date of such damage.

11.1.3    Anything contained in this Lease to the contrary, in the event that (i) twenty-five percent (25%) or more of the Premises are damaged by fire, explosion or other casualty; (ii) as a result of such damage, Tenant is unable to reasonably operate its business in the Premises in the manner of operation immediately prior to the occurrence of the destruction and damage; and (iii) the Premises cannot be repaired or restored within three hundred sixty-five (365) days following the occurrence of such damage or destruction as reasonably determined by Landlord in a written notice (the "Repair Estimation Notice") which Landlord shall provide to Tenant within sixty (60) days following the occurrence, then, Tenant shall have the right to cancel and terminate this Lease as of the date of the occurrence of such destruction or damage by delivery of written notice thereof to Landlord within thirty (30) days after the date on which Landlord gave Tenant the Repair Estimation Notice.

11.1.4    Notwithstanding anything to the contrary contained in this Lease, if the casualty, repairing or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Annual Base Rent, and payments with respect to Operating Costs; Real Estate Taxes and HVAC Charges for the applicable Operating Year(s) shall be allowed from the date when the damage occurred until the date that is the earlier of (i) the date that is one hundred twenty (120) days from the date on which Landlord substantially completes the work in the Premises pursuant to this Section and (ii) the date on which Tenant reopens for business in any portion of the Premises, such proportion to be computed on the basis of the relation which the gross square foot area of the space rendered untenantable bears to the floor area of the Premises. If Landlord is required or elects to repair the Premises as provided herein, Tenant shall repair or replace its stock-in-trade, fixtures, furniture, furnishings, floor coverings and equipment and, if Tenant has closed, Tenant shall promptly reopen for business upon Landlord's completion of its repair of the Premises.

11.1.5    Except as provided in Section 11.1.4, Tenant waives any right to cancel or terminate this Lease as a result of damage to the Premises because of fire or other casualty pursuant to any presently existing statute, any statute that may be enacted in the future, or any other law.

Section 11.2    Eminent Domain.

11.2.1    If the whole of the Premises shall be taken by any public authority by the exercise, or under the threat of the exercise, of the power of eminent domain, this Lease shall terminate as of the day the right to possession shall be taken by such public authority and Tenant shall pay any and all rent and other charges due hereunder up to such date with an appropriate refund by Landlord of such rent as may have been paid in advance for any period subsequent to the date the right to possession is taken.

11.2.2    If less than all of the floor area of the Premises shall be so taken, the Term shall cease only on the parts so taken as of the day the right to possession shall be taken by such public authority, and Tenant shall pay any and all rent and other charges due hereunder up to such day with appropriate refund by Landlord of such rent as may have been paid in advance on the portion of the floor area so taken for any period subsequent to the date the right to possession is taken and thereafter the Annual Base Rent and any and all other charges due hereunder for the remaining Operating Years, or portions thereof, shall be equitably adjusted, based upon the square footage of the Premises remaining. Landlord shall, at its expense, make all necessary repairs or alterations to the basic building

and exterior work so as to constitute the remaining Premises a complete architectural unit within ninety (90) days after the day the right to possession is taken (such period to be automatically extended so long as Landlord continues to diligently prosecute such repairs and alterations), provided that Landlord shall not be obligated to undertake any such repairs and alterations. If the cost thereof exceeds the award received by Landlord and is available for such purpose, Tenant and a separate award leaves space no longer suitable for Tenant's Use, then this Lease shall terminate as of the day the right to possession is taken and Tenant shall pay any and all rent and other charges due hereunder up to such day with an appropriate refund by Landlord of such rent as may have been paid in advance for any period subsequent to such day.

11.2.3    If more than twenty-five percent (25%) of the floor area of the building in which the Premises are located, or more than twenty-five percent (25%) of the aggregate floor area of all the buildings in the Shopping Center shall be taken by the exercise, or under the threat of the exercise, of the power of eminent domain, Landlord may, by notice in writing to Tenant delivered on or before the day of surrendering the right to possession to the public authority, terminate this Lease and any and all rent and other charges due hereunder shall be paid up to the date of termination.

11.2.4    All compensation awarded for any taking under the power of eminent domain, whether for the whole or a part of the Premises shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or to the fee of the Premises or otherwise and Tenant hereby assigns to Landlord all of the Tenant's right, title and interest in and to any and all such compensation; provided, Tenant may seek a separate award in a separate action for Tenant's personal property, moving expenses and lost business, and Landlord will cooperate with Tenant with regard thereto, so long as no such award is based upon a diminution of Tenant's leasehold interest hereunder and no such award will reduce the amount of any award which would otherwise be receivable by Landlord. Tenant agrees to execute such instruments of assignment as may be required by Landlord, to join with Landlord in any petition for the recovery of damages, if requested by Landlord, and to turn over to Landlord any such damages that may be recovered in any such proceeding.

Section 11.3    Election to Terminate. Following a casualty to or condemnation of any part of the Premises, if Landlord is required or elects to repair the Premises as herein provided, and such repairs are not substantially complete within the ninety (90) day periods described in Sections 11.1.1 or 11.2.2 (as extended as provided therein) then, Tenant may elect to terminate this Lease as of the end of such applicable period; such election shall be exercised, if at all, by giving written notice to Landlord within thirty (30) days after the end of the applicable period.

## ARTICLE XII.
## DEFAULT AND REMEDIES

Section 12.1    Defaults by Tenant. Subject to notice and cure as specified in this Section 12.1, Landlord may, at its option, exercise any of the remedies for breach of this Lease provided herein or provided at law, in equity or by statute, if any of the following events ("Event of Default") occurs:

(a)    Tenant fails to pay any and all Annual Base Rent or any other charges or payments provided to be made hereunder within ten (10) days after written notice of same;

(b)    Tenant fails to initially open for business within sixty (60) days from the Required Operating Date, or, after opening for business, Tenant fails to remain open for business as provided in Subsection 10.1.4;

(c)    Tenant fails to immediately cure any hazardous condition which Tenant has created in violation of any Legal Requirements, or in breach of this Lease, after Tenant receives written notice thereof or, earlier, after Tenant has actual knowledge thereof;

(d)    Tenant does not pay within ten (10) days after written demand any other liability to Landlord arising out of, or in connection with, any obligation of Tenant to Landlord relating to the Shopping Center;

30

(e)      Except as otherwise specified in this Section 12.1, Tenant fails to perform in a complete manner any other term, covenant or condition of Tenant in this Lease and unless it is expressly provided in this Lease that a specified act or omission by Tenant constitutes a default hereunder without notice from Landlord, such failure continues for thirty (30) days after written notice thereof (or if such default is of the nature that it cannot be cured within thirty (30) days, then an Event of Default shall not occur if Tenant commences efforts to cure the default promptly after receipt of written notice thereof, and continues to diligently to prosecute all action necessary to cure such default within a reasonable time, not to exceed ninety (90) days after the notice of default);

(f)      a receiver or similar officer becomes entitled to Tenant's interest in this leasehold;

(g)      Tenant's interest in this Lease is taken by execution or other process of law in any action against Tenant;

(h)      Tenant's interest in Premises are levied upon by any revenue officer or similar officer;

(i)      Tenant does, or permits to be done, any act which creates a mechanic's lien or claim against the Premises or the land or building of which the Premises are a part and Tenant does not promptly comply with the provisions hereunder with respect thereto;

(j)      Tenant fails to procure or maintain the insurance required pursuant to Section 10.1.9, and such failure is not cured within five (5) days after written notice thereof; or

(k)      Tenant has submitted any intentionally fraudulent report required to be furnished hereunder or breaches any representation or warranty made hereunder.

Section 12.2      **Termination Upon Default.**  Upon the occurrence of any Event of Default, Landlord may, in addition to all other rights and remedies it may have, terminate this Lease by giving written notice to Tenant. Either before or after such termination of this Lease, Landlord may reenter the Premises, with or without process of law, using such force as may be necessary, to remove all persons, fixtures and chattels therefrom and at Landlord's option to store the same at Tenant's expense.  Tenant shall pay to Landlord on demand, as damages and not as a penalty, the sum of (1) any and all rents and other charges due and payable by Tenant as of the date of termination, plus (2) the unamortized cost to Landlord, computed in accordance with generally accepted accounting principles, of improvements to the Premises, if any, provided by Landlord at its expense or otherwise paid for by Landlord, plus (3) a sum of money equal to the then present value, using an annual discount rate of three percent (3%) of (i) the Annual Base Rent, Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and all other charges provided herein to be paid by Tenant to Landlord for the remainder of the Term, less (ii) the fair rental value of the Premises for said period (net of the cost of reletting the Premises), plus (4) the cost of performing any other covenants to be performed by Tenant for the remainder of the Term, plus (5) any other damages sustained by Landlord due to any Event of Default, including, but not limited to, reasonable attorneys' fees and court costs.  Nothing contained herein shall limit or prejudice the right of Landlord to prove and obtain as damages, by reason of such Event of Default, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount referred to above.  The rights and remedies of Landlord under this Article XII, shall survive the termination of this Lease.

Section 12.3      **Repossession Upon Default.**  Upon the occurrence of any Event of Default, Landlord may repossess the Premises by forcible entry, detainer suit or otherwise, without demand or notice of any kind to Tenant (except as otherwise expressly provided for) and without terminating this Lease, in which event Landlord may from time to time, but shall be under no obligation to, relet all or any part of the Premises for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Premises for a term greater or lesser than that remaining under the Term, the right to relet the Premises as a part of a larger area, and the right to change the character or use of the Premises).  For the purpose of such reletting, Landlord may decorate and make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient.  Whether or not the Premises or any part are relet, Tenant shall pay to Landlord on demand any and all rents and other charges payable by Tenant as of the date Landlord repossesses the Premises.  Tenant shall be liable for and shall pay from

31

time to time upon demand from Landlord the difference between (1) the Annual Base Rent, Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and all other charges provided herein to be paid by Tenant for the remainder of the Term and (2) the net avails of any reletting, if any, during the Term and Tenant agrees that Landlord need not wait until the termination of this Lease to recover any sums falling due under the terms of this section. If the Premises are relet, Tenant shall pay to Landlord, upon demand, any cost or expense incurred by Landlord in such reletting including, but not limited to, any and all expenses for decorations, repairs, changes, alterations, additions, broker's commissions and reasonable attorneys' fees. In no event, however, shall Landlord be under any obligation to relet the Premises for any purpose, nor shall Landlord be liable for any failure to relet, failure to collect rent or giving rental or other concessions to any new tenant. No such re-entry by Landlord shall constitute an election to terminate this Lease unless and until Landlord gives Tenant written notice of Landlord's election to terminate nor shall it relieve Tenant of its obligations under this Lease, all of which shall survive such repossession.

Section 12.4    **Duty to Mitigate.** Landlord and Tenant shall each use commercially reasonable efforts to mitigate any damages resulting from a default of the other party under this Lease. Landlord's obligation to mitigate damages after a default by Tenant under this Lease shall be satisfied in full if Landlord undertakes to lease the Premises to another tenant (a "Substitute Tenant") in accordance with the following criteria:

(i)    Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant;

(ii)    Landlord shall not be obligated to offer the Premises to a prospective tenant when other premises in the Shopping Center which, in Landlord's sole discretion, is suitable for that prospective tenant's use are (or soon will be) available;

(iii)    Landlord shall not be obligated to lease the Premises to a Substitute Tenant for a rent less than the then current fair market rent prevailing for similar retail uses in Comparable Properties, nor shall Landlord be obligated to enter into a lease under other terms and conditions which are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Shopping Center;

(iv)    Landlord shall not be obligated to enter into a lease with any proposed tenant whose use would: (A) disrupt the tenant mix or balance of the Shopping Center; (B) violate any restriction, covenant or requirement contained in the lease of another tenant of the Shopping Center; (C) adversely affect the reputation of the Shopping Center; or (D) be incompatible with the operation of the Shopping Center in a manner consistent with the operation of Comparable Properties;

(v)    Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant that does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first-class manner;

(vi)    Landlord shall not be required to expend any amount of money to alter, remodel or otherwise make the Premises suitable for use by a proposed Substitute Tenant unless: (x) Tenant pays any such sum to Landlord in advance of Landlord's execution of a lease with the Substitute Tenant (which payment shall not be in lieu of any damages or other sums to which Landlord may be entitled as a result of Tenant's default under this Lease), or (y) Landlord, in Landlord's sole discretion, determines that any such expenditure is financially justified in connection with entering into a lease with the Substitute Tenant; and

(vii)    Upon compliance with the above criteria respecting the reletting of the Premises after an Event of Default by Tenant, Landlord shall be deemed to have fully satisfied Landlord's obligation to mitigate damages under this Lease and under any law or judicial ruling in effect on the date of this Lease or at the time of Tenant's default.

Section 12.5    **Bankruptcy Default.** If Tenant or any guarantor of this Lease shall become bankrupt or insolvent or unable to pay its debts as such become due, or shall file any debtor proceedings, or if Tenant or any guarantor shall take or shall have taken against either party, in any court, pursuant to any statute either of the United

States or of any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or any such guarantor's property, which petition is not dismissed within thirty (30) days, or if Tenant or any such guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, then the occurrence of any one of such events shall constitute an Event of Default and Landlord may exercise any of the remedies for an Event of Default provided herein or provided at law, in equity or by statute and, in addition thereto, Landlord shall have the immediate right of reentry and may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

Section 12.6    **Interest and Late Charge on Late Payment.** If, on more than one occasion in any twelve (12)-month period, Rent or other charges to be paid hereunder by Tenant which shall not be paid within ten (10) days from the date due shall bear interest at the lesser or: (i) the maximum rate then permitted under applicable state law, or, (ii) the greater of the Corporate Base Rate as announced from time to time by JP Morgan Chase (or a similar institution designated by Landlord) at the time of the Event of Default plus five percent (5%) or the rate of eighteen percent (18%) per annum, from the date when the same is due and payable under the terms of this Lease until the same shall be paid (the "Default Rate"). In addition, if on more than one occasion in any twelve (12)-month period, Tenant fails to pay Rent or any other charge within ten (10) days from the date when due, Tenant shall pay Landlord, as additional Rent, a late payment service charge covering administrative and overhead expenses equal to the greater of (i) Five Hundred Dollars ($500) or (ii) three percent (3%) of the overdue amount. Tenant shall pay a Twenty-Five Dollar ($25) charge for any checks written to Landlord and returned for insufficient funds.

Section 12.7    **Holdover by Tenant.** Any holding over by Tenant of the Premises after the expiration of the Term or termination of this Lease shall operate and be construed to be a tenancy from month-to-month only, at a rental rate equal to 150% of the Monthly Base Rent and any and all other charges payable hereunder at the expiration of the Term or termination of this Lease. If Tenant holds over after a written demand by Landlord for possession at the expiration of the Term or after termination of this Lease by either party of a month-to-month tenancy created pursuant to this Section, or after termination of the Lease or of Tenant's right to possession pursuant to Section 12.3 or Section 12.5, Tenant shall pay monthly rent at a rate equal to 150% of the Monthly Base Rent payable immediately prior to the expiration or other termination of this Lease or Tenant's right to possession. In addition, Tenant shall remain liable for any other charges payable hereunder. Nothing in this Section shall be construed to give Tenant the right to hold over after the expiration or termination of this Lease, and Landlord may exercise any and all remedies at law or in equity to recover possession of the Premises.

Section 12.8    **Landlord's Right to Cure Defaults.** Landlord may, but shall not be obligated to, at any time, following ten (10) days written notice with right to cure (excluding for emergency situations in which case Landlord shall have the right to take all reasonable measures, as determined by Landlord, to cure any such emergency situation), cure any default by Tenant under this Lease, and whenever Landlord so elects, all costs and expenses paid by Landlord in curing such default, including, without limitation, reasonable attorneys' fees and expenses, shall be so much additional rent immediately due and payable upon demand, together with interest (except in the case of attorneys' fees) at the Default Rate.

Section 12.9    **Effect of Waiver of Default; Valuation Laws.** No consent or waiver, expressed or implied, by Landlord to or of any breach of any term, covenant or condition of this Lease shall be construed as a consent or waiver to or of any other breach of the same or any other term, covenant or condition. No payment by Tenant nor receipt from Landlord of a lesser amount than the rent or other charges due hereunder shall be deemed to be other than on account of the earliest unpaid rent or other charges due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord shall accept such check for payment without prejudice to Landlord's right to recover the balance of such rent or other charge or pursue any other remedy available to Landlord. Any recovery under this Article XII shall be without relief from any valuation and appraisement laws now or hereafter enacted.

Section 12.10    **Remedies Cumulative.** No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and

every power and remedy given by this Lease to Landlord may be exercised from time to time and so often as occasion may arise or as may be deemed expedient by Landlord.

Section 12.11    **Costs of Collection.**    In the event of litigation between the parties, the non-prevailing party shall, on demand, pay or reimburse the other party for the payment of the prevailing party's expenses, including, but not limited to, reasonable attorneys' fees, expenses and administrative hearing and court costs, in both the trial and any and all appellate proceedings, incurred either directly or indirectly in enforcing any obligation under this Lease, in connection with appearing, defending or otherwise participating in any action or proceeding, arising from the filing, imposition, contesting, discharging or satisfaction of any lien or claim for lien, in defending or otherwise participating in any legal proceedings initiated by or on behalf of the non-prevailing party where the prevailing party is not adjudicated to be in default under this Lease.   The covenants of this Section 12.11 shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

Section 12.12    **Security Deposit.**  To secure the prompt and faithful performance by Tenant of each and every term, covenant and condition to be performed or observed by Tenant hereunder, including, but without limitation, such terms, covenants and conditions in this Lease which become applicable upon the termination of this Lease or Tenant's right to possession of the Premises, Tenant, prior to the Delivery Date, shall deposit with Landlord or Landlord's Agent, as a security deposit (the "Security Deposit") either (i) a cash deposit in the sum set forth in Section 1.1.18 with Landlord or Landlord's Agent as a security deposit, or (ii) a letter of credit in the amount of the sum set forth in Section 1.1.18 and in accordance with the applicable requirements of this Section 12.12 and Section 12.12.1. Notwithstanding anything contained in this Lease to the contrary, Landlord shall have no obligation to deliver the Premises to Tenant unless and until Tenant deposits the Security Deposit with Landlord or Landlord's Agent. Any Security Deposit (including, as applicable, in the form of a letter of credit as provided in Section 12.12.1 hereunder) required hereunder shall be subject to the following terms and conditions:

(a)    that such Security Deposit or any part or portion thereof not previously applied, or, from time to time, such one or more parts or portions thereof, may be applied to the curing of any default that may then exist, without prejudice to any other remedy or remedies which the Landlord may have on account thereof, and, upon such application, Tenant shall pay Landlord on demand the amount so applied which shall be added to the Security Deposit so the same may be restored to its original amount (or, in the case of a letter of credit, shall cause the issuing bank to increase the amount of the letter of credit to the Security Deposit amount);

(b)    that should the Premises or Shopping Center be conveyed by Landlord, the deposit (or letter of credit, as applicable) or any portion thereof not previously applied shall be turned over or credited to Landlord's grantee without interest and Tenant shall be provided with written notice and confirmation of the transfer signed by Landlord and Landlord's grantee, and if the same be turned over or credited to Landlord's grantee, after the provision of written notice of the transfer and confirmation of the transfer signed by Landlord and Landlord's grantee, Tenant hereby releases Landlord from any and all liability with respect to the Security Deposit and/or its application or return, and the Tenant agrees to look to such grantee for such application or return;

(c)    that Tenant shall look exclusively to Landlord or its successors pursuant to Section 12.12(b) hereof for return of the Security Deposit upon the expiration of this Lease;

(d)    that Landlord or its successors shall not be obligated to hold the Security Deposit (if in the form of cash) in a separate fund without any interest thereon, and Landlord may commingle the same with Landlord's other funds;

(e)    subject to Section 12.12(h), that if Tenant shall faithfully fulfill, keep, perform and observe all of Tenant's obligations, covenants, conditions and agreements hereunder, the Security Deposit, or the part or portion thereof not previously applied, shall be returned by Landlord to the Tenant without interest no later than thirty (30) days after the later of (i) the expiration of the Term, or any renewal or extension thereof or (ii) the final adjustment of Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and other charges and expenses which Tenant is obligated to pay pursuant to the terms of this Lease, provided Tenant has vacated

34

the Premises and surrendered possession thereof to the Landlord at the expiration of the Term or any extension or renewal thereof as provided herein;

(f)       that Landlord, on behalf of itself and its successors, reserves the right, at its sole option, to return to Tenant the Security Deposit or what may then remain thereof, at any time prior to the date when Landlord, or its successors, is obligated hereunder to return the same, but such return shall not in any manner be deemed to be a waiver of any default by the Tenant hereunder then existing nor to limit or extinguish any liability of Tenant hereunder;

(g)       that if Tenant shall fail to faithfully fulfill, keep, perform or observe any of Tenant's obligations, covenants, conditions or agreements hereunder, Landlord shall have the right, but not the obligation, to apply the Security Deposit or any portion thereof, to cure such failure (but Landlord's rights shall not be limited to the Security Deposit); and

(h)       notwithstanding anything to the contrary contained in this Section 12.12, provided that no Event of Default (i) then exists under this Lease, and (ii) there has not been more than two (2) Events of Default by Tenant in the payment of Base Rent hereunder for which Landlord has provided written notice of default, in the previous twelve (12)-month period, even if such Events of Default have been cured, then, on each Reduction Date (as hereinafter defined), the Security Deposit (either the remaining cash deposit or the letter of credit, as applicable), shall be reduced by Two Hundred Thousand Dollars ($200,000). As used herein, a Reduction Date shall mean: (i) the last day of the 18th full calendar month of the Term, (ii) the last day of the 30th full calendar month of the Term, (iii) the last day of the 42nd full calendar month of the Term, and (iv) the last day of the 54th full calendar month of the Term so that, immediately following the last day of the 54th calendar month of the Term, and so long as the foregoing conditions for the reduction of the Security Deposit have been satisfied, the entire Security Deposit shall equal, and be no less than, Two Hundred Thousand Dollars ($200,000). Provided that no Event of Default then exists under this Lease, and there has not been more than two (2) Events of Default by Tenant in the payment of Base Rent for which Landlord has provided written notice of default, in the previous twelve (12)-month period, (even if such Events of Default has been cured), then, on the date immediately following the tenth (10th) Operating Year, Landlord shall release to Tenant the entire Security Deposit (either the remaining cash deposit or the letter of credit, as applicable) or any then remaining amount with respect to the Security Deposit.

The Security Deposit may not be used as Rent.

12.12.2  **Letter of Credit.** Notwithstanding anything set forth to the contrary in this Lease, in lieu of the cash deposit described in Section 12.12 of this Lease, Tenant may, within ten (10) days after the Date of this Lease, deliver or cause to be delivered to Landlord, a clean, unconditional, irrevocable letter of credit, in the amount of the Security Deposit, issued to Landlord, and in compliance with the terms and conditions of Section 12.12 (including, but not limited to, Section 12.12 (a) – (h), as applicable) and this Section 12.12.1. Upon an Event of Default under this Lease, Landlord may draw on the letter of credit to cure such default and/or to reimburse Landlord for Landlord's damages incurred as a result of such Event of Default. Such letter of credit shall be: (i) in form and substance substantially as set forth in Exhibit F (with the following criteria at a minimum); (ii) in the required amount of the Security Deposit; (iii) issued by a commercial bank acceptable to Landlord from time to time with offices located in Chicago, Illinois for the account of Tenant, and its permitted successors and assigns under this Lease; (iv) made payable to, and expressly transferable and assignable one or more times at no charge by, the owner from time to time of the Shopping Center or a Mortgagee (which transfer/assignment shall be conditioned only upon the execution of a reasonable and customary written document in connection therewith),whether or not the original account party of the letter of credit continues to be the Tenant under this Lease by virtue of a change in name or structure, merger, assignment, transfer or otherwise; (v) payable at sight upon presentment to a Chicago, Illinois branch of the issuer of a simple sight draft stating only that Landlord is permitted to draw on the letter of credit under the terms of the Lease and setting forth the amount that Landlord is drawing; (vi) of a term not less than one year and shall on its face state that the same shall be renewed automatically, without the need for any further written notice or amendment, for successive minimum one year periods, unless the issuer notifies Landlord in writing, at least sixty (60) days prior to the expiration date thereof, that such issuer has elected not to renew the letter of credit (which will thereafter entitle Landlord to draw on the letter of credit and hold same as a cash security deposit); and

(vii) at least thirty (30) days prior to the then current expiration date of such letter of credit, either (A) renewed (or automatically and unconditionally extended) from time to time through the ninetieth (90th) day after the expiration of the Term, or (B) replaced by Tenant with another letter of credit meeting the requirements of this Section 12.12.1, in the full required amount. Tenant shall cooperate with Landlord to effect any modifications, transfers or replacements of the letter of credit requested by Landlord in order to assure that Landlord is at all times fully secured by a valid letter of credit that may be drawn upon by Landlord, its successors and assigns. If any of the aforesaid requirements are not complied with timely, then, an immediate Event of Default shall be deemed to have occurred, and Landlord shall have the right to immediately draw upon the letter of credit without notice to Tenant. Each letter of credit shall be issued by a commercial bank that has a credit rating with respect to certificates of deposit, short term deposits or commercial paper of at least A-2 (or equivalent) by Moody's Investor Service, Inc., or at least P-2 (or equivalent) by Standard & Poor's Corporation, and shall be otherwise acceptable to Landlord in its sole and absolute discretion. If the issuer's credit rating is reduced below A-2 (or equivalent) by Moody's Investors Service, Inc. or below P-2 (or equivalent) by Standard & Poor's Corporation, or if the financial condition of such issuer changes in any other materially adverse way, then, Landlord shall have the right to require that Tenant obtain from a different issuer a substitute letter of credit that complies in all respects with the requirements of this Section 12.12.1, and Tenant's failure to obtain such substitute letter of credit within fifteen (15) days following Landlord's written demand therefor (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary) shall entitle Landlord to immediately draw upon the then existing letter of credit in whole or in part, upon written notice to Tenant, after which Landlord shall hold and/or apply the cash proceeds of such letter of credit as a cash security deposit in accordance with this Lease. In the event the issuer of any letter of credit held by Landlord is insolvent or is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, or if a trustee, receiver or liquidator is appointed for the issuer, then, effective as of the date of such occurrence, said letter of credit shall be deemed to not meet the requirements of this Section 12.12.1, and, within ten (10) days thereof, Tenant shall replace such letter of credit with other collateral acceptable to Landlord in its reasonable discretion (and Tenant's failure to do so shall, notwithstanding anything in this Lease to the contrary, constitute a default for which there shall be no notice or grace or cure periods being applicable thereto other than the aforesaid ten (10) day period). Any failure or refusal of the issuer to honor the letter of credit shall be at Tenant's sole risk and shall not relieve Tenant of its obligations under this Lease.

Section 12.13    **Landlord's Default.**  If Landlord shall materially breach or fail to perform or observe any agreement or condition in this Lease contained on Landlord's part to be performed or observed, and, if Landlord shall not cure such breach or failure within thirty (30) days after Landlord's receipt of written notice from Tenant specifying such breach or failure (or, if such breach or failure shall reasonably take more than thirty (30) days to cure, and Landlord shall not have commenced to cure within thirty (30) days and has not diligently prosecuted the cure to completion), Tenant may, at Tenant's option, cure such breach or failure for the account of Landlord and any reasonable amount paid by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor, so long as, and provided that, Tenant delivers to Landlord copies of paid invoices and statements, lien waivers, cancelled checks and such other evidence of such amounts reasonably requested by Landlord. Landlord agrees to reimburse Tenant for the reasonable amount paid by Tenant within thirty (30) days from the date Landlord receives copies of such items from Tenant setting forth in reasonable detail the work performed and amounts paid by Tenant. If Landlord fails to so pay Tenant within such thirty (30)-day period, then, Tenant shall have the right to offset against the next installment of Monthly Base Rent coming due under this Lease until the total aggregate of all such offsets equals the amount due to Tenant pursuant to this Section 12.13, plus interest at the Default Rate on any unpaid amount so due to Tenant, provided, however, any such monthly offset by Tenant shall not exceed the Offset Limit. If the Offset Limit is insufficient to reimburse Tenant in full during the remainder of the Term, such Offset Limit will be ratably adjusted, taking into account the then remaining number of installments of Monthly Base Rent due and payable by Tenant hereunder during the remainder of the Term. Notwithstanding anything to the contrary in the foregoing, Tenant's right to cure Landlord's breaches or failures with respect to the performance of Landlord's maintenance and repair obligations under Section 9.1 which directly relate to the Premises shall be governed by Section 9.1. In no event shall Tenant have the right to exercise Tenant's right to cure in regard to the premises of any other tenant in the Shopping Center.

LP 5142039.7 \ 28730-98464

## ARTICLE XIII.
## AMERICANS WITH DISABILITIES

The parties hereto acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 *et seq.*) and regulations and guidelines promulgated thereunder, as all of the same may be amended or supplemented from time to time (collectively referred to as "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Premises and the Shopping Center depending on, among other things: (a) whether Tenant's business is deemed a "public accommodation" or "commercial facility", (b) whether such requirements are "readily achievable", and (c) whether a given alteration affects a "primary function area" or triggers "path of travel" requirements. The parties hereby agree that: (i) Landlord shall be responsible for ADA Title III compliance in the Common Areas, except as provided below; (ii) Tenant shall be responsible for ADA Title III compliance in the Premises, including any leasehold improvements or other work to be performed in the Premises under or in connection with this Lease, and (iii) Landlord may perform, or require that Tenant perform, and Tenant shall be responsible for the cost of, ADA Title III "path of travel" requirements triggered by alterations in the Premises after the Delivery Date. Tenant shall be solely responsible for requirements under Title I of the ADA relating to Tenant's employees.

## ARTICLE XIV.
## LANDLORD'S INSURANCE

Landlord agrees to maintain insurance in at least the following coverage amounts:

(i)     Property insurance for the Shopping Center (excluding Tenant's leasehold improvements), against loss or damage from such causes of loss as are embraced by insurance policies of the type now known as "All Risk" property insurance on a replacement cost basis in an amount not less than one hundred percent (100%) of the then full replacement cost of the buildings located in the Shopping Center; and

(ii)     Commercial liability insurance insuring against claims for personal injury (including bodily injury or death), property damage, liability and such other loss or damage from such causes of losses are embraced by insurance policies of the type now known as "commercial general liability" insurance.

Upon request from Tenant, Landlord shall furnish Tenant with certificates for its insurance. Landlord shall not be required to insure Tenant's equipment, trade fixtures or personal property.  All amounts paid by Landlord for obtaining the insurance required herein shall be included in Operating Costs.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

Section 15.1     **Mutual Waiver of Claims and Subrogation.**  Whenever (i) any loss, cost, damage or expense resulting from fire, explosion or any other casualty or occurrence is incurred by either of the parties to this Lease or anyone claiming by, through or under them in connection with the Premises and (ii) such party is then either covered in whole or in part by insurance with respect to such loss, cost, damage or expense, or required under this Lease to be so insured, then the party so insured (or so required) hereby releases the other party from any liability the other party may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance (or which could have been recovered had insurance been carried as so required) and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect is to invalidate such insurance coverage or increase the cost thereof (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereupon keeping such release and waiver in full force and effect).  If the party released from liability hereunder is the Landlord, said term "Landlord" for the purpose of this Section only, shall include the other Owner's Entities.

Section 15.2     **Notices.**  Any notice or demand from Landlord to Tenant or from Tenant to Landlord shall be in writing and shall be sent by a nationally recognized air courier, such as, but not limited to Federal