IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CHANCERY DIVISION - COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | No. 2018-CH- |
| v. | ) ) ) | |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company registered to do business in Illinois, | ) ) ) ) | |
| Defendant. | ) ) | |

2018CH04248
CALENDAR/ROOM 13
TIME 00:00
Declaratory Jdgmt

## VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff, Webster Place Athletic Club, LLC ("Tenant"), by and through its attorneys,

Burke, Warren, MacKay & Serritella, P.C., complains against defendant, Ramco-Webster Place,

LLC, a Delaware limited liability company ("Landlord"), as follows:

## INTRODUCTION

1.    Tenant operates a 32,000 square foot full-service athletic club in what is known as

the Clybourn Corridor in Chicago, near Western and Clybourn Avenues on the north side of the

city. The Clybourn Corridor is a major destination for shopping and retail and serves as an arterial

connection between Chicago's west side and Lincoln Park. Traffic congestion is heavy, and

parking is limited.

2.    Many, if not most, of Tenant's members commute to the athletic club by

automobile. Tenant chose the Clybourn Corridor location because under the Lease, defined below,

it was able to provide free parking for up to four hours to its members in parking areas owned and

controlled by Landlord. But for Landlord's contractual agreement to provide free parking for

Tenant's members, Tenant would not have entered into the Lease.

facilities in the Premises, such as the shower or locker rooms, further leading to membership cancellations.

8.  Landlord has failed to cure any of these breaches despite repeated notices and complaints, in writing and verbally, from Tenant.

9.  Tenant now brings this action seeking: (i) a declaration that Tenant's performance under the Lease is excused by Landlord's ongoing material breaches (Count 1); and (ii) rescission of the Lease (Count 2).

## PARTIES

10.  Landlord is a Delaware limited liability company doing business in Illinois and the owner of property located at 1455 W. Webster Avenue, Chicago, Illinois, otherwise known as the "Webster Place Shopping Center" (the "Shopping Center").

11.  Tenant is an Illinois limited liability company doing business in Cook County, Illinois.

## JURISDICTION AND VENUE

12.  Jurisdiction and venue, under 735 ILCS 5/2-209 and 735 ILCS 5/2-101, are proper in Cook County because the Property is located in the State of Illinois, and this is the county in which the transaction or some part thereof occurred out of which the cause of action arose and where the Property as defined below, that is the subject of the Lease is located.

## FACTS

13.  Pursuant to a certain shopping center lease dated December 5, 2014, as amended by the First Amendment to Lease dated January 28, 2015 ("First Am.") and side letter agreement dated February, 2017 (the "Side Letter") (collectively the "Lease"), Tenant leases certain ground

3

administrative hearing and court costs, in both the trial and any and all appellate
proceedings, incurred either directly or indirectly in enforcing any obligation under
this Lease...The covenants of this Section 12.11 shall survive the expiration or
termination of this Lease due to the lapse of time or otherwise.

(*Id.,* §12.11).

A.    Parking Issues

20.    The Shopping Center is located in an area that is commonly known as the Clybourn

Corridor, an affluent, densely populated, congested area of Chicago near the Lincoln Park

neighborhood with extremely limited free public parking.

21.    The Shopping Center contains four parking areas available to the public for a fee,

identified as the Main Garage, Shakespeare Lot, Shakespeare Garage, and Main Surface Lot in the

Site Plan attached to the Lease as Exhibit C (collectively referred to herein as the "Parking Areas").

(*Id.,* Exh. C.)

22.    The Parking Areas are used as a revenue stream by the Landlord, which charges the

public for parking.

23.    Running an athletic club in the area of the Shopping Center is extremely

competitive. Parking is a crucial consideration for customers. Without parking, Tenant cannot

maintain or grow its membership base and the Club will fail. Tenant selected the Premises when

searching for property in the area to operate an athletic club in reliance upon the Landlord's

promise to include convenient free parking in the Parking Areas.

24.    As a significant feature of the Lease, Tenant negotiated Section 5.6 ("Tenant's

Parking Rights") which entitles it to free parking for its members, patrons and customers (referred

to herein as "Free Tenant Parking") in the Parking Areas, at no additional cost to Tenant as set

forth specifically below:

**Tenant's Parking Rights.** During the Term, and subject to the terms and
conditions set forth in the Lease, Landlord shall provide to Tenant's members,

5

28.    Under the current parking system, implemented and maintained by Landlord, the entrance to the Parking Areas is blocked by a gate. A driver who wishes to park in any of the Parking Areas is required to pull a paper ticket out of a ticket machine for the gate to lift, allowing the driver to enter the Parking Areas and park his or her car. When the parker seeks to leave the Parking Area, he or she must insert the ticket into the pay stations located at the exit to the Parking Area, and then pay the parking fee with his or her credit card. Once payment is accepted, the gate will lift allowing the parker to exit.

29.    Under the Parking Validation Program referenced in Section 5.6 of the Lease, the Landlord provides certain Parking Validation Ticketing Equipment, as defined therein, to Tenant to enable Tenant's Parkers to validate their parking tickets so that they may exit the Parking Areas without making any payment or encountering any further delay. (*See Id.*, Exh. I, *Webster Place Shopping Center Rules and Regulations* (the "Shopping Center Rules"), ¶12.)

30.    Since the commencement of the Lease, however, and despite Landlord's contractual obligations to do so, a significant number of Tenant's members have not received free parking.

31.    Instead, the pay stations regularly, and frequently, fail to recognize properly validated tickets, thus preventing Tenant's members from exiting the Parking Areas, forcing them to either call and wait for Parking Lot attendants or use their own credit cards to pay for parking and incur an additional expense that Tenant's members do not expect to incur, in addition to their monthly membership fees. (The "Parking Validation Failures.") In addition to inconveniencing the exiting Tenant's members, the Parking Validation Failures also cause traffic back-ups at the Parking Areas exits, preventing other users of the Parking Areas from exiting the Parking Areas

and roof of the Premises, and the structural soundness of exterior walls thereof...in good order, repair and condition." (*See* Exh. 1, Lease, §9.1.)

39.    Landlord breached Section 9.1 of the Lease, resulting in extensive water and other damage to the Premises, which the Landlord has failed to repair.

40.    On April 1, 2017, the ground water pumps located in the Premises which, on information and belief, are used to pump groundwater seeping into the Premises from the parking lot and other common areas, and thus Landlord is obligated to maintain, failed, causing the Tenant's pump room and back stairway of the Premises to fill with standing water, which water seeped into the Premises' weight room. Due to the urgency of the matter and to prevent additional damage, Tenant had to have the pumps repaired at its own expense.

41.    In addition, water regularly leaks into the Premises due to defects in the roof of the Shopping Center, and, on information and belief, from condensation from the HVAC system, which water has caused the ceiling of the office on the Second Floor to collapse, destroyed the carpeting and drywall in the Second Floor, and caused mold to grow, among other damages, making the Second Floor of the Premises unusable. Landlord has failed to repair the Second Floor, despite numerous requests from Tenant. (*See* photo attached hereto as Exh. 3.)

42.    The water leaking from the Second Floor has also leaked down to the Ground Floor of the Premises, causing mold, drywall and other damage to the back dock, the boiler room, and the electrical rooms. (*See* photos attached hereto as Exh. 4.)

43.    In addition, the loading dock is defective and as a result, often unusable, causing disruption to deliveries to the Premises, including requiring deliveries to, at times, be brought in by hand through member areas of the Premises, disrupting Tenant's operations.

51.    Landlord has materially breached the Lease by failing to provide Free Tenant Parking, required maintenance to prevent and resolve the Water and Structural Issues, and HVAC (collectively, the "Breaches").

52.    Despite multiple complaints by Tenant, Landlord has not cured the Breaches.

53.    Tenant has failed to receive the benefit of its bargain under the Lease as a result of Landlord's continuous and ongoing Breaches and its refusal to cure the Breaches, particularly the promise of Free Tenant Parking.

54.    Landlord's Breaches have resulted in a decline in membership, and in the inability to utilize a significant portion of the Premises.  The economic loss suffered by Tenant, which has continued unabated for months, has essentially eliminated the benefit of the bargain Tenant obtained under the Lease.

55.    Landlord's failure to and refusal to perform its obligations under the Lease excuse Tenant from further performance of its obligations under the Lease.

56.    The Breaches cannot be remedied by monetary damages.

WHEREFORE, plaintiff, Webster Place Athletic Club, LLC, an Illinois limited liability company, requests that the Court enter an order declaring that Webster Place Athletic Club, LLC's performance under the Lease to defendant, Ramco-Webster Place, LLC, a Delaware limited liability company, is excused, and grant such other relief as this Court deems just and equitable.

<u>COUNT II</u>
RESCISSION – MATERIAL BREACH OF LEASE

57.    Tenant incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth in this Paragraph 57.

WEBSTER ATHLETIC CLUB, LLC
an Illinois limited liability company
Plaintiff

By:_____
One of its attorneys

Aaron H. Stanton (*astanton@burkelaw.com*)
Madeleine W. Milan (*mmilan@burkelaw.com*)
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
Telephone: (312) 840-7000
Firm ID No. 41704

# EXHIBIT 1

TABLE OF CONTENTS

ARTICLE I.
BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS..................................................4
    Section 1.1        Basic Lease Provisions and Definitions.................................................4
    Section 1.2        Significance of Basic Lease Provisions and Definitions .............................7
    Section 1.3        Enumeration of Exhibits ................................................................7

ARTICLE II.
PREMISES AND TERM ...................................................................................7
    Section 2.1        Shopping Center .........................................................................7
    Section 2.2        Premises..................................................................................7
    Section 2.3        Term.....................................................................................7
    Section 2.4        Intentionally Omitted ...................................................................7
    Section 2.5        Reservation of Rights by Landlord .....................................................8
    Section 2.6        Tenant's Right to Measure Premises.............................................8
                                                                      9

ARTICLE III.
DELIVERY OF PREMISES AND THE PERFORMANCE OF TENANT'S WORK....................10
    Section 3.1        Plans and Specifications for Tenant's Work ..........................................10
    Section 3.2        Condition of the Premises ..............................................................10
    Section 3.3        Failure to Deliver Possession..........................................................10
    Section 3.4        Obligations of Tenant Before the Term Begins ......................................10
    Section 3.5        Landlord's Contribution to Tenant's Work ...........................................11

ARTICLE IV.
RENT.............................................................................................12
    Section 4.1        Rent ....................................................................................12
    Section 4.2        Operating Year .........................................................................12
                                                                        12

ARTICLE V.
COMMON AREAS AND OPERATING COSTS ...........................................................12
    Section 5.1        Common Areas and Facilities ..........................................................12
    Section 5.2        Use of Common Areas ..................................................................12
    Section 5.3        Operating Costs.........................................................................13
    Section 5.4        Tenant's Pro Rata Share ................................................................14
    Section 5.5        Payment of Operating Costs ...........................................................14
    Section 5.6        Tenant's Parking Rights.................................................................15

ARTICLE VI.
REAL ESTATE TAXES ...............................................................................16
    Section 6.1        Real Estate Taxes.......................................................................16
    Section 6.2        Tenant's Pro Rata Share................................................................16
    Section 6.3        Payment of Real Estate Taxes..........................................................17

ARTICLE VII.
INDEMNITY ........................................................................................17
    Section 7.1        Tenant's Indemnity.....................................................................17
    Section 7.2        Landlord's Indemnity ..................................................................17

ARTICLE VIII.
UTILITY SERVICES AND HEATING, VENTILATING AND AIR CONDITIONING ..............17
    Section 8.1        Utilities.................................................................................17
    Section 8.2        Heating, Ventilating and Air Conditioning ...........................................18
    Section 8.3        Heating, Ventilating, and Air Conditioning Charges .................................18
    Section 8.4        Tenant's Pro Rata Share ................................................................18

LP 5142639.7 \ 28730-98464

Section 15.13    Financial Statements................................................................................40
Section 15.14    Project Management Space.......................................................................40
Section 15.15    Riders and Exhibits..................................................................................40
Section 15.16    Force Majeure...........................................................................................40
Section 15.17    Recording..................................................................................................40
Section 15.18    Limitation of Liability.............................................................................41
Section 15.19    Personal Property Taxes..........................................................................41
Section 15.20    Easements.................................................................................................41
Section 15.21    Corporate Authority.................................................................................41
Section 15.22    Landlord Consents....................................................................................41
Section 15.23    Legal Requirements..................................................................................41
Section 15.24    Guaranty of Completion...........................................................................41

LF 5142039.7 \ 28730-98464

| 7-11 | $29.03 psf | $668,996.35 | $17.20 psf | $170,159.60 | $839,155.95 |
| 12-16 | $31.20 psf | $719,004.00 | $18.49 psf | $182,921.57 | $901,925.57 |

FIRST OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 17-21 | $33.54 | $772,929.30 | $19.88 psf | $196,672.84 | $969,602.14 |

SECOND OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 22-26 | $36.05 | $830,772.25 | $21.37 psf | $211,413.41 | $1,042,185.66 |

THIRD OPTION TERM:

| Operating Year | First Floor Space | | Basement Space | | Total |
|---|---|---|---|---|---|
| 27-31 | $38.75 | $892,993.75 | $22.97 psf | $227,242.21 | $1,120,235.96 |

1.1.14   PERCENTAGE RENT RATE: Not Applicable.

1.1.15   PERCENTAGE RENT PERIOD: Not Applicable.

1.1.16   TENANT'S USE: The Premises shall only be used only for (i) the operation of a full service health club for adults and teenagers (14 years and older) (except to the extent a portion of the Premises is used for Ancillary Child Activities (as hereinafter defined)), providing physical and occupational therapy and rehabilitation services, weight and aerobic training, racquet sports, swimming pool, sauna and whirlpool facilities, group exercise classes including yoga and Pilates, free weights, circuit training, spinning, personal and sports training and massage therapy, together with the right to use the Premises for such incidental uses customary to a health club facility including, but not limited to, a pro shop, limited vitamin and nutritional supplements sales as customary for a health club facility, weight loss and related programs, golf instruction, swim lessons, food and beverage service for patrons of the health club facilities (so long as, and provided that, the area in which such food and beverage service is operated does not exceed 5,000 square feet), and Ancillary Child Activities (the uses and purposes described in this clause (i) being collectively referred to in this Lease as (the "Health Club Use") and (ii) subject to, and in accordance with, Section 10.1.2, Other Permitted Retail Uses (as hereinafter defined), and for no other use or purpose. "Ancillary Child Activities" means babysitting and activities (including ballet) ancillary to Tenant's operation of a health club facility on the Premises offered only to children of patrons of the health club facilities while such patrons are present on the Premises (except for occasional/periodic "date night" special events offered only to health club members). Notwithstanding anything contained in this Section 1.1.16, in no event shall Tenant separately market or advertise the availability of Ancillary Child Activities on the Premises, and Tenant shall immediately cease use of any portion of the Premises for Ancillary Child Activities if such use violates any of the Existing Exclusives (as defined in Section 10.2.4).

1.1.17   GUARANTOR (for completion of Tenant's Work): Laurence H. Weiner, Gerald L. Nudo, and Patrick Cunningham.

1.1.18   SECURITY DEPOSIT: $1,000,000.

1.1.19   TERMINATION DATE: June 30, 2031, as the Termination Date may be extended by virtue of Tenant's exercise of the Extension Options (as hereinafter defined) in accordance with Section 2.3 hereof.

1.1.20   THE LEASING BROKER(S): Mid-America Real Estate Corporation

5

LP 5142039.7 \ 28730-96464

Tenant's Pro Rata Share of Shopping Center Insurance ............................................ 7.2
Tenant's Use ........................................................................................................ 1.1.16
Tenant's Work ...................................................................................................... 3.1
Term ................................................................................................................... 2.3

Section 1.2     Significance of Basic Lease Provisions and Definitions. Each reference in this Lease to any of the Basic Lease Provisions and Definitions contained in Section 1.1 shall be deemed and construed to incorporate all of the terms provided under each Basic Lease Provision and Definition.

Section 1.3     Enumeration of Exhibits. The exhibits enumerated in this section and attached to this Lease are incorporated in this Lease by this reference and are to be construed as a part of this Lease.

| | |
|---|---|
| Exhibit A | List of Landlord Entities |
| Exhibit B | Legal Description of Shopping Center |
| Exhibit C | Site Plan of the Shopping Center |
| Exhibit D-1 | Floor Plan of the First Floor Space |
| Exhibit D-2 | Floor Plan of the Basement Space |
| Exhibit E | Intentionally Omitted |
| Exhibit F | Form of Letter of Credit |
| Exhibit G | Sign Criteria |
| Exhibit H | Sign Rendering with Approved Lettering |
| Exhibit I | Webster Place Shopping Center Rules and Regulations |
| Exhibit J | Completion and Performance Guaranty |
| Exhibit K | Statement as to Remeasurement |
| Exhibit L | Existing Exclusives/ Prohibited Uses |
| Exhibit M | Pre-Existing Leases |

## ARTICLE II.
## PREMISES AND TERM

Section 2.1     Shopping Center. Landlord is the owner of a tract of land legally described on Exhibit B which is being operated as the shopping center depicted on Exhibit C and defined in Section 1.1.7, and referred to in this Lease as the Shopping Center set forth in Section 1.1.7.

Section 2.2     Premises. Landlord hereby leases to Tenant, and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms, covenants and conditions of this Lease, the Premises described in Subsection 1.1.8.

Section 2.3     Term. TO HAVE AND TO HOLD the Premises for the period commencing on the Commencement Date and ending on the Termination Date, unless sooner terminated by lapse of time or otherwise pursuant to the terms of this Lease (the "Term").

2.3.1     Primary Term. The primary sixteen (16)-Operating Year term of this Lease (the "Primary Term") shall commence on the Commencement Date and end on the Termination Date (as set forth in Section 1.1.19), unless sooner terminated by lapse of time or otherwise pursuant to the terms of this Lease.

2.3.2     Option Term.

(a)     Provided that no Event of Default arising out of Tenant's failure to pay Monthly Base Rent (as defined in Section 4.1) exists at the time of the giving of the required notice set forth herein or at the time of commencement of the First Option Term (defined herein), Tenant shall have the option (the "First Extension Option") to extend the Term for a five (5)-Operating Year period (the "First Option Term"), commencing on the day immediately following the last day of the Primary Term. The First Extension Option shall be exercised by written notice from Tenant to Landlord, given not later than twelve (12) months prior to the last day of the Primary Term, and shall state that Tenant elects to extend the Primary Term for the First Option Term. Annual Base Rent for each

LP 5142039.7\28730-98464

configuration, size and location of buildings therein, the dimensions of such buildings, the number of floors in any of the buildings, dimensions of stores in such buildings and the identity and type of other stores and tenancies in the Shopping Center. Landlord reserves to itself the use of the exterior walls, the roof, the air space above the roof, the space below the floor and above the ceiling and the exclusive right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Shopping Center in locations which will not materially interfere with Tenant's Use. Landlord shall not be in violation of the foregoing sentence if it uses or accesses structural columns or risers within the sales area of the Premises or areas above the ceiling that are located above the sales area of the Premises so long as such is done in a manner which minimizes the disruption of Tenant's business operations. Landlord further reserves the right to locate kiosks and other similar structures (whether temporary or permanent) and to make available, alter, add to or delete from common areas in the Shopping Center, provided only that (i) the Premises shall be located substantially as depicted on Exhibit D-1 and D-2; (ii) none of the foregoing shall result in any material obstruction of access to the Premises; and (iii) none of the foregoing shall result in (x) any material obstruction of the visibility of either the Premises or Tenant's storefront signage from Webster Avenue and from the perspective of south-bound Clybourn traffic (provided, however, that any obstruction of such visibility due to the theatre pylon sign (or any replacement thereof) and any other signage from time to time installed or erected by the theatre pursuant to its lease (or any subsequent lease of the theatre premises) shall be permitted), and (y) the reduction by more than seven (7) parking spaces of the parking spaces which, as of the Date of this Lease, are located within the Main Surface Lot (as the Main Surface Lot is generally shown on the Site Plan of the Shopping Center set forth in Exhibit C (the "Site Plan")), unless the reduction of the number of parking spaces in the Main Surface Lot by more than seven (7) parking spaces is due to any action by the City of Chicago (the "City") or any other governmental authority pursuant to Legal Requirements, or (z) the reduction of more than 100 parking spaces from the parking available to Tenant pursuant to this Lease. If the number of parking spaces available to Tenant pursuant to this Lease is reduced by eight (8) or more parking spaces (but by less than 100), then, (I) Landlord and Tenant agree to extend the hours beyond 1:00 p.m. during which Tenant's members, patrons and customers shall have the right to use the Main Surface Lot pursuant and subject to Section 5.6 and (II) Tenant's members, patrons and customers shall have the non-exclusive right, without charge, to use the Main Surface Lot for a ninety (90)-minutes period after 1:00 p.m., on a first-come, first-served basis pursuant and subject to Section 5.6. Notwithstanding anything to the contrary, no representation or warranty, express or implied, is made as to the accuracy of the information, scale, design, configuration or locations on Exhibit C and Exhibit D-1 and D-2, and the same is subject to errors, omissions, changes, alterations, additions and withdrawals without notice.

Section 2.6     Tenant's Right to Measure Premises. The square footage of the Premises shall be the area computed by measurement of the Premises to and from the center of party walls and the outside of exterior walls or exterior window lines. If, within fourteen (14) days from the Delivery Date (i) Tenant's architect measures the Premises and calculates that the square footage of the Premises is less than as set forth in Section 1.1.8, and (ii) Tenant so notifies Landlord in writing (which notice shall include the basis for Tenant's architect's computation of the square footage within the Premises), Landlord and Tenant shall cause their respective architects to act in good faith and with cooperation to achieve the correct measurement of the square footage of the Premises. If Landlord's and Tenant's respective architects are not able to agree upon a correct measurement of the square footage of the Premises within ten (10) days from the date Tenant notifies Landlord of the discrepancy as aforesaid, Landlord and Tenant shall select a third architect, reasonably acceptable to both parties, to calculate the square footage of the Premises, and such architect shall perform such measurement and notify Landlord and Tenant of same within five (5) days of such architect's appointment; provided, in no event shall square footage of the Premises be greater than that designated by Landlord's architect nor less than that designated by Tenant's architect. If the square footage of the Premises has been measured by Tenant's architect pursuant to, and in accordance with, this Section 2.6, then, Landlord and Tenant shall execute and deliver to each other a written statement in the form attached hereto as Exhibit K, which shall specify the square footage of the Premises, and if, as a result of such measurement, the square footage of the Premises is determined to differ from the square footage set forth in Section 1.1.8, such written statement shall also specify the square footage of the Premises, and shall set forth an adjustment of the amount of the Annual Base Rent and Tenant's Pro Rata Percentages set forth in Section 1.1.21 in accordance with such measurement.

LF 5142039.7\28730-98464

Commencement Date. Tenant shall furnish detailed evidence as to the cost of Tenant's Work, that Tenant's Work has been completed and paid for in full, and that any and all liens which have been, or which may be filed, have been released or satisfied of record.   Tenant shall supply to Landlord a sworn general contractor's and sworn owner's statement listing all contracts in connection with the Tenant's Work and applicable payments made and lien waivers received to date. Tenant shall be solely responsible for the payment for and the performance and quality of Tenant's Work and Landlord shall have no responsibility therefor.   Tenant's Work shall be performed and completed in accordance with the Plans and Specifications approved by Landlord and shall be performed in a first class and workmanlike manner in accordance with all applicable Legal Requirements.   Tenant shall not commence Tenant's Work until Landlord has been provided with insurance certificates evidencing that the contractors and subcontractors performing Tenant's Work have in full force and effect adequate worker's compensation insurance as required by the laws of the State of Illinois, public liability and builder's risk insurance in such amounts and according to terms reasonably satisfactory to Landlord.   Any liability of the Landlord or of the Landlord's property for any such work or any other improvements upon the Premises by the Tenant is hereby expressly prohibited.   The interest of the Landlord in and to the Premises and the Shopping Center shall not be subject to liens for improvements made in or to the Premises by Tenant or by Tenant's employees, contractors or agents.

Section 3.5   Landlord's Contribution to Tenant's Work.

(a)   So long as Tenant is not in default of any material obligations of Tenant under this Lease (the failure to pay any Annual Base Rent then due and payable being deemed to constitute a default of a material condition of Tenant under this Lease), Landlord shall pay to Tenant, as "Landlord's Contribution to Tenant's Work", Eight Hundred Seventy Five Thousand Dollars ($875,000) toward the hard and soft construction costs of Tenant's Work.   Landlord shall pay Landlord's Contribution to Tenant's Work within thirty (30) days after all of the following conditions are met:

(i)   Tenant's Work shall have been substantially completed in all respects and in accordance with the provisions of this Lease, Tenant's Plans and Specifications, and applicable Legal Requirements;

(ii)   Tenant has furnished Landlord (x) an affidavit from Tenant listing all contractors and suppliers whom Tenant has contracted with in connection with Tenant's Work, together with the cost of each contract, and (y) an affidavit from Tenant's general contractor listing all subcontractors and suppliers whom the general contractor has contracted with in connection with Tenant's Work, together with the cost of each contract and the dollar amount of work each subcontractor and supplier has theretofore performed or furnished;

(iii)   Tenant shall have furnished to Landlord final unconditional lien waivers from all general contractors, subcontractors and materialmen who supplied services or material in excess of $2,000.00 in performing Tenant's Work;

(iv)   Tenant shall have opened the Premises for business as provided in this Lease;

(v)   Tenant shall have provided Landlord with copies of all necessary governmental permits, including, but not limited to, a certificate of occupancy (or its equivalent) for the operation of the Premises in accordance with this Lease, issued by the appropriate governmental entity; and

(vi)   Tenant shall have delivered to Landlord with "as built" drawings of those aspects, if any, of Tenant's Work relating to plumbing, sprinkler system, or HVAC if, and to the extent that, such "as-built" drawings are required for performance by or on behalf of Tenant of any such aspects of Tenant's Work.

(b)   If (i) Tenant is entitled to receive payment of Landlord's Contribution to Tenant's Work in accordance with, and subject to, the terms and conditions of this Section 3.5, and (ii) Landlord fails to pay to Tenant Landlord's Contribution to Tenant's Work, or any portion thereof to which Tenant is entitled, then, Tenant shall have the right, subject to the Offset Limit (as hereinafter defined), to offset against the next installments of Monthly Base Rent coming due under this Lease until the total aggregate of all such offsets, equals the amount of Landlord's

11

Regulations and other regulations, and to cause its permitted concessionaires, licensees, officers, employees and agents, and to use its commercially reasonable efforts to cause its customers and invitees to conform thereto. In addition to its other rights hereunder, Landlord may at any time temporarily close any part of the Common Areas to make repairs or changes, to prevent the acquisition of public rights in such areas, to discourage non-customer parking, or for other reasonable purposes, and may do such other acts in and to the Common Areas as in its sole discretion Landlord may deem desirable, subject to the restrictions set forth in Section 2.5, and so long as any such other acts by Landlord do not materially affect the ability of Tenant to operate its business in the Premises in accordance with this Lease. Landlord shall have the right to close the Common Areas or any part thereof on such days or during such hours as Landlord shall, in its sole discretion, determine. Tenant shall, upon Landlord's request, furnish to Landlord the license numbers and description of the vehicles operated by Tenant and its permitted concessionaires, licensees, officers, employees and agents. Tenant shall not at any time interfere with the rights of the Landlord, other tenants and its and their permitted concessionaires, licensees, officers, employees, agents, customers and invitees to use any part of the Common Areas. Except for, and subject to, Tenant's Parking Rights, Landlord reserves the right to impose parking charges determined by meters or otherwise. Notwithstanding anything to the contrary, neither Landlord nor any of their respective members, managers, partners, officers, employees or agents shall have any responsibility for patrolling the Common Areas or keeping them secure.

Section 5.3    Operating Costs. Beginning on the Commencement Date, Tenant shall pay to Landlord, as Additional Rent hereunder, "Tenant's Pro Rata Share of Operating Costs" (as hereinafter defined). The term "Operating Costs" shall mean any and all costs and expenses of every kind and nature paid or incurred by Landlord (including appropriate reserves) in operating, managing, equipping, lighting, repairing, replacing, cleaning and maintaining the Shopping Center (other than those facilities which Landlord is obligated to maintain at its expense pursuant to Section 9.1); all costs and expenses of security and fire protection, including, at the option of Landlord, servicing Tenant with fire extinguishers (if and to the extent such service is provided by Landlord); pedestrian and vehicular traffic direction and control; all costs and expenses of cleaning and removing of rubbish, dirt, debris, snow and ice; all costs and expenses of maintaining, planting, replanting and replacing flowers and landscaping; water and sewerage charges; premiums for liability and property damage, fire, extended coverage, malicious mischief, vandalism, sprinkler leakage, flood insurance, rent loss, wind storm, sink hole and worker's compensation, employer's liability, and any other insurance procured by Landlord in connection with the Shopping Center in such form, amounts and companies as Landlord shall, in its sole judgment; wages, unemployment taxes, social security taxes, special assessments, transportation or environmental protection taxes or levies or similar taxes or levies, and personal property taxes attributable to the Shopping Center; professional fees including, but not limited to, accounting and legal fees relating to the Shopping Center; required licenses and permits; all costs and expenses for supplies and operation of loud speakers and any other sound equipment; all costs and expenses incurred by Landlord in the testing, maintaining and repairing of sprinkler and other systems, if any, located in the Shopping Center or, at Landlord's option, in the Premises; all charges for the use and service of utility services for the Common Areas, including, but not limited to, all costs and expenses of maintaining lighting fixtures (including the cost of light bulbs and electric current); maintenance of all utility facilities not maintained by the servicing utility company; all costs, expenses, surcharges or other impositions or assessments incurred by Landlord (excluding those arising in connection with environmental protection legislation or regulations) or assessed against or imposed on the Shopping Center or any part thereof with regard or in connection with impacts on public services, facilities or infrastructure; depreciation, interest and all other costs resulting from improvements or additions imposed and required by regulatory agencies; cost of equipment, machinery and facilities not properly chargeable to capital; reasonable depreciation of equipment, machinery and facilities; rents paid for the leasing of equipment, machinery and facilities and finance charges paid for the purchase of equipment, machinery and facilities which are capital assets and are used in the operation of the Shopping Center; and a management fee (the "Management Fee") not exceeding an amount equal to five percent (5%) of the annual gross revenues of the Shopping Center from time to time; and such other costs as Landlord may reasonably determine are required for the proper operation and maintenance of the Shopping Center.

Notwithstanding the foregoing, Operating Costs shall not, however, include (i) interest and amortization on mortgages and other debt costs; (ii) improvements, repairs or alterations to spaces leased to other tenants; (iii) the cost of providing any service directly to and paid directly by, any tenant; (iv) costs of items to the extent Landlord receives reimbursement from any other tenant or from insurance proceeds or condemnation proceeds, service contracts or otherwise; (v) any duplicative charges or expenses; (vi) legal fees and commissions or other costs incurred in leasing or in disputes with other tenants, (vii) capital expenditures, as defined by generally accepted

Cost Cap from the fourth Operating Year to the fifth Operating Year (i.e. 1-1/2% (3% of 1-1/2% = 4-1/2%)). Any "unused portion" of the Operating Cost Cap (as adjusted to 4-1/2%) would continue to be applied against any increase in Controllable Operating Costs which exceed the initial 3% Operating Cost Cap until the entirety of such "unused portion" has been fully applied.] "Controllable Operating Costs" shall mean all Operating Costs, other than (i) costs and expenses for snow and ice removal and other weather-related costs and expenses; (ii) premiums and costs for insurance; (iii) utility costs; (iv) amortization of capital expenditures incurred to reduce Operating Costs and/or which are required under any Legal Requirements not applicable to the Shopping Center as of the Date of this Lease; (v) union labor costs; and (vi) the Management Fee. Subsequent to the end of each fiscal year, Landlord shall furnish Tenant with a statement (the "Annual Reconciliation Statement") of the actual Operating Costs paid or incurred by Landlord during such period, and there shall be an adjustment between Landlord and Tenant within thirty (30) days after delivery of such statement with payment to Landlord, or repayment or credit to Tenant (if Tenant is not in default hereunder) by Landlord, as the case may require, so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of Operating Costs for such period. The Annual Reconciliation Statement shall be considered final and binding on Tenant unless Tenant takes exception to such Annual Reconciliation Statement by written notice delivered to Landlord within one hundred twenty (120) days after Landlord provides such Annual Reconciliation Statement to Tenant, which notice from Tenant shall specify the reasons therefor. If Tenant delivers such written notice to Landlord within such one hundred twenty (120)-day period, then, Landlord shall deliver to Tenant reasonable back-up documentation regarding any item of Operating Costs referenced in such notice. If the parties are unable to resolve any dispute as to the correctness of such Annual Reconciliation Statement within thirty (30) days following such notice of objection, either party may refer the issues raised to a public accounting firm selected by Landlord and reasonably acceptable to Tenant, and the decision of such accountants shall be conclusively binding upon Landlord and Tenant. In connection therewith, Tenant and such accountants shall execute and deliver to Landlord a confidentiality agreement, in form and substance reasonably satisfactory to Landlord, whereby such parties agree not to disclose to any third party any of the information obtained in connection with such review. Tenant shall pay the fees and expenses relating to such procedure, unless such accountants determine that Landlord overstated Operating Costs in such Annual Reconciliation Statement by more than 5%, in which case Landlord shall pay such fees and expenses. Tenant acknowledges that Landlord's ability to budget and incur expenses depends on the finality of such, and Tenant accordingly agrees that time is of the essence with respect to Tenant's obligation. In no event shall the compensation to be paid to such accountants be based on a contingency. If Landlord maintains its books and records on a calendar year, or such other fiscal year as Landlord may from time to time determine, Landlord shall have the right, but not the obligation, to adjust the application of the Operating Cost Cap and the method determining the amount of Controllable Operating Costs to reflect such calendar year or other fiscal year. The covenants of this Section shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

Section 5.6   *Tenant's Parking Rights.* During the Term, and subject to the terms and conditions set forth in this Lease, Landlord shall provide to Tenant's members, patrons and customers, at no additional cost to Tenant, and so long as Tenant is operating the Premises for the Health Club Use: (i) free 4-hour non-reserved, non-exclusive parking, on a first-come, first-served basis, in the Main Garage, Shakespeare Lot and Shakespeare Garage, as such garages and lot are generally depicted on the Site Plan; and (ii) during the hours of 4:45 a.m. through 1:00 p.m., free 90-minute non-reserved, non-exclusive parking, on a first-come, first-served basis in the Main Surface Lot, as such lot is generally shown on the Site Plan. The free parking described in clauses (i) and (ii) of this Section 5.6 is referred to in this Lease as "Tenant's Parking Rights", and shall be subject to, and provided by Landlord in accordance with, Landlord's Parking Validation Program described in the Rules and Regulations contained in Exhibit I, as may be from time to time modified; provided, however, no modifications of the Rules and Regulations shall deprive Tenant of, or materially interfere with, Tenant's Parking Rights under this Section 5.6. Upon the expiration of the 4-hour period referenced above, Tenant's members, patrons and customers shall be charged, and be responsible for, the parking rates and fees from time to time charged by Landlord to the public for the use of the Main Garage, Shakespeare Lot and the Shakespeare Garage, or any of them. So long as Tenant is operating the Premises for the Health Club Use, Tenant shall have the right to allow Tenant's employees to park, on a non-reserved, non-exclusive basis, in the Shakespeare Lot and Shakespeare Garage in accordance with, and subject to, the same terms and conditions applicable to Tenant's Members, patrons and customers, including payment for such parking at the rates and fees from time to time charged by Landlord to the public; provided, however, that, so long as Tenant is operating the Premises for the Health Club Use, Tenant's employees shall not be charged for their use of the Shakespeare Lot and Shakespeare Garage during the hours such employees are working on the Premises.

15

[For purposes of illustrating the method to be used in calculating Tenant's Pro Rata Share of Real Estate Taxes for each of the First Floor Space and the Basement Space: Since the Commencement Date occurs in calendar year 2015:

(a)    Tenant's obligation to pay Tenant's Pro Rata Share of Real Estate Taxes with respect to the First Floor Space will begin in calendar year 2015 for Real Estate Taxes accruing in calendar year 2015 (payable in calendar year 2016), with such payments to be reconciled and adjusted pursuant to Section 6.3 in calendar year 2017; and

(b)    Tenant's obligation to pay Tenant's Pro Rata Share of Real Estate Taxes with respect to the Basement Space if, and to the extent Real Estate Taxes for any Operating Year exceed the Base Year Tax Amount, will begin accruing during calendar year 2016) (for Real Estate Taxes payable in calendar year 2017), with such payments to be reconciled and adjusted pursuant to Section 6.3 in calendar year 2018].

Section 6.3    Payment of Real Estate Taxes.  Beginning on the Commencement Date, Tenant shall pay to Landlord on account of Tenant's Pro Rata Share of Real Estate Taxes equal monthly installments on the first day of each calendar month in advance, without demand or setoff (except if, and to the extent, expressly permitted under this Lease) in an amount estimated from time to time by Landlord to be Tenant's Pro Rata Share of Real Estate Taxes.  When the actual figures for such Real Estate Taxes are known, Landlord shall furnish Tenant with a statement reconciling Tenant's actual Pro Rata Share of Real Estate Taxes; any over or under payment of Tenant's Pro Rata Share of Real Estate Taxes shall be adjusted and paid or credited by Landlord to Tenant (so long as Tenant is not in default of any of Tenant's obligations under this Lease beyond the applicable cure period) or paid to Landlord by Tenant, as applicable, to the other, within thirty (30) days after delivery of such statement so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of Real Estate Taxes for such period.  Tenant shall also be responsible for and shall pay all lease taxes or similar taxes levied on the business of Tenant in the Premises levied or assessed by any governmental entity having jurisdiction over the Premises.  The covenants of this Section shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

## ARTICLE VII.
## INDEMNITY

Section 7.1    Tenant's Indemnity.  Tenant shall defend (with counsel reasonably  satisfactory to Landlord), indemnify and save Landlord, the Owner's Entities (as hereinafter defined) harmless from all liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) with respect of any injury to, or death of, any person, or damage, theft or destruction of any property, occurring on or about the Premises occasioned by any act or omission of Tenant, Tenant's agents, employees, contractors, sublessees, concessionaires, or licensees, or any other person or entity claiming by, through or under Tenant.  The foregoing covenants shall survive the expiration or termination of this Lease.

Section 7.2    Landlord's Indemnity.  Landlord shall defend (with counsel reasonably  satisfactory to Tenant), indemnify and save Tenant harmless from all liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) with respect of any injury to, or death of, any person, or damage, theft or destruction of any property, whether or not occurring on or about the Premises or any other part of the Shopping Center occasioned by any act or omission of Landlord, Landlord's agents, employees, or contractors or any other person or entity claiming by, through or under Landlord.  The foregoing covenants shall survive the expiration or termination of this Lease.

## ARTICLE VIII.
## UTILITY SERVICES AND HEATING, VENTILATING AND AIR CONDITIONING

Section 8.1    Utilities.  Tenant, at Tenant's sole cost and expense, shall be solely responsible for and shall promptly pay all charges for use or consumption of sewer, water, gas, electricity or any other utility services to the Premises if, and to the extent that, any of the foregoing are separately metered or sub-metered to the Premises. The cost or expense with respect to any sewer, water, gas, electricity or any other utility services that are not

for an Operating Year may be included in the unused portion of the HVAC Charge Cap for a future Operating Year, until such "unused portion" of the HVAC Charge Cap is fully utilized. [Purely as an example, and only for purposes, of illustrating the foregoing: since the HVAC Charge Cap for Controllable HVAC Charges is three percent (3%), if Tenant's obligations for Controllable HVAC Charges increased by 1-1/2% from the fourth Operating Year to the fifth Operating Year, and by 5-1/2% from the fifth Operating Year to the sixth Operating Year, then, Landlord shall have the right to require Tenant to pay up to a 4-1/2% increase in Controllable HVAC Charges from the fifth Operating Lease Year to the sixth Operating Lease Year by utilizing the "unused portion" of the 3% Operating Cost Cap from the fourth Operating Year to the fifth Operating Year (i.e. 1-1/2% (3% + 1-1/2% = 4-1/2%) Any "unused portion" of the HVAC Charge Cap (as adjusted to 4-1/2% would continue to be applied against any increase in Controllable HVAC Charges which exceed the initial 3% HVAC Charge Cap until the entirety of such "unused portion" has been fully applied]. "Controllable HVAC Charges" shall mean all HVAC Charges, other than (i) utility costs incurred by Landlord to provide heat, ventilation and air conditioning to the Shopping Center; and (ii) the amortization of capital expenditures incurred to reduce HVAC Charges and/or which are required under any Legal Requirements not applicable to the Shopping Center as of the Date of this Lease. After the end of each calendar year Landlord uses for such purpose, Landlord shall furnish Tenant with a statement of the actual HVAC Charges paid or incurred by Landlord during such period, and there shall be an adjustment between Landlord and Tenant within thirty (30) days after delivery of such statement with payment to, or repayment by (if Tenant is not in default hereunder) Landlord, as the case may require, so that Landlord shall receive from Tenant the precise amount of Tenant's Pro Rata Share of HVAC Charges for such period. If Landlord maintains its books and records on a calendar year, or other fiscal year as Landlord may from time to time determine, Landlord shall have the right, but not the obligation, to adjust the application of the HVAC Charge Cap and the method determining the amount of Controllable HVAC Charges" to reflect such calendar year or other fiscal year. The covenants of this Section shall survive the expiration or termination of this Lease due to lapse of time or otherwise.

## ARTICLE IX.
## LANDLORD'S COVENANTS

Section 9.1    Repairs by Landlord. Except for the repairs, alterations, additions or replacements required in Section 10.1.7 to be performed by Tenant, Landlord covenants at its expense to keep the foundations, bearing walls, concealed plumbing serving more than the Premises, concealed wiring serving the Premises (but excluding any wiring installed by Tenant), the exterior of the Premises and roof of the Premises, and the structural soundness of exterior walls thereof (including the structural elements, if any, of Tenant's storefront, but, in all events excluding glass, plate glass and doors), in good order, repair and condition, unless any such work is required because of damage caused by any act, omission or negligence of Tenant, any employees, agents, invitees, guests, concessionaires, licensees, sublessees or contractors of Tenant or any of their respective employees, agents, invitees, guests, concessionaires, licensees or contractors, or any person or entity claiming by, through or under Tenant, in which event, Landlord shall make such repair and be reimbursed by Tenant for such repair, as additional Rent. Landlord shall not be required to commence any such repair until a reasonable time after Landlord receives written notice from Tenant that the same is necessary, which notice shall specifically reference the required repair. The provisions of this Section 9.1 shall not apply in the case of damage or destruction by fire or other casualty or a taking under the power of eminent domain, in which event the obligations of Landlord shall be controlled by Article XI. If Landlord's failure to perform Landlord's obligations under this Section 9.1 results in an imminent threat to the safety of persons or property, Tenant shall have the right, after giving Landlord reasonable prior notice of such condition (which notice may be verbal to Landlord or to Landlord's property manager, if any), to take reasonable measures to remediate such condition. Landlord shall reimburse Tenant for the reasonable cost expended by Tenant to remediate such condition within thirty (30) days from the date on which Tenant delivers to Landlord copies of paid invoices and statements, lien waivers, cancelled checks and such other evidence of such costs reasonably requested by Landlord. Except as otherwise provided in this Section 9.1, Landlord shall not be obligated to make repairs, replacements or improvements of any kind within the Premises, or any equipment facilities or fixtures contained therein or which exclusively serve the Premises, which shall be the sole responsibility of Tenant as provided in this Lease.

Section 9.2    Quiet Enjoyment. Landlord covenants and agrees that so long as no Event of Default has occurred, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject to the terms and conditions of this Lease and

LP 5142039.7\28730-98464

tenant, subtenant or other occupant (as the case may be). and, thereafter, uses diligent and good faith efforts to enforce its rights under such lease, sublease or license agreement (as the case may be) and to obtain Judicial Relief. For purposes of this Section 9.4.4. "Judicial Relief" shall mean a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the violation of Section 9.4.1; provided, however, Landlord shall not be required to appeal any adverse decision denying Judicial Relief.

### ARTICLE X.
### TENANT'S ADDITIONAL COVENANTS

Section 10.1    Affirmative Covenants.  Tenant covenants and agrees at its sole cost and expense at all times during the Term, such further time as Tenant occupies the Premises or any part thereof and such further time as indicated below:

10.1.1    To promptly perform all of the obligations of Tenant set forth in this Lease and to pay when due the Annual Base Rent, Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and any and all other Rent which by the terms of this Lease are to be paid by Tenant.  All Rent and other charges to be paid by Tenant under this Lease shall be paid to Landlord without any setoffs or counterclaims whatsoever (except if, and to the extent, expressly permitted under this Lease). The foregoing covenant shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

10.1.2    To occupy and use the Premises only for Tenant's Use described in Section 1.1.16, and for no other uses or purposes; subject to Force Majeure (as hereinafter defined) or any fire or other casualty of remodeling of the Premises for a reasonable duration, to continuously operate its business in the Premises for Tenant's Use described in Section 1.1.16 under Tenant's Trade Name or another trade name as may be adopted by Tenant from time-to-time so long as such changed trade name is not offensive and is consistent with the operation of the Shopping Center in accordance with the operation of Comparable Properties; and to conduct its business at all times in a first class and reputable manner.  Tenant shall give Landlord at least ninety (90) days prior written notice (the "Change of Use Notice") if Tenant intends to change the use of the Premises to any use constituting Other Permitted Retail Uses.  "Other Permitted Retail Uses" shall mean any retail uses permitted by applicable Legal Requirements, and which (i) do not violate any restrictions recorded against title to the Property, or any portion thereof; (ii) do not violate any Existing Exclusives (as hereinafter defined) exclusive or Future Exclusive Rights (as defined in Section 10.2.4) existing as of the date Landlord receives the subject change of Use Notice; (iii) do not compete with any primary business or use being conducted by another tenant of the Shopping Center as of the date Landlord receives the subject Change of Use Notice; (iv) are not for any of the uses or purposes designated as "Prohibited Uses" on Exhibit L; and (v) are consistent and in accordance with retail businesses conducted in Comparable Properties. For purposes of this Section 10.1.2, a business of another tenant in the Shopping Center shall be deemed to be a "primary business" of such other tenant if, at least fifteen percent (15%) of the square footage of the space leased occupied by such other tenant is used for such business.

10.1.3    Intentionally omitted.

10.1.4    Subject to Force Majeure or any fire or other casualty, to initially open for business no later than the date (the "Required Opening Date") that is one-hundred twenty (120) days after the Commencement Date, and to continuously operate at all times during the Term in accordance with Section 10.1.2.

10.1.5    To conform to all rules and regulations which Landlord may reasonably make in the management and operation of the Shopping Center (a copy of the current rules and regulations are attached hereto and made a part hereof as Exhibit I), and require such conformance by Tenant's employees, agents, contractors, guests, invitees, permitted sublessees, concessionaires and licensees or any person or entity claiming by, through or under Tenant; provided, however (i) Landlord shall enforce any such rules and regulations against Tenant in a non-discriminatory manner with respect to other similarly situated tenants, and (ii) no future rules or regulations shall materially interfere with the right of Tenant to operate its business in the Premises in accordance with this Lease; to receive and deliver goods and merchandise only in the manner and at such times and in such areas as may be designated by Landlord; to keep all drains inside the Premises clean; and to store all trash and garbage in adequate containers

21

10.1.9   To maintain in responsible companies approved by Landlord, public liability insurance on the Premises during the Term of this Lease, insuring Tenant as well as Landlord and its agents providing property management or advisory services to the Shopping Center as designated by Landlord, including Landlord's Agent (collectively, "Property Managers") and any Landlord's Mortgagee as additional named insureds thereunder, from and against all claims, demands or actions for injury or death of one or more persons in an amount of not less than $2,000,000 per occurrence and for damage to property with a deductible of no more than $1,000 and in an amount not less than $500,000 made by or on behalf of any persons, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises and the businesses of all of Tenant's sublessees, concessionaires and licensees (Landlord shall have the right to direct Tenant to increase such amounts whenever Landlord considers them inadequate) and, in addition, and in like amounts, covering Tenant's contractual liability under the hold harmless provisions contained in this Section 10.1.9; to carry like coverage against loss or damage by boiler or compressor or internal explosion of boilers or compressors, if there is a boiler or compressor in or serving the Premises; to maintain plate glass insurance covering all plate glass in the Premises; to maintain all-risk insurance including but not limited to, fire, vandalism and malicious mischief, water and sewer backup or leakage, and sprinkler leakage, extended coverage, covering all of Tenants equipment, stock-in-trade, trade and other fixtures, furniture, furnishings, floor coverings and all other items of personal property of Tenant located on or within the Premises to the extent of one hundred percent (100%) of their replacement cost naming Landlord, the Property Managers, and Landlord's Mortgagee as additional named insureds; and, at any time that any portion of the Premises is being used for the sale, display, distribution or serving of alcoholic liquors (within the meaning of the Illinois Liquor Control Act, as or hereinafter amended) to maintain, at least ten (10) days before the commencement of any such activity and continuously thereafter, liquor liability insurance in form and substance and with insurers satisfactory to Landlord, with total limits of liability for bodily injury, loss of means of support and property damage because of each occurrence of not less than Three Million Dollars ($3,000,000.00), or such greater amounts as Landlord may designate. Such liquor liability insurance shall insure Landlord, Landlord's Agent, and any and all other Owner's Entities against any and all liability by virtue of the Illinois Liquor Control Act, any amendments or supplements thereto, or any kindred legislation concerning the use, sale or giving away of alcoholic liquors. During any time that the required liquor liability insurance is for any reason not in force, then, during all and any such times, no sale, merchandising, transfer, giving away, or exchange of so called "alcoholic liquors" shall be made by Tenant in, upon or from any part of the Premises. Tenant shall procure and maintain, at its expense, business interruption or extra expense insurance with coverage limits not less than those carried by a reasonably prudent tenant subject to Landlord's approval and naming Landlord, and Landlord's Mortgagee as additional named insureds but in no event less than the applicable Annual Base Rent. All insurance to be procured and maintained by Tenant pursuant to this Section 10.1.9 shall: (i) be in a form, and carried with responsible companies with a general policy rating of "A" or better and a financial class of VII or better assigned by A.M Best Company, Inc. authorized to do business in the state in which the Premises are located, each satisfactory to Landlord and its Mortgagee; (ii) provide that any release from liability or waiver of claim for recovery entered into in writing by the insured or any additional insured prior to any loss or damage shall not affect the validity of such policy or the right of any insured or additional insured to recover thereunder; (iii) contain a waiver of subrogation clause in form and content satisfactory to Landlord; (iv) provide that it will not be subject to cancellation, non-renewal, reduction or other change except after at least thirty (30) days' prior written notice to Landlord; and (v) name Landlord, the Property Managers and Landlord's Mortgagee as additional named insureds thereunder. The policies or duly executed certificates for the same (which shall evidence the insurer's waiver of subrogation) together with satisfactory evidence of the payment of the premium thereon, shall be deposited with Landlord on or before the Commencement Date and, upon renewals or replacements of such policies, not less than thirty (30) days prior to expiration of the term of such coverage. If Tenant fails to comply with such requirements, Landlord may (but shall have no obligation to) obtain such insurance and keep the same in effect, and Tenant shall pay Landlord as additional Rent due hereunder the premium cost thereof upon demand.

10.1.10   That Landlord and the other Owner's Entities shall not be liable for, and Tenant shall not be entitled to an abatement of rent in respect of, and, to the extent permissible by state law, Tenant waives all claims for damage to Tenant's property sustained by Tenant or any person or entity claiming by, through or under Tenant resulting from any accident or occurrence in or upon the Premises or the building of which they shall be a part, or any other part of the Shopping Center, including, but not limited to: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep such building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating, ventilating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, railings, elevators, escalators or

Avenue, and (ii) replace or renovate the existing monument sign at the Clybourn Avenue entrance of the Shopping Center. Tenant shall have the right, subject to signage codes and ordinances and all other applicable Legal Requirements (but shall not be obligated) to have (1) identification panel on each of such signs. Tenant shall reimburse Landlord, as additional Rent, for fifty percent (50%) of the costs incurred by Landlord to replace or renovate such existing signs; provided, however, Tenant shall not be obligated to reimburse Landlord for such costs if,, immediately prior to such replacement or renovation, Tenant does not have an identification panel on the sign which is being replaced or renovated. Tenant shall pay such reimbursement to Landlord within thirty (30) days from the date Landlord delivers to Tenant reasonable evidence of the costs so incurred by Landlord. In the event that Landlord erects a monument or pylon sign in addition to the existing pylon sign at the Clybourn entrance of the Shopping Center, or if Landlord replaces such existing pylon sign with a pylon or other sign that provides for more tenant signage space or panels than such existing pylon sign, then, Tenant shall be allowed, during the term of this Lease, to maintain one sign panel on such additional monument or pylon sign, or such replacement of the existing pylon sign, as the case may be. The exact size and location of such panel shall be determined by Landlord in Landlord's sole discretion. Tenant shall only be allowed to advertise the trade name of its business as identified in Section 1.1.6 herein on its sign panel. Upon Landlord's receipt and approval of Tenant's "copy" for the sign panel, Landlord shall be responsible for installing the sign panel on the pylon sign. Landlord shall thereafter be responsible the ongoing maintenance and repair of said panel, subject to reimbursement as Operating Costs as provided in Section 5.3.

10.1.17 Tenant acknowledges that Tenant has elected not to install soundproofing between the Premises and adjoining space in the Shopping Center. Tenant covenants to keep and operate the Premises, and all equipment located in the Premises: (i) free of vibration which may be transmitted beyond the Premises; and (ii) free of any sounds at a level exceeding 80 decibels (dBs) provided; however, if, at any time, Landlord notifies Tenant of complaints about the intrusion of vibration or sound or noise emanating or transferring from the Premises exceeding 60 decibels from other tenants in the Shopping Center then, Tenant shall either immediately cease all activities generating any such vibration, sound or noise, or, at Tenant's sole cost and expense, install or otherwise utilize in the Premises such insulation, sound isolation or sound attenuation applications as necessary to absorb any such objectionable vibrations or noise, and to prevent such objectionable vibrations or sound or noise at a level exceeding 60 decibels (dBs) from being emanated or transferred from the Premises. In addition, Tenant acknowledges that loud music or other loud noises may emanate from adjoining space into the Premises, and Landlord shall have no liability to Tenant because of same.

Section 10.2    Negative Covenants. Tenant covenants and agrees at all times during the Term and such further time as Tenant occupies the Premises or any part thereof:

10.2.1 Not to injure, overload, deface, or otherwise harm the Premises or the Shopping Center; nor commit any nuisance; nor unreasonably annoy owners or occupants of neighboring property; nor use the Premises for any extra-hazardous purpose or in any manner that will suspend, void or make inoperative or increase the cost of any policy of insurance maintained by Landlord on the Shopping Center; nor burn any trash or refuse within the Shopping Center; nor sell, display, distribute or give away any alcoholic liquor or beverages (provided, however, if the Premises is being operated for the Health Club Use, then, Tenant shall have the right to sell, display, distribute or give away alcoholic liquor or beverages to patrons of the health club facility if, and so long as, (i) Tenant maintains liquor liability insurance in accordance with and as required by, Section 10.1.9, and (ii) the sale or distribution of alcoholic liquor or beverages does not violate any Existing Exclusives); nor permit or cause odors to emanate or be dispelled from the Premises; nor solicit business in the Common Areas nor distribute advertising material to, in or upon any Common Areas; nor sell, distribute or give away any product or service which tends to create a nuisance in the Common Areas; nor make any use of the Premises which is improper, offensive or contrary to any Legal Requirements nor conduct or permit any liquidation, going-out-of-business, bankruptcy, fire, or auction sales in the Premises; nor use any advertising medium such as handbills, flashing lights, searchlights, signs, loud-speakers, phonographs, sound amplifiers or audio video receiving equipment in a manner to be seen or heard outside of the Premises other than Tenant's sign approved by Landlord; nor load, unload or park any truck or other delivery vehicle in any area of the Shopping Center other than the area designated therefore by Landlord; nor use any vestibule or entry of the Premises, sidewalks, walkways or Common Areas of the Shopping Center for the storage or disposal of trash or refuse or the keeping or displaying of any merchandise or other object, including, but, not limited to, the use of any of the foregoing for any newsstand, cigar stand, sidewalk shop or any business occupation or undertaking (such uses of such areas being reserved to Landlord and its designees); nor operate any heating or

25

assignment and subletting, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the complete performance by Tenant of the terms, covenants and conditions of this Lease. Notwithstanding anything contained in this Lease to the contrary, no transfer, assignment or subletting, inclusive of a Permitted Transfer (as hereinafter defined), whether or not consented to by Landlord, shall: (x) relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal and not as a guarantor or surety, to the same extent as though no transfer, assignment or sublease had been made, or (y) relieve Guarantor of its obligations under the Guaranty (as hereinafter defined).

Notwithstanding anything to the contrary contained in this Section 10.2.3, Tenant shall have the right, at any time during the Term without the consent of Landlord to:

    (I)     assign this Lease or sublet the Premises to: (1) any subsidiary, parent or affiliated corporation of Tenant; (2) any entity resulting from the reorganization, merger or consolidation affecting Tenant; or (3) any person, firm or corporation acquiring substantially all of Tenant' stock or assets;

    (II)    assign this Lease or sublet the entirety of the Premises to an affiliated entity or third party who intends to operate the Premises as a health club facility; or

    (III)    sublease up to 5,000 square feet of the Premises, provided that Tenant's right to sublease up to such square footage pursuant to this clause (III) shall be subject to the following requirements:

        (A)    if the subleased space is to be separately demised from the balance of the Premises, such separate demise is performed and maintained in accordance with Legal Requirements; and

        (B)    the use of the subleased space by the sublessee is related to the operation of Tenant's business in the balance of the Premises for the Health Club Use.

Any transfer under clauses (I), (II) or (III) above shall be referred to as "Permitted Transfer" and, in the event of a Permitted Transfer, Tenant shall promptly notify Landlord of such assignment or subletting (as the case may be), and provide Landlord with copies of the applicable transfer documents.

    10.2.4   Not to operate or use, or permit or suffer to be operated or used, all or any part of the Premises for any of the uses or purposes designated as "Prohibited Uses" on Exhibit L, or any other use or purpose other than Tenant's Use permitted hereunder nor any other use or purpose which is inconsistent with the image and standard of quality of the Shopping Center, it being mutually acknowledged that the Shopping Center is to be operated as a first class shopping center. Tenant agrees that Tenant shall not violate: (i) any exclusive rights which have been granted to other tenants of the Shopping Center as of the Date of this Lease (the "Existing Exclusives"), which Existing Exclusives are so designated on Exhibit L, or (ii) any future exclusive rights granted to other tenants of the Shopping Center ("Future Exclusive Rights") provided that, and so long as, Tenant is given written notice of such Future Exclusive Rights; provided, however, no Future Exclusive Rights shall restrict Tenant from operating the Premises for the Health Club Use.

    10.2.5   Not to suffer any mechanics', laborers' or materialmen's liens to be filed against the Premises or the Shopping Center or any interest therein by reason of any work, labor, services performed at, or materials furnished to, or claimed to have been performed at, or furnished to, the Premises, by, or at the direction or sufferance of, Tenant, or anyone holding the Premises or any portion thereof, through or under the Tenant; provided, however, that if any such liens shall, at any time, be filed or claimed, Tenant shall have the right to contest, in good faith and with reasonable diligence, any and all such liens, provided security reasonably satisfactory to Landlord is deposited with Landlord to insure payment thereof, together with all interest and other costs associated therewith, and to prevent any sale, foreclosure or forfeiture of the Premises or the Shopping Center by reason of nonpayment thereof. On final determination of the lien or claim for lien, Tenant shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released of record and any judgment satisfied. If Tenant shall fail

27

shall repair such damage.  In no event shall Landlord be required to repair or replace Tenant's stock-in-trade, fixtures, furniture, furnishings, floor coverings, equipment and all other improvements to the Premises.

11.1.2   In the event of any such damage and (i) Landlord is not required to repair as hereinabove provided, or (ii) the Premises shall be damaged to the extent of fifty percent (50%) or more of the cost of replacement or (iii) the building of which the Premises are a part is damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, or (iv) the buildings (taken in the aggregate) in the Shopping Center shall be damaged to the extent of more than twenty-five percent (25%) of the aggregate cost of replacement, Landlord may elect either to repair or to rebuild the Premises or the building or buildings, or to terminate this Lease upon giving notice of such election in writing to the Tenant within ninety (90) days after the occurrence of the event causing such damage.  If Landlord elects to terminate this Lease, such termination shall be effective thirty (30) days after such notice and, subject to Section 11.1.3, Tenant shall pay any and all rent and other charges due hereunder up to the date of such damage with an appropriate refund by Landlord of such rent or other charges as may have been paid in advance for any period subsequent to the date of such damage.

11.1.3   Anything contained in this Lease to the contrary, in the event that (i) twenty-five percent (25%) or more of the Premises are damaged by fire, explosion or other casualty; (ii) as a result of such damage, Tenant is unable to reasonably operate its business in the Premises in the manner of operation immediately prior to the occurrence of the destruction and damage; and (iii) the Premises cannot be repaired or restored within three hundred sixty-five (365) days following the occurrence of such damage or destruction as reasonably determined by Landlord in a written notice (the "Repair Estimation Notice") which Landlord shall provide to Tenant within sixty (60) days following the occurrence, then, Tenant shall have the right to cancel and terminate this Lease as of the date of the occurrence of such destruction or damage by delivery of written notice thereof to Landlord within thirty (30) days after the date on which Landlord gave Tenant the Repair Estimation Notice.

11.1.4   Notwithstanding anything to the contrary contained in this Lease, if the casualty, repairing or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Annual Base Rent, and payments with respect to Operating Costs, Real Estate Taxes and HVAC Charges for the applicable Operating Year(s) shall be allowed from the date when the damage occurred until the date that is the earlier of (i) the date that is one hundred twenty (120) days from the date on which Landlord substantially completes the work in the Premises pursuant to this Section and (ii) the date on which Tenant reopens for business in any portion of the Premises, such proportion to be computed on the basis of the relation which the gross square foot area of the space rendered untenantable bears to the floor area of the Premises.  If Landlord is required or elects to repair the Premises as provided herein, Tenant shall repair or replace its stock-in-trade, fixtures, furniture, furnishings, floor coverings and equipment and, if Tenant has closed, Tenant shall promptly reopen for business upon Landlord's completion of its repair of the Premises.

11.1.5   Except as provided in Section 11.1.4, Tenant waives any right to cancel or terminate this Lease as a result of damage to the Premises because of fire or other casualty pursuant to any presently existing statute, any statute that may be enacted in the future, or any other law.

Section 11.2    Eminent Domain.

11.2.1   If the whole of the Premises shall be taken by any public authority by the exercise, or under the threat of the exercise, of the power of eminent domain, this Lease shall terminate as of the day the right to possession shall be taken by such public authority and Tenant shall pay any and all rent and other charges due hereunder up to such date with an appropriate refund by Landlord of such rent as may have been paid in advance for any period subsequent to the date the right to possession is taken.

11.2.2   If less than all of the floor area of the Premises shall be so taken, the Term shall cease only on the parts so taken as of the day the right to possession shall be taken by such public authority, and Tenant shall pay any and all rent and other charges due hereunder up to such day with appropriate refund by Landlord of such rent as may have been paid in advance on the portion of the floor area so taken for any period subsequent to the date the right to possession is taken and thereafter the Annual Base Rent and any and all other charges due hereunder for the remaining Operating Years, or portions thereof, shall be equitably adjusted, based upon the square footage of the Premises remaining.  Landlord shall, at its expense, make all necessary repairs or alterations to the basic building

29

(e)    Except as otherwise specified in this Section 12.1, Tenant fails to perform in a complete manner any other term, covenant or condition of Tenant in this Lease and unless it is expressly provided in this Lease that a specified act or omission by Tenant constitutes a default hereunder without notice from Landlord, such failure continues for thirty (30) days after written notice thereof (or if such default is of the nature that it cannot be cured within thirty (30) days, then an Event of Default shall not occur if Tenant commences efforts to cure the default promptly after receipt of written notice thereof, and continues to diligently to prosecute all action necessary to cure such default within a reasonable time, not to exceed ninety (90) days after the notice of default);

(f)    a receiver or similar officer becomes entitled to Tenant's interest in this leasehold;

(g)    Tenant's interest in this Lease is taken by execution or other process of law in any action against Tenant;

(h)    Tenant's interest in Premises are levied upon by any revenue officer or similar officer;

(i)    Tenant does, or permits to be done, any act which creates a mechanic's lien or claim against the Premises or the land or building of which the Premises are a part and Tenant does not promptly comply with the provisions hereunder with respect thereto;

(j)    Tenant fails to procure or maintain the insurance required pursuant to Section 10.1.9, and such failure is not cured within five (5) days after written notice thereof; or

(k)    Tenant has submitted any intentionally fraudulent report required to be furnished hereunder or breaches any representation or warranty made hereunder.

Section 12.2    Termination Upon Default.    Upon the occurrence of any Event of Default, Landlord may, in addition to all other rights and remedies it may have, terminate this Lease by giving written notice to Tenant. Either before or after such termination of this Lease, Landlord may reenter the Premises, with or without process of law, using such force as may be necessary, to remove all persons, fixtures and chattels therefrom and at Landlord's option to store the same at Tenant's expense. Tenant shall pay to Landlord on demand, as damages and not as a penalty, the sum of (1) any and all rents and other charges due and payable by Tenant as of the date of termination, plus (2) the unamortized cost to Landlord, computed in accordance with generally accepted accounting principles, of improvements to the Premises, if any, provided by Landlord at its expense or otherwise paid for by Landlord, plus (3) a sum of money equal to the then present value, using an annual discount rate of three percent (3%) of (i) the Annual Base Rent, Tenant's Pro Rata Share of Operating Costs, Tenant's Pro Rata Share of Real Estate Taxes, and Tenant's Pro Rata Share of HVAC Charges and all other charges provided herein to be paid by Tenant to Landlord for the remainder of the Term, less (ii) the fair rental value of the Premises for said period (net of the cost of reletting the Premises), plus (4) the cost of performing any other covenants to be performed by Tenant for the remainder of the Term, plus (5) any other damages sustained by Landlord due to any Event of Default, including, but not limited to, reasonable attorneys' fees and court costs. Nothing contained herein shall limit or prejudice the right of Landlord to prove and obtain as damages, by reason of such Event of Default, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount referred to above. The rights and remedies of Landlord under this Article XII, shall survive the termination of this Lease.

Section 12.3    Repossession Upon Default.    Upon the occurrence of any Event of Default, Landlord may repossess the Premises by forcible entry, detainer suit or otherwise, without demand or notice of any kind to Tenant (except as otherwise expressly provided for) and without terminating this Lease, in which event Landlord may from time to time, but shall be under no obligation to, relet all or any part of the Premises for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Premises for a term greater or lesser than that remaining under the Term, the right to relet the Premises as a part of a larger area, and the right to change the character or use of the Premises). For the purpose of such reletting, Landlord may decorate and make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient. Whether or not the Premises or any part are relet, Tenant shall pay to Landlord on demand any and all rents and other charges payable by Tenant as of the date Landlord repossesses the Premises. Tenant shall be liable for and shall pay from

LF 5142039.7 \ 28730-98464

States or of any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or any such guarantor's property, which petition is not dismissed within thirty (30) days, or if Tenant or any such guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, then the occurrence of any one of such events shall constitute an Event of Default and Landlord may exercise any of the remedies for an Event of Default provided herein or provided at law, in equity or by statute and, in addition thereto, Landlord shall have the immediate right of reentry and may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

Section 12.6    Interest and Late Charge on Late Payment.    If, on more than one occasion in any twelve (12)-month period, Rent or other charges to be paid hereunder by Tenant which shall not be paid within ten (10) days from the date due shall bear interest at the lesser or: (i) the maximum rate then permitted under applicable state law, or, (ii) the greater of the Corporate Base Rate as announced from time to time by JP Morgan Chase (or a similar institution designated by Landlord) at the time of the Event of Default plus five percent (5%) or the rate of eighteen percent (18%) per annum, from the date when the same is due and payable under the terms of this Lease until the same shall be paid (the "Default Rate"). In addition, if on more than one occasion in any twelve (12)-month period, Tenant fails to pay Rent or any other charge within ten (10) days from the date when due, Tenant shall pay Landlord, as additional Rent, a late payment service charge covering administrative and overhead expenses equal to the greater of (i) Five Hundred Dollars ($500) or (ii) three percent (3%) of the overdue amount. Tenant shall pay a Twenty-Five Dollar ($25) charge for any checks written to Landlord and returned for insufficient funds.

Section 12.7    Holdover by Tenant.    Any holding over by Tenant of the Premises after the expiration of the Term or termination of this Lease shall operate and be construed to be a tenancy from month-to-month only, at a rental rate equal to 150% of the Monthly Base Rent and any and all other charges payable hereunder at the expiration of the Term or termination of this Lease. If Tenant holds over after a written demand by Landlord for possession at the expiration of the Term or after termination of this Lease by either party of a month-to-month tenancy created pursuant to this Section, or after termination of the Lease or of Tenant's right to possession pursuant to Section 12.3 or Section 12.5, Tenant shall pay monthly rent at a rate equal to 150% of the Monthly Base Rent payable immediately prior to the expiration or other termination of this Lease or Tenant's right to possession. In addition, Tenant shall remain liable for any other charges payable hereunder. Nothing in this Section shall be construed to give Tenant the right to hold over after the expiration or termination of this Lease, and Landlord may exercise any and all remedies at law or in equity to recover possession of the Premises.

Section 12.8    Landlord's Right to Cure Defaults.    Landlord may, but shall not be obligated to, at any time, following ten (10) days written notice with right to cure (excluding for emergency situations in which case Landlord shall have the right to take all reasonable measures, as determined by Landlord, to cure any such emergency situation), cure any default by Tenant under this Lease, and whenever Landlord so elects, all costs and expenses paid by Landlord in curing such default, including, without limitation, reasonable attorneys' fees and expenses, shall be so much additional rent immediately due and payable upon demand, together with interest (except in the case of attorneys' fees) at the Default Rate.

Section 12.9    Effect of Waiver of Default; Valuation Laws.    No consent or waiver, expressed or implied, by Landlord to or of any breach of any term, covenant or condition of this Lease shall be construed as a consent or waiver to or of any other breach of the same or any other term, covenant or condition. No payment by Tenant nor receipt from Landlord of a lesser amount than the rent or other charges due hereunder shall be deemed to be other than on account of the earliest unpaid rent or other charges due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord shall accept such check for payment without prejudice to Landlord's right to recover the balance of such rent or other charge or pursue any other remedy available to Landlord. Any recovery under this Article XII shall be without relief from any valuation and appraisement laws now or hereafter enacted.

Section 12.10    Remedies Cumulative.    No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and

33

the Premises and surrendered possession thereof to the Landlord at the expiration of the Term or any extension or renewal thereof as provided herein;

(f)      that Landlord, on behalf of itself and its successors, reserves the right, at its sole option, to return to Tenant the Security Deposit or what may then remain thereof, at any time prior to the date when Landlord, or its successors, is obligated hereunder to return the same, but such return shall not in any manner be deemed to be a waiver of any default by the Tenant hereunder then existing nor to limit or extinguish any liability of Tenant hereunder;

(g)      that if Tenant shall fail to faithfully fulfill, keep, perform or observe any of Tenant's obligations, covenants, conditions or agreements hereunder, Landlord shall have the right, but not the obligation, to apply the Security Deposit or any portion thereof, to cure such failure (but Landlord's rights shall not be limited to the Security Deposit); and

(h)      notwithstanding anything to the contrary contained in this Section 12.12, provided that no Event of Default (i) then exists under this Lease, and (ii) there has not been more than two (2) Events of Default by Tenant in the payment of Base Rent hereunder for which Landlord has provided written notice of default, in the previous twelve (12)-month period, even if such Events of Default have been cured, then, on each Reduction Date (as hereinafter defined), the Security Deposit (either the remaining cash deposit or the letter of credit, as applicable), shall be reduced by Two Hundred Thousand Dollars ($200,000). As used herein, a Reduction Date shall mean: (i) the last day of the 18th full calendar month of the Term, (ii) the last day of the 30th full calendar month of the Term, (iii) the last day of the 42nd full calendar month of the Term, and (iv) the last day of the 54th full calendar month of the Term so that, immediately following the last day of the 54th calendar month of the Term, and so long as the foregoing conditions for the reduction of the Security Deposit have been satisfied, the entire Security Deposit shall equal, and be no less than, Two Hundred Thousand Dollars ($200,000). Provided that no Event of Default then exists under this Lease, and there has not been more than two (2) Events of Default by Tenant in the payment of Base Rent for which Landlord has provided written notice of default, in the previous twelve (12)-month period, (even if such Events of Default has been cured), then, on the date immediately following the tenth (10th) Operating Year, Landlord shall release to Tenant the entire Security Deposit (either the remaining cash deposit or the letter of credit, as applicable) or any then remaining amount with respect to the Security Deposit.

The Security Deposit may not be used as Rent.

        12.12.2  Letter of Credit.  Notwithstanding anything set forth to the contrary in this Lease, in lieu of the cash deposit described in Section 12.12 of this Lease, Tenant may, within ten (10) days after the Date of this Lease, deliver or cause to be delivered to Landlord, a clean, unconditional, irrevocable letter of credit, in the amount of the Security Deposit, issued to Landlord, and in compliance with the terms and conditions of Section 12.12 (including, but not limited to, Section 12.12 (a) – (h), as applicable) and this Section 12.12.1. Upon an Event of Default under this Lease, Landlord may draw on the letter of credit to cure such default and/or to reimburse Landlord for Landlord's damages incurred as a result of such Event of Default. Such letter of credit shall be: (i) in form and substance substantially as set forth in Exhibit F (with the following criteria at a minimum); (ii) in the required amount of the Security Deposit; (iii) issued by a commercial bank acceptable to Landlord from time to time with offices located in Chicago, Illinois for the account of Tenant, and its permitted successors and assigns under this Lease; (iv) made payable to, and expressly transferable and assignable one or more times at no charge by, the owner from time to time of the Shopping Center or a Mortgagee (which transfer/assignment shall be conditioned only upon the execution of a reasonable and customary written document in connection therewith),whether or not the original account party of the letter of credit continues to be the Tenant under this Lease by virtue of a change in name or structure, merger, assignment, transfer or otherwise; (v) payable at sight upon presentment to a Chicago, Illinois branch of the issuer of a simple sight draft stating only that Landlord is permitted to draw on the letter of credit under the terms of the Lease and setting forth the amount that Landlord is drawing; (vi) of a term not less than one year and shall on its face state that the same shall be renewed automatically, without the need for any further written notice or amendment, for successive minimum one year periods, unless the issuer notifies Landlord in writing, at least sixty (60) days prior to the expiration date thereof, that such issuer has elected not to renew the letter of credit (which will thereafter entitle Landlord to draw on the letter of credit and hold same as a cash security deposit); and

35

ARTICLE XIII.
AMERICANS WITH DISABILITIES

The parties hereto acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 *et seq.*) and regulations and guidelines promulgated thereunder, as all of the same may be amended or supplemented from time to time (collectively referred to as "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Premises and the Shopping Center depending on, among other things: (a) whether Tenant's business is deemed a "public accommodation" or "commercial facility", (b) whether such requirements are "readily achievable", and (c) whether a given alteration affects a "primary function area" or triggers "path of travel" requirements. The parties hereby agree that: (i) Landlord shall be responsible for ADA Title III compliance in the Common Areas, except as provided below; (ii) Tenant shall be responsible for ADA Title III compliance in the Premises, including any leasehold improvements or other work to be performed in the Premises under or in connection with this Lease, and (iii) Landlord may perform, or require that Tenant perform, and Tenant shall be responsible for the cost of, ADA Title III "path of travel" requirements triggered by alterations in the Premises after the Delivery Date. Tenant shall be solely responsible for requirements under Title I of the ADA relating to Tenant's employees.

ARTICLE XIV.
LANDLORD'S INSURANCE

Landlord agrees to maintain insurance in at least the following coverage amounts:

(i)     Property insurance for the Shopping Center (excluding Tenant's leasehold improvements), against loss or damage from such causes of loss as are embraced by insurance policies of the type now known as "All Risk" property insurance on a replacement cost basis in an amount not less than one hundred percent (100%) of the then full replacement cost of the buildings located in the Shopping Center; and

(ii)    Commercial liability insurance insuring against claims for personal injury (including bodily injury or death), property damage, liability and such other loss or damage from such causes of losses are embraced by insurance policies of the type now known as "commercial general liability" insurance.

Upon request from Tenant, Landlord shall furnish Tenant with certificates for its insurance. Landlord shall not be required to insure Tenant's equipment, trade fixtures or personal property. All amounts paid by Landlord for obtaining the insurance required herein shall be included in Operating Costs.

ARTICLE XV.
MISCELLANEOUS PROVISIONS

Section 15.1     Mutual Waiver of Claims and Subrogation.  Whenever (i) any loss, cost, damage or expense resulting from fire, explosion or any other casualty or occurrence is incurred by either of the parties to this Lease or anyone claiming by, through or under them in connection with the Premises and (ii) such party is then either covered in whole or in part by insurance with respect to such loss, cost, damage or expense, or required under this Lease to be so insured, then the party so insured (or so required) hereby releases the other party from any liability the other party may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance (or which could have been recovered had insurance been carried as so required) and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect is to invalidate such insurance coverage or increase the cost thereof (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereupon keeping such release and waiver in full force and effect).  If the party released from liability hereunder is the Landlord, said term "Landlord" for the purpose of this Section only, shall include the other Owner's Entities.

Section 15.2     Notices.  Any notice or demand from Landlord to Tenant or from Tenant to Landlord shall be in writing and shall be sent by a nationally recognized air courier, such as, but not limited to Federal

37

3.5, or (iii) be required to pay any amounts to Tenant arising under the Lease prior to such successor landlord taking possession. Tenant acknowledges that this Lease has been assigned to Mortgagee as collateral security for the performance by Landlord of Landlord's obligation under its Mortgage and other loan documents with Mortgagee.

Section 15.7    **Estoppel Certificates.**  At any time, and from time to time, Tenant agrees, upon request in writing from Landlord, to execute, acknowledge and deliver to Landlord a statement in writing in form reasonably satisfactory to Landlord, certifying to Landlord, any Mortgagee or any potential purchaser of the Shopping Center, that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which the Monthly Base Rent and any and all other charges have been paid, the absence of any default or any claim or offset by Tenant against Landlord (or specifying any such default, claim or offset) and making such other accurate certifications as Landlord, such Mortgagee or such potential purchaser may reasonably require.  At Landlord's election, failure to deliver such statement to Landlord within ten (10) days from the date of Tenant's receipt of Landlord's request therefore shall be deemed an Event of Default.  At any time, and from time to time, Landlord agrees, upon request in writing from Tenant, to execute, acknowledge and deliver to Tenant a statement in writing in form reasonably satisfactory to Tenant, certifying to Tenant or any potential assignee of this Lease or sublessee of the Premises that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which the Monthly Base Rent and any and all other charges have been paid, the absence of any default by Tenant (or specifying any such default), and making such other accurate certifications as Tenant or such potential assignee or sublessee may reasonably require.

Section 15.8    **Applicable Law and Construction.**  The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Lease.  The invalidity or unenforceability of any provision of this Lease (other than those provisions relating to the payment of rent or other charges) shall not affect or impair any other provision.  The headings of the Articles and Sections contained herein are for convenience only and do not define, limit or construe the contents of such articles, sections or subsections.  Whenever a singular term is used herein, the same shall include the plural.  Whenever the masculine gender is used herein, the same shall include the feminine and neuter genders.

Section 15.9    **Time of the Essence.**  Time is of the essence in this Lease.

Section 15.10    **Execution of Lease by Landlord.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises.  When executed and delivered to Landlord, this Lease shall be considered an irrevocable offer by Tenant which shall remain open for a period of fourteen (14) days from the date of delivery.  Upon execution by Landlord, this Lease shall be deemed made as of the date of such execution, and an executed copy of this Lease shall be sent to Tenant.  In the event Tenant's offer is not accepted within said fourteen (14) day period, Landlord may consider Tenant's offer to be a continuing offer, which may be accepted at any time prior to Landlord's receipt of a written revocation of said offer from Tenant.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord and Tenant, and no act or omission of any employee or other agent of Landlord or Leasing Broker(s) shall alter, change or modify any of the provisions hereof.  This Lease constitutes the entire Agreement between Landlord and Tenant and there are no representations, warranties, promises, agreement, conditions or undertakings, oral or written, between Landlord and Tenant other than those set forth herein.  Any subsequent change, addition or alteration to this Lease shall not be binding upon Landlord or Tenant unless in writing and signed by both parties.

Section 15.11    **Binding Effect of Lease.**  The terms, covenants, agreements, obligations and conditions contained herein, except as otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns, subject to the rights of Landlord under Subsection 10.2.3 above.  Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment and the assumption by the assignee of the terms, covenants and conditions to be performed by Landlord herein arising on or after the date of such assignment, Landlord and its successors and assigns (other than the assignee of this Lease) shall be released from any and all liability hereunder with respect to terms, covenants, agreements, obligations and conditions to be performed by Landlord.  Landlord or its assignee or successor shall give Tenant written notice of the occurrence of any such assignment of this Lease.

39

Section 15.18    Limitation of Liability.  Notwithstanding anything to the contrary contained in this Lease, it is specifically understood and agreed that the liability of Landlord hereunder shall be limited to the interest of Landlord in the Shopping Center in the event of a breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord. Tenant hereby agrees that any judgment it may obtain against Landlord shall be enforceable solely against Landlord's ownership interest in the Shopping Center.

Section 15.19    Personal Property Taxes.  Tenant shall pay before delinquency any personal property taxes attributable to the furniture, fixtures, merchandise, equipment or other personal property situated in or on the Premises.  If any such personal property taxes are levied against Landlord or Landlord's property, and if Landlord pays the same (which Landlord shall have the right, but not the obligation, to do) or if the assessed value of Landlord's property is increased by the inclusion of a value placed on Tenant's property, and if Landlord pays the taxes based on such increased assessment (which Landlord shall have the right, but not the obligation, to do). Tenant upon demand shall repay to Landlord the taxes levied against the Landlord or the proportion of such taxes resulting from any increase in the assessment on Landlord's property.

Section 15.20    Easements.  Landlord shall have the right to grant any easements on, over, under and above the Premises for such purposes as Landlord determines, provided such easements will not materially interfere with Tenant's Use.

Section 15.21    Corporate Authority.  Tenant represents and warrants that it has full corporate or partnership power and authority, as the case may be, to enter into this Lease and has taken all corporate or partnership action, as the case may be, necessary to carry out the transaction contemplated herein, so that when executed this Lease constitutes a valid and binding obligation enforceable in accordance with its terms.  If Tenant is a corporation, Tenant shall provide Landlord with a corporate resolution in a form acceptable to Landlord, authorizing execution of the Lease at the time of such execution.

Section 15.22    Landlord Consents.  Except as provided in Section 5.1, Section 5.2 and Section 5.3 above, whenever Landlord's consent, approval or agreement is required in this Lease, such consent, approval or agreement shall not be unreasonably delayed or withheld.

Section 15.23    Legal Requirements.  As used in this Lease, "Legal Requirements" shall mean any or all statutes, ordinances, codes, rules, regulations and other requirements of any one or more of the federal, state and local governmental or quasi-governmental body or bodies having jurisdiction at any time or from time to time during the Term of this Lease over the Premises or the Shopping Center.

Section 15.24    Guaranty of Completion.  Tenant's obligations under this Lease with respect to the construction of Tenant's work shall be guaranteed by Guarantor pursuant to the terms of the Guaranty of Completion (the "Guaranty") attached hereto as Exhibit J.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

LP 5142039.7\28736-98464

[SIGNATURE PAGE TO LEASE]

WEBSTER PLACE SM-3, L.L.C., a Delaware limited
liability company

By: _____
Name: _Richard Kaplan_____
Its:        Authorized Signatory


WEBSTER PLACE SM-4, L.L.C., a Delaware limited
liability company

By: _____
Name: _Richard Kaplan_____
Its:        Authorized Signatory


WEBSTER PLACE SM-5, L.L.C., a Delaware limited
liability company

By: _____
Name: _Richard Kaplan_____
Its:        Authorized Signatory


WEBSTER PLACE SM-6, L.L.C., a Delaware limited
liability company

By: _____
Name: _Richard Kaplan_____
Its:        Authorized Signatory


WEBSTER PLACE SM-7, L.L.C., a Delaware limited
liability company

By: _____
Name: _Richard Kaplan_____
Its:        Authorized Signatory

[SIGNATURES CONTINUED NEXT PAGE]

43

[SIGNATURE PAGE TO LEASE]

WEBSTER PLACE SM-13, L.L.C., a Delaware limited
liability company

By: _____

Name: _____

Its:          Authorized Signatory


WEBSTER PLACE SM-14, L.L.C., a Delaware limited
liability company

By: _____

Name: _____

Its:          Authorized Signatory

collectively "Landlord"


[SIGNATURES CONTINUED NEXT PAGE]

LP 5142039.7 \ 28730-90464

## EXHIBIT A

### LIST OF LANDLORD ENTITIES

| |
|---|
| Webster Place SEC Investors, L.L.C., a Delaware limited liability company |
| Webster Place MM, L.L.C., a Delaware limited liability company |
| Webster Place SM-1, L.L.C., a Delaware limited liability company |
| Webster Place SM-2, L.L.C., a Delaware limited liability company |
| Webster Place SM-3, L.L.C., a Delaware limited liability company |
| Webster Place SM-4, L.L.C., a Delaware limited liability company |
| Webster Place SM-5, L.L.C., a Delaware limited liability company |
| Webster Place SM-6, L.L.C., a Delaware limited liability company |
| Webster Place SM-7, L.L.C., a Delaware limited liability company |
| Webster Place SM-8, L.L.C., a Delaware limited liability company |
| Webster Place SM-9, L.L.C., a Delaware limited liability company |
| Webster Place SM-10, L.L.C., a Delaware limited liability company |
| Webster Place SM-11, L.L.C., a Delaware limited liability company |
| Webster Place SM-12, L.L.C., a Delaware limited liability company |
| Webster Place SM-13, L.L.C., a Delaware limited liability company |
| Webster Place SM-14, L.L.C., a Delaware limited liability company |

EXHIBIT C

SITE PLAN OF THE SHOPPING CENTER



C-1

EXHIBIT D-2

FLOOR PLAN OF THE BASEMENT SPACE



D-2-1

EXHIBIT F

FORM OF LETTER OF CREDIT

[SEE ATTACHED]

LP 5142039.7 \ 28730-98464

THIS DRAFT LC IS PROVIDED TO YOU AT YOUR REQUEST AND THERE IS NO
OBLIGATION ON OUR PART DESPITE OUR ASSISTANCE IN THE PREPARATION OF THIS
DRAFT LC. THE DRAFT LC IS NOT TO BE CONSTRUED AS EVIDENCE OF COMMITMENT
ON OUR PART TO ISSUE SUCH LC'S IN THE FUTURE.

DRAFT DATED DECEMBER 3, 2014

Page Two
L/C No. RAXXXXX

This Letter of Credit may not be transferred to any person with whom U.S.
persons are prohibited from doing business under U.S. foreign assets control regulations
or other applicable U.S. laws and regulations.

In addition, provided that you have not provided us with written notice of
applicant's default under the above referenced agreement prior to the effective date of
any reduction, the amount of this Letter of Credit shall be automatically decreased
without amendment in accordance with the following schedule as set forth and continued
as follows (less any amounts previously drawn):

| Effective Date of decrease | Amount decreased | Aggregate Balance |
| --- | --- | --- |
| December 31, 2016 | USD200,000.00 | USD800,000.00 |
| December 31, 2017 | USD200,000.00 | USD600,000.00 |
| December 31, 2018 | USD200,000.00 | USD400,000.00 |
| December 31, 2019 | USD200,000.00 | USD200,000.00 |

Partial and multiple drawings are permitted and the available amount of this
Letter of Credit shall be reduced by all payments made hereunder.

We engage with you that draft(s) drawn under and in compliance with the terms
and conditions of this Letter of Credit will be duly honored upon presentation and
delivery of documents, as specified, either by facsimile to 212-821-6707, Attention,
Letter of Credit Services, followed by Originals sent by overnight courier or just by
Originals to the following address: UBS Financial Services, Inc., 299 Park Avenue, 26th
Floor, New York, New York 10171 Attn.: Letter of Credit Services, on or before
December 30, 2015, or as automatically extended in accordance herein. The date of
presentment of any draw shall be the date a copy of the sight draft and draw statement
are faxed from Beneficiary to UBS Financial Services Inc., or, if earlier, the date of our
receipt of the original sight draft, draw statement and this Letter of Credit. Payments will
be effected by wire transfer in accordance with your written instructions.

The original of this Letter of Credit must be presented together with the above
documents in order to endorse the amount of each drawing on the reverse side and will
be returned to the Beneficiary unless it is fully utilized. If cancellation of this Letter of
Credit is required by the Beneficiary before the then current expiration date, the Original
of this Letter of Credit and any amendment(s), must be returned to us accompanied by a
dated and signed letter issued on the letterhead of the Beneficiary which requests its
cancellation.

This Letter of Credit sets in forth in full the terms of our undertaking, and such
undertaking shall not in any way be modified, amended, amplified, or limited by any
document, instrument, or agreement referred to herein, or in which this Letter of Credit is
referred to, or to which this Letter of Credit relates; and no such reference shall be
deemed to incorporate herein by reference any such document, instrument, or
agreement.

Continued on Page Three

EXHIBIT G

SIGN CRITERIA

The purpose of the sign criteria promulgated by owners and the management is to create a graphic environment that is individual and distinctive in identity for the merchant and also compatible with other signs within the Shopping Center. The total concept should give an impression of quality and professionalism and install a good business image.

Tenant, at Tenant's sole cost and expense, shall design, furnish and install one (1) illuminated sign above the storefront of the Premises and one (1) blade sign identifying the Premises, all with Tenant's Trade Name. Tenant's sign design shall be the maximum store-front signage allowed by municipal approvals, subject to Landlord's Approval Procedure (set forth below) and must conform with the following criteria:

1.      The wording on the sign shall be limited to Tenant's Trade Name only and shall not include any logos, pictures or diagrams.

2.      The length of the illuminated storefront sign is limited to 70% of the width of the Premises and shall be centered horizontally and shall be limited to 24" in height. The placement and size of the blade sign shall be consistent with other tenant spaces at the Shopping Center.

3.      The illuminated storefront sign shall be of individual internally illuminated letters and connected to Tenant's electric service with an automatic timer. The internal lamps shall be contained and concealed wholly within the depth structure of the letters.

4.      The face of all sign letters shall be in a color approved by Landlord. All other portions of the sign (e.g., edge of letters, raceway) shall be painted to match PITTSBURGH PAINT: Cameo Black #4751.

5.      All letters shall have concealed attachment devices, clips, wiring and transformers. No exposed raceways, ballast boxes or electrical transformers will be permitted except as required by code.

6.      The sign shall be fabricated and installed in compliance with all applicable building and electrical codes.

THE FOLLOWING ARE NOT PERMITTED:

a.      Roof or box signs.

b.      Cloth signs.

c.      Exposed seam tubing.

d.      Animated or moving components.

e.      Intermittent or flashing illumination.

f.      Iridescent painted signs.

g.      Letter mounted or painted on illuminated panels.

h.      Signs or letters painted directly on any surface, except as provided herein.

i.      Paper signs of any type.

j.      The name and/or stamp of the sign contractor.

LP 5142039.7 \ 28730-98464

EXHIBIT H

SIGN RENDERING WITH APPROVED LETTERING





CURRENT



LP 5142039.7 \ 28730-98464

EXHIBIT I

RULES OF REGULATIONS OF THE
WEBSTER PLACE SHOPPING CENTER

1.      Intentionally Omitted.

2.      Tenant must keep the inside and outside of all glass and windows of the Premises clean.

3.      All store windows shall be lit with incandescent lights only. Said incandescent lights must be left on during business and non-business hours each and every day of the year until the later of 12 Midnight or 30 minutes after the conclusion of the last scheduled movie at the movie theatre. Fluorescent lights may be installed in the balance of the store, but shall be used only during business hours and must be turned off during all non-business hours.

4.      Tenant, at its own expense, must maintain the Premises and the areas immediately adjoining the Premises in the enclosed mall, at the entry of the Premises and at the rear of the Premises, in a clean, orderly and sanitary condition.

5.      Tenant must not place, exhibit or display any merchandise or other articles on any exterior sidewalks or elsewhere outside of the Premises. No sale of merchandise by tent sale, truck load sale or the like, will be permitted on the parking lot or other Common Areas.

6.      Tenant must not use or permit the use of any objectionable advertising medium, including but not limited to loudspeakers, phonographs, public address systems, flashing devises or sound amplifiers, within the Shopping Center and which are in any manner audible or visible outside the Premises.

7.      Tenant must not cause or permit objectionable odors to emanate or be dispelled from the Premises.

8.      Tenant must not solicit business or distribute any handbills or other advertising matter or hold demonstrations in the Shopping Center, parking lot or other Common Areas.

9.      Except for small parcel packages, no deliveries will be permitted through the front of the Premises unless the Tenant does not have a rear service door. In such event, prior arrangements must be made with the Shopping Center Manager for delivery at such premises. Merchandise being received shall immediately be moved into the Premises and not be left in the service or receiving areas or otherwise outside the Premises.

10.     Tenant must not, in or on any part of the Common Area:

(a)     Vend, peddle, or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet, or other matter whatsoever.

(b)     Exhibit any sign, placard, banner, notice or other written material, except for activities as approved by Landlord.

(c)     Distribute any circular, booklet, handbill, placard or other material, except for activities as approved by Landlord.

(d)     Hold or permit any demonstrations, rally, meeting or the like.

(e)     Solicit membership in any organization, group or association or contributions for any purpose.

(f)     Create a nuisance.

LP 5142039.7 \ 2E730-98464

EXHIBIT J

COMPLETION AND PERFORMANCE GUARANTY

[SEE ATTACHED]

LP 5142039.7 \28730-98464

(ii)    if any mechanic's or materialman's lien or claim is filed against the Premises or the Shopping Center, or any other portion thereof as a result of the construction of the Tenant's Work and Tenant fails to remove or bond or insure over the same as required under Section 10.2.5 of the Lease, then, to cause the removal of any such mechanic's or materialman's liens or claim, or to insure over any such mechanic's or materialman's liens or claim, or to obtain, pay for and file, as required by applicable law, a surety bond to bond around any such mechanic's or materialman's liens or claim, within twenty one (21) days after Guarantor receives notice of Tenant's failure to timely address such mechanic's or materialman's liens or claim in compliance with the Lease.

(b)    <u>Termination</u>.  Guarantor's liability with respect to Tenant's Construction Obligations shall terminate upon the lien-free completion of construction of Tenant's Work in accordance with the terms hereof and the Lease by July 25, 2015.

(c)    <u>Unconditional Guaranty</u>.  Subject to Sections 1(a) and 1(b) above, Guarantor hereby absolutely, irrevocably and unconditionally covenants and agrees that Guarantor is liable, collectively and severally, for Tenant's Construction Obligations as a primary obligor, and that Guarantor shall fully perform each and every term and provision hereof.  This Guaranty is a guaranty of payment and performance and not of collection.

(d)    <u>Remedies</u>.  If, after demand by Landlord, in accordance with Section 1(a) above, Guarantor shall fail to commence payment and performance of Tenant's Construction Obligations and diligently pursue completion of the same as provided in the Section 1(a) hereof, and Guarantor fails to cure such default within thirty (30) days after written notice of such default hereunder from Landlord (or, if such default by Guarantor cannot reasonably be cured within thirty (30) days, if Guarantor fails to commence curing within such initial thirty (30) day period or thereafter fails to diligently prosecute completion of such cure), then, in addition to any other rights and remedies hereunder or under the Lease, Landlord may, without further notice to or demand on Guarantor, pay and/or perform Tenant's Construction Obligations itself, through an agent, or by entering into contracts with third parties in accordance with (1) the Plans and Specifications, (2) all Legal Requirements, and (3) the terms and conditions of the Lease.  To the extent that Landlord pays and/or performs Tenant's Construction Obligations, Landlord shall be entitled to recover, as damages from Guarantor, and Guarantor shall pay to Landlord, the costs and expenses incurred by Landlord in connection with paying and/or performing Tenant's Construction Obligations as provided in the immediately preceding sentence, together with interest thereon from the date such costs were incurred until repaid at the default rate per annum provided in the Lease (such costs and expenses being hereafter referred to, collectively, as the "Reimbursable Costs");

If Guarantor fails to pay and perform Tenant's Construction Obligations as provided in Section 1(a) above, and Landlord thereafter commences exercising the remedies provided in this Section 1(d), Landlord shall have no obligation to thereafter accept any offer of payment and/or performance by Guarantor of Tenant's Construction Obligations at any time, and no such offer shall constitute a defense to Landlord's claims for damages against Guarantor.  GUARANTOR EXPRESSLY ACKNOWLEDGES THAT THE MEASURE OF DAMAGES FOR BREACH OF THIS GUARANTY SHALL BE CALCULATED AS PROVIDED IN THIS SECTION 1(d), AND NOT AS TO THE EXTENT TO WHICH PERFORMING TENANT'S CONSTRUCTION OBLIGATIONS WOULD INCREASE THE VALUE OF THE PREMISES.

Section 2.    <u>Guaranty Absolute</u>.    Guarantor guarantees that Tenant's Construction Obligations shall be paid and performed strictly in accordance with the terms of the requirements listed in

J-3

been paid in full, the amount shall be held in trust for the benefit of Landlord and shall be promptly paid to Landlord to be credited and applied to Tenant's Construction Obligations.

Section 6.    Representations and Warranties.  Guarantor represents and warrants that: (i) this Guaranty (w) has been authorized by all necessary action; (x) does not violate any agreement, instrument, law, regulation or order applicable to Guarantor; (y) does not require the consent or approval of any person or entity, including but not limited to any governmental authority, or any filing or registration of any kind, that has not been obtained or made; and (z) is the legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally; and (ii) in executing and delivering this Guaranty, Guarantor has (w) without reliance on Landlord or any information received from Landlord and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and Tenant, Tenant's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, Tenant or the obligations and risks undertaken herein with respect to Tenant's Construction Obligations; (x) adequate means to obtain from Tenant on a continuing basis information concerning Tenant; (y) full and complete access to the Lease and any other documents executed in connection with the Lease; and (z) not relied and will not rely upon any representations or warranties of Landlord not embodied herein or any acts heretofore or hereafter taken by Landlord (including but not limited to any review by Landlord; and (iii) Recitals A and C to this Guaranty are true and correct in all material respects.

Section 7.    Remedies Generally.  The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law.

Section 8.    Formalities.  Guarantor waives presentment, demand, notice of dishonor, protest, notice of acceptance of this Guaranty or incurrence of any of Tenant's Construction Obligations and any other formality with respect to any of the Tenant's Construction Obligations or this Guaranty.

Section 9.    Amendments and Waivers.  No amendment or waiver of any provision of this Guaranty, nor consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by Landlord, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of Landlord to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

Section 10.    Expenses.  Guarantor shall reimburse Landlord on demand for all out-of-pocket costs, expenses and charges (including without limitation reasonable fees and charges of external legal counsel for Landlord and costs allocated by its internal legal department) incurred by Landlord in connection with enforcement of this Guaranty.  The obligations of Guarantor under this Section shall survive the termination of this Guaranty.

Section 11.    Assignment.  This Guaranty shall be binding on, and shall inure to the benefit of Guarantor, Landlord and their respective successors and assigns; provided that Guarantor may not assign or transfer its rights or obligations under this Guaranty.  Without limiting the generality of the foregoing: (a) the obligations of any Guarantor under this Guaranty shall continue in full force and effect and shall be binding on its successor and assigns; and (b) Landlord may assign, sell, or otherwise transfer its rights under the Lease to any other person or entity and the other person or entity shall then become vested with all the rights granted to Landlord in this Guaranty or otherwise.

unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 16.   ENTIRETY.   THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR, AND LANDLORD WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF. THIS GUARANTY IS INTENDED BY LANDLORD AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS HEREOF AND THEREOF, AND NO COURSE OF DEALING AMONG GUARANTOR AND LANDLORD, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR, AND LANDLORD.

Section 17.   Intentionally Omitted

Section 18.   Counterparts. This Guaranty may be executed in counterparts, each of which shall be deemed an original.

Section 19.   WAIVER OF RIGHT TO TRIAL BY JURY.   GUARANTOR AND, BY ITS ACCEPTANCE HEREOF, LANDLORD HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). GUARANTOR AND, BY ITS ACCEPTANCE HEREOF, LANDLORD (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND SUCH OTHER PARTY HAVE BEEN INDUCED TO EXECUTE OR ACCEPT THIS GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 19.

[SIGNATURE PAGE FOLLOWS]

LP 5142039.7\28730-98464

STATE OF                                    )
                                            )  ss.:
COUNTY OF                                   )

On the ____ day of _____, 2014, before me came Laurence H. Weiner, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____; that he is the individual described in and which executed the foregoing instrument; and that he signed his name thereto in such capacity.

                                        Notary Public

                                        _____


STATE OF                                    )
                                            )ss.:
COUNTY OF                                   )

On the ____ day of _____, 2014, before me came Gerald L. Nudo, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____; that he is the individual described in and which executed the foregoing instrument; and that he signed his name thereto in such capacity.

                                        Notary Public

                                        _____


STATE OF                                    )
                                            )ss.:
COUNTY OF                                   )

On the ____ day of _____, 2014, before me came Patrick Cunningham, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____; that he is the individual described in and which executed the foregoing instrument; and that he signed his name thereto in such capacity.

                                        Notary Public

                                        _____


                                J-9

EXHIBIT K

STATEMENT AS TO REMEASUREMENT

It is hereby agreed among the parties to a certain Lease dated _____, 2014 for Store ____ in Webster Place Shopping Center (the "Lease") between _____ ("Tenant"), and those entities specified on Exhibit A hereto ("Landlord") that:

The square footage of the Premises has been measured by Tenant's architect pursuant to, and in accordance with, Section 2.6 of the Lease, and, as a result of such measurement, the square footage of the Premises is determined to differ from the square footage set forth in Section 11.8.

Accordingly:

1.   The Premises, for all purposes of the Lease, shall be deemed to consist of _____ square feet.

2.   Annual Base Rent means the following:

PRIMARY TERM

| Operating Year | First Floor Space | Basement Space | Total |
|---|---|---|---|
| 1 | $0.00 psf | $0.00 psf | |
| 2-6 | $27.00 psf | $16.00 psf | |
| 7-11 | $29.03 psf | $17.20 psf | |
| 12-16 | $31.20 psf | $18.49 psf | |

FIRST OPTION TERM:

| Operating Year | First Floor Space | Basement Space | Total |
|---|---|---|---|
| 17-21 | $33.54         0 | $19.88 psf | |

SECOND OPTION TERM:

| Operating Year | First Floor Space | Basement Space | Total |
|---|---|---|---|
| 22-26 | $36.05 | $21.37 psf | |

THIRD OPTION TERM:

| Operating Year | First Floor Space | Basement Space | Total |
|---|---|---|---|
| 27-31 | $38.75 | $22.97 psf | |

LP 5142039.7 \ 28730-98464

EXHIBIT L

EXISTING EXCLUSIVES/PROHIBITED USES

Existing Exclusives:

1.  Sale of vitamins and nutritional supplements in more than 50% of a tenant's premises.

2.  Sale of outdoor sport and fitness goods, kayaks and boating accessories, climbing equipment, roof storage racks and travel related accessories, and other items customarily found in adventure travel and outfitting stores.

3.  Banking and financial services, including the operation of automatic teller machines (ATMs), or a savings and loan, bank, credit union or other financial institution.

4.  Bowling alley, catering establishment, discotheque or night club, or restaurant greater than 10,000 s.f.

5.  No premises within 200 feet of the movie theatre to be used for sale of popcorn in bags or boxes, or soda for off-premises consumption.

6.  Any store selling or displaying for sale or rental books, books on tape, magazines, periodicals, recorded music, video tapes or disks ("Competing Items"), but expressly excluding from the foregoing video games, computer software or computer games; a coffee bar or coffee shop. The Incidental Sale of such Competing Items in connection with the overall business of another operator or tenant shall not be deemed a violation. "Incidental Sale" shall mean less than fifty (50) linear feet of shelf space (i.e., 10 shelves, each 5 feet in length) of such operator's or tenant's display area is devoted, in the aggregate, to the sale and/or display of the aforesaid Competing Items.

7.  For a children's fitness center which primarily provides physical and early learning programs for children and the parents (i.e., together with their children) ages 6 weeks to 13 years old.

8.  Retail sale of pet food, supplies and related items.

Prohibited Uses:

1.  bowling alley;

2.  catering establishment;

3.  any arcade;

4.  any tavern or bar;

5.  restaurant;

6.  night club or discotheque;

7.  second hand store;

8.  mobile home park or trailer court;

9.  dumping, disposing, incineration or reduction or garbage (exclusive of approximately screened dumpsters located in the rear of any building);

LP 5142029.7 \28730-91464

EXHIBIT M

PRE-EXISTING LEASES

Barnes & Noble

7.1    Tenant may use the Premises for the purpose of the display and retail sale or rental of books, books on tape, magazines, periodicals, recorded music, video tapes and disks, video games, computer software and computer games and various media and merchandise typically sold in Tenant's other local stores and for no other purpose. Tenant may also operate within the Premises or grant a concession or sublease for a "coffee bar" or "coffee shop" or similar operation providing its customers with coffee, tea, and other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage items, as well as merchandise incidental thereto, provided such operation does not involve any cooking, other than heating food items in a microwave. Tenant shall not have an automatic teller/cash machine on or about the Premises unless same is operated by First National Bank or its successor.

Chase

1.1.14    USE: Banking and financial services for bank customers including the operation of automatic teller machines ("ATM's") and other ancillary uses, AND FOR NO OTHER PURPOSE.

Life Springs

1.1.17    USE: The sale at retail of health foods, vitamins, nutritional supplements, fresh juice and related goods AND FOR NO OTHER PURPOSE.

Moosejaw

1.1.17    USE: Tenant's use of the premises shall be for the retail sale of outdoor sport and fitness goods, new clothing, shoes, boots, kayaks and boating accessories, climbing equipment, roof storage racks, travel related items and accessories as well as other items customarily found in adventure travel and outfitting stores and related products AND FOR NO OTHER PURPOSE.

My Gym

1.1.16    USE: Tenant shall use the Premises solely for a children's fitness center which primarily provides physical early learning and other programs for children ages 6 weeks to 13 years old which may include classes and programs that require or involve adult participation (the "Primary Use"). Activities and programs in connection with the Primary Use include: parent & me classes (which include parents and children in the same class, but shall not include classes for parents alone), gymnastics, birthday parties, seasonal and holiday parties, karate, camps, sports skill instruction, art classes, and creative play. In addition to primary activities associated with the Primary Use, there is a secondary retail merchandise component, selling (a) items for children, including but not limited to: children's apparel, tee shirts, sports bags, water bottles and other sporting equipment, accessories, audio video, puzzles, educational items and other children's items incidental to the Primary Use; (b) items for children and parents that are branded with the My Gym logo and/or characters, including but not limited to: tee shirts, sports bags, water bottles and other sporting equipment videos, DVDs and CDs. Except as provided in this Section 1.1.16, TENANT SHALL NOT USE THE PREMISES FOR ANY OTHER PURPOSE. In addition, in all events, Tenant's use and occupancy of the Premises and the Common Areas (as hereinafter defined) of the Shopping Center shall be

LP 5142039.7 \ 28730-98464

Per Sublease:

1.1.18    USE: Movie theatre, together with any and all customary and
standard uses of the motion picture exhibition industry
incidental thereto which Subtenant may elect to make use of
the Premises for from time to time (which uses shall include
but not be limited to the uses being made of the Other Theatre
Premises as of the date of this Sublease [said uses as of the
date of this Sublease, the "Existing Uses"]), together with
such other uses for which Subtenant may elect to make of the
Premises from time to time, provided (i) such other uses are
customary and standard in the motion picture exhibition
industry or for entertainment centers replacing or expanding
the medium of the motion picture exhibition industry as they
are then constituted, (ii) Guarantor's net worth is shown to
then be in excess of $125,000,000, (iii) such other uses do
not violate any other sublease for other premises in the
Shopping Center as of the date such other use is commenced,
(iv) such other uses are compatible with the character,
quality and Subtenant mix of the Shopping Center, and (v) such
other uses will not be disruptive to Subtenants of space below
the Premises all as reasonably determined by Sublandlord.
Sublandlord represents and warrants to Subtenant that the
Existing Uses do not and shall not violate any other lease for
premises in the Shopping Center.   Without limiting the
immediately preceding sentence, within ten (10) days after
written request from Subtenant from time to time, Sublandlord
shall notify Subtenant whether a proposed other use of the
Premises would violate any other lease for other premises in
the Shopping Center or would satisfy the conditions set forth
above.  If Sublandlord fails to respond to such request within
said ten (10) day period, it shall be conclusively presumed
that the proposed other use does not violate any other lease
for other premises at the Shopping Center and satisfies the
conditions set forth above.  In the event the Use is other
than the Existing Uses and as a condition to Sublandlord's
determination as provided above, the Percentage Rent Rate,
Gross Box Office Income and Annual Gross Box Office Income
Base shall be reconstituted based upon the industry
information for such new Use and designed to pay Sublandlord
Percentage Rent equivalent to the average of the preceding
three Operating Years or if not practicable the Monthly Base
Rent shall be increased to include such Percentage Rent.

Vertical Blinds

1.1.18    USE: The sale and manufacture of window treatments, AND FOR NO OTHER PURPOSE.

LP 5142039.7\28730-98464

EXHIBIT A

LIST OF LANDLORD ENTITIES

| |
|---|
| Webster Place SEC Investors, L.L.C., a Delaware limited liability company |
| Webster Place MM, L.L.C., a Delaware limited liability company |
| Webster Place SM-1, L.L.C., a Delaware limited liability company |
| Webster Place SM-2, L.L.C., a Delaware limited liability company |
| Webster Place SM-3, L.L.C., a Delaware limited liability company |
| Webster Place SM-4, L.L.C., a Delaware limited liability company |
| Webster Place SM-5, L.L.C., a Delaware limited liability company |
| Webster Place SM-6, L.L.C., a Delaware limited liability company |
| Webster Place SM-7, L.L.C., a Delaware limited liability company |
| Webster Place SM-8, L.L.C., a Delaware limited liability company |
| Webster Place SM-9, L.L.C., a Delaware limited liability company |
| Webster Place SM-10, L.L.C., a Delaware limited liability company |
| Webster Place SM-11, L.L.C., a Delaware limited liability company |
| Webster Place SM-12, L.L.C., a Delaware limited liability company |
| Webster Place SM-13, L.L.C., a Delaware limited liability company |
| Webster Place SM-14, L.L.C., a Delaware limited liability company |

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date and year first written above.

WEBSTER PLACE SEC INVESTORS, L.L.C., a Delaware limited liability company

By: _____
Name: _____
Its:        Authorized Signatory


WEBSTER PLACE MM, L.L.C., a Delaware limited liability company

By: _____
Name: _____
Its:        Authorized Signatory


WEBSTER PLACE SM-1, L.L.C., a Delaware limited liability company

By: _____
Name: _____
Its:        Authorized Signatory


WEBSTER PLACE SM-2, L.L.C., a Delaware limited liability company

By: _____
Name: _____
Its:        Authorized Signatory


[SIGNATURES CONTINUED NEXT PAGE]

February ___, 2017

Webster Place Athletic Club LLC
c/o Marc Realty
55 East Jackson Boulevard, Suite 500
Chicago, Illinois 60604
Attention: Laurence Weiner


Re:   Shopping Center Lease dated as of December 5, 2014 (the "Original Lease"), as amended by First Amendment to Shopping Center Lease dated as of January 28, 2015 (the "First Amendment" and, together with the Original Lease, the "Lease"), between Webster Place Athletic Club LLC, an Illinois limited liability company ("Tenant"), and Chicago Title Land Trust Company, as Trustee under trust agreement dated May 29, 2015 (as amended), and known as Trust No. 8002368233 ("Landlord").

Ladies and Gentlemen:

Please refer to the above-referenced Lease. Terms used but not defined in this letter shall have the meanings given to them in the Lease.

This letter shall confirm that Landlord shall provide to Tenant an additional tenant improvement allowance in the amount of $375,000, payable to Tenant on the date of the sale of the Webster Place Shopping Center from Landlord to RAMCO Property Acquisitions, LLC, or its affiliate, which is scheduled to occur on or around February 22, 2017 (the "Closing"). Such tenant improvement allowance shall be paid to Tenant via wire transfer to the account specified in Schedule A, attached hereto, from the Closing escrow. In the event the Closing does not occur, Landlord shall pay such tenant improvement allowance to Tenant no later than March 15, 2017.

Notwithstanding anything to the contrary contained in the Lease, Landlord agrees that Tenant has the right to non-reserved, non-exclusive parking, on a first-come, first-served basis, in the Main Surface Lot, as such lot is generally depicted on the Site Plan attached to the Lease, for a period not to exceed four (4) hours per vehicle parked, at no additional charge to Tenant. Furthermore, any reference in the Lease to restricting the time of day of Tenant's right to use the Main Surface Lot shall be deleted.

Landlord hereby acknowledges that Tenant's obligations under the Lease with respect to the construction of Tenant's Work has been fulfilled and satisfied, and that the Guarantors under the Completion and Performance Guaranty attached to the Lease are hereby discharged and relieved of any further obligation thereunder.

# EXHIBIT 2



# EXHIBIT 3

# EXHIBIT 4

















# EXHIBIT 5

new memberships in 2017 were more than 35% less than in 2016; our other seven clubs all experienced growth of new memberships in the same time-period. Cancellations also grew in 2017, as compared to decreased cancelations at our other clubs. As a result, our membership at Webster Place has not only not grown, as compared to our other clubs, but is on a downward trajectory. As a benchmark comparison, all our other clubs maintain their memberships at between 4,500 and 7,500 members, as compared to Webster Place which is under 2,000 members, much less than half of any other club. The reason for this is the failure of ownership to address the above issues, which has directly led to the loss of members and our inability to attract new members.

We would prefer to remain committed to Webster Place. In order to achieve success, we will need your help, and in an effort to create an arrangement that could be acceptable to both parties we are prepared to work together with you, starting with getting on a conference call to discuss these issues and go over the reports at your earliest opportunity.

Respectfully,

Steve



Steven B. Luxenberg, Esq.
Director of Lease Administration
MARC REALTY
55 East Jackson Boulevard, Suite 500
Chicago, Illinois 60604

fax: 312.884.5375
direct extension:  312.884.5393
e-mail:  sluxenberg@marcrealty.com

The information transmitted in this e-mail message and attachments, if any, may be attorney-client information, including privileged and confidential matter, or otherwise exempt from disclosure under applicable law and is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522, and is intended only for the use of the individual or entity named above.  Distribution to, or review by, unauthorized persons is prohibited.  All personal messages express views solely of the sender, which are not to be attributed to Marc Realty.  If you have received this transmission in error, immediately notify us and permanently delete this transmission including attachments, if any.

Steven B. Luxenberg, Esq.
Director of Lease Administration
MARC REALTY
55 East Jackson Boulevard, Suite 500
Chicago, Illinois 60604

fax: 312.884.5375
direct extension:  312.884.5393
e-mail:  sluxenberg@marcrealty.com

The information transmitted in this e-mail message and attachments, if any, may be attorney-
client information, including privileged and confidential matter, or otherwise exempt from
disclosure under applicable law and is protected by the Electronic Communications Privacy
Act, 18 U.S.C. Sections 2510-2522, and is intended only for the use of the individual or entity
named above.  Distribution to, or review by, unauthorized persons is prohibited.  All personal
messages express views solely of the sender, which are not to be attributed to Marc
Realty.  If you have received this transmission in error, immediately notify us and permanently
delete this transmission including attachments, if any.

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION - COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | No. 2018-CH-4248 |
| v. | ) ) ) | Judge Anna H. Demacopoulos |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company registered to do business in Illinois, | ) ) ) ) | Calendar 13 |
| Defendant. | ) | |

### NOTICE MOTION

To:     See Certificate of Service

PLEASE TAKE NOTICE that on April **24**, 2018 , at *10:00* ⓐ.m./p.m., or as soon thereafter as counsel may be heard, the undersigned shall appear before the Honorable Judge Anna H. Demacopoulos, or any judge sitting in her stead, in Room 2502 at the Richard J. Daley Center, Chicago, Illinois, and shall then and there present the attached Plaintiff's Motion to Escrow Rent with the Clerk of the Court, a true and correct copy of which are attached.

Respectfully submitted,

WEBSTER PLACE ATHLETIC CLUB, LLC

By: _____
            One of its Attorneys

Aaron H. Stanton (*astanton@burkelaw.com*)
Gerry D. Ring (*gring@burkelaw.com*)
Madeleine W. Milan (*mmilan@burkelaw.com*)
Burke, Warren, Mackay & Serritella, P.C.
330 N. Wabash Ave., 22nd Floor
Chicago, IL 60611
(312) 840-7000
(312) 840-7900 (facsimile)
Attorney No. 41704

16556\00005\4830-0208-7264.v1

## CERTIFICATE OF SERVICE

The undersigned, an attorney representing Plaintiff, Webster Place Athletic Club, LLC, hereby certifies that true and correct copies of the foregoing Plaintiff's Motion to Escrow Rent with the Clerk of the Court, was served upon the address(es) below as indicated via messenger before 5:00 p.m. on April _5_, 2018.

**VIA MESSNEGER**
Ramco-Webster Place, LLC
c/o CT Corporation, Registered Agent
208 S. LaSalle Street
Suite 814
Chicago, IL  60604

_____
Madeleine W. Milan

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CHANCERY DIVISION - COUNTY DEPARTMENT

| | |
|---|---|
| WEBSTER PLACE ATHLETIC CLUB<br>LLC, an Illinois limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>RAMCO-WEBSTER PLACE, LLC, a<br>Delaware limited liability company<br>registered to do business in Illinois,<br><br>Defendant. | )<br>)<br>)<br>)   No. 2018-CH-4248<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S MOTION TO ESCROW
### CONTESTED WITHHELD RENT WITH THE CLERK OF THE COURT

Plaintiff, Webster Place Athletic Club, LLC (the "*Tenant*"), by and through its attorneys,

Burke, Warren, MacKay & Serritella, P.C., respectfully requests – pending resolution of the

underlying dispute arising out of a "Shopping Center Lease" (the "*Lease*") between Tenant and

Defendant, Ramco-Webster Place LLC (the "*Landlord*") – that this Court order the Landlord to

escrow with the Clerk of the Court all contested rent that Landlord claims is due under the Lease

to the extent that Landlord subsequently draws the amount of the contested rent from an

"Irrevocable Standby Letter of Credit," (the "*LOC*"), which Tenant put up as security under the

Lease.[1] In support of this Motion, Tenant states as follows:

---

[1] With respect to Tenant's pro-rata share of tax or operating costs for the Shopping Center, Tenant agrees that upon approval by this Court of reasonable expenses, that such funds should be released to Landlord from the escrow to pay these tax or operating costs.

## PRELIMINARY STATEMENT

1.    By this Motion, Tenant, which operates a full-service health club in the Premises[2] at the Shopping Center,  seeks to have the Landlord deposit withheld rent into escrow with the Clerk of the Court while this Court adjudicates Tenant's Complaint that it be excused from performance under the Lease (including the payment of rent) due to Landlord's repeated, material breaches of the Lease and refusal to cure such breaches – particularly Landlord's failure to provide free parking to Tenant's members, resulting in the substantial loss of members and revenue.

2.    As detailed below, the Lease permits the Tenant to cure the Landlord's failure to "perform or observe any agreement or observe any agreement or condition" in the Lease and allows the Tenant to then offset these cure costs by reducing its rent due under the Lease.

3.    The Tenant, however, has been unable to cure the Landlord's multiple breaches because these breaches relate to common areas at the Shopping Center controlled by the Landlord, which Tenant cannot cure.  For example, the repeated failure of Landlord's parking lot validation exit system for the entire Shopping Center is something that only the Landlord, not the Tenant, can cure.  If the Tenant had been able to cure these breaches, it would have done so under the Lease and reduced its rent by the costs to cure these breaches, as permitted under the Lease.

4.    The Landlord, even though it has materially and repeatedly breached the Lease and refused to cure its breaches, has nevertheless demanded full rent payments. To force the Landlord to cure these breaches, the Tenant has withheld the payment rent for several months (the "*Withheld Rent*"). The Landlord, however, has refused to take any action to cure these breaches.

---

[2] Capitalized terms not defined herein are defined as set forth in the Verified Complaint for Declaratory and Other Relief (the "*Complaint*"), which is incorporated herein by reference and which is provided to the Court with this Motion.

5.     Realizing that it has been in material breach, the Landlord did not send the Tenant a default notice for the Withheld Rent until after the filing of this Complaint, months after the Tenant began withholding rent.

6.     Upon receiving the default notice and notice that the Landlord intends to draw the amount of the Withheld Rent ($295,136.43) from the LOC, the Tenant immediately filed this Motion.

## BACKGROUND

7.     Tenant operates a 32,000 square foot full-service athletic club in Premises it leases from Landlord in the Shopping Center located at Webster and Clybourn in Chicago in what is sometimes referred to as the "Clybourn Corridor." Traffic is very congested in the Clybourn Corridor, and parking, particularly free parking, is extremely limited and very valuable to the local retailers. Most of Tenant's members commute to its athletic club by automobile. Tenant executed the Lease to operate an athletic club at the Shopping Center because Landlord promised to provide up to four (4) hours of free parking for Tenant's members. But for the Landlord's parking promise, Tenant would not have entered the Lease.

8.     Landlord has, as detailed in the Complaint, failed to perform its obligations under the Lease to provide free parking to Tenant's customers and maintain the structural elements of the Premises, including the roof and exterior walls, which has led to standing water and mold problems throughout the athletic club and made portions of the Premises unusable. (Compl. ¶¶30-44.) Landlord has also failed to provide an adequate HVAC system, crucial to maintaining members' comfort. (*Id.*, ¶¶45-49.) The HVAC problems have led to widely fluctuating temperatures inside the athletic club. (*Id.*, ¶47.)

9.     Even though the athletic club is in the busy and popular Clybourn Corridor, membership in the athletic club, which is operated by Tenant's parent Chicago Athletic Clubs, has

declined, while at the same time, membership at the other seven clubs also operated by Chicago

Athletic Clubs in Chicago, has increased.   (*Id.*, ¶34.) This decrease in membership is directly

attributable to the Landlord's repeated material breaches of the Lease. (*Id.*)

        10.     The monthly base rent under the Lease is currently more than $65,000 a month.

(*Id.*, ¶17.) Tenant also provided a LOC as security under the Lease (Exh. 1(F) to Compl.), which

Landlord may draw upon only after an "Event of Default," which includes failure to pay "Rent"

due under the Lease within ten (10) days after receiving proper written notice from Landlord. (*See*

Lease, attached to Complaint as Exh. 1, §12.12.2.)

        11.     Under the Lease, Tenant may cure Landlord's breaches only where such breaches

are contained within the Premises.  However, "in no event shall Tenant have the right to exercise

Tenant's right to cure in regard to the premises of any other tenant in the Shopping Center." (*Id.*,

§12.13.) Here, as the breaches detailed above relate to portions of the Shopping Center not under

Tenant's control - the parking lots and parking equipment, the roof and structural elements, and

the HVAC systems – Tenant cannot avail itself of the Lease's self-help provisions and off-set its

rent.

        12.     As a result, Tenant's obligations under the Lease should be excused, and the Lease

rescinded, based upon Landlord's multiple, ongoing material breaches of the Lease; however,

Tenant's requested relief must first be adjudicated by the Court. Tenant does not want to, nor

should it be forced to, jeopardize the *status quo* during the pendency of this case, so it seeks the

right to place rent into escrow to protect both parties during the litigation.

        13.     Protecting the *status quo* is particularly important here given the current make up

of the Shopping Center and the long-term viability of the Landlord, which is very tenuous.   As

reflected in Exh. M to the Lease, attached to the Complaint as Exh. 1, the other main tenants at the

4

Shopping Center are a Barnes & Noble bookstore, a company whose declining financial condition has been publicly well documented over the years (*see* Exh. A, hereto) as well as a movie theatre, also part of a declining industry, which is part of Regal Entertainment Group, which itself has been reported profitability issues. (*See* Exh. B, hereto.) Furthermore, the Clybourn Corridor generally has been reported to have softened for retail landlords, with heightened vacancy rates. (*See* Exh. C.) Also, as detailed by the photographs attached as Exhs. 3 and 4 to the Complaint, the Landlord failed to properly maintain the Shopping Center. Accordingly, there is a distinct possibility that if funds are not put in escrow such funds will not exist at the conclusion of this case.

14.    If the Tenant is permitted to deposit rent with the Court, or otherwise escrow it, the prevailing party will be assured that it will recover the rent. Moreover, Landlord will not be prejudiced because Tenant agrees, subject to Court approval, that the Landlord may access portions of escrowed rent to satisfy Tenant's pro-rata share of tax or operating costs necessary to operate the Shopping Center.

## **CONCLUSION**

WHEREFORE, Plaintiff, Webster Place Athletic Club, LLC, respectfully requests – pending resolution of the underlying dispute arising out of the Lease – that this Court order the Landlord to escrow with the Clerk of the Court the Withheld Rent that Landlord subsequently draws from the LOC.

WEBSTER ATHLETIC CLUB, LLC,
Plaintiff

By: _____
One of its attorneys

Aaron H. Stanton (*astanton@burkelaw.com*)
Gerry D. Ring (*gring@burkelaw.com*)
Madeleine W. Milan (*mmilan@burkelaw.com*)
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
Telephone: (312) 840-7000
Firm ID No. 41704
4833-8311-3568

# EXHIBIT A

4/5/2018                          Barnes & Noble sales dropped online and in store over holidays, stock hit

# Barnes & Noble shares plunge in wake of bleak holiday report

Charisse Jones, USA TODAY    Published 2:54 p.m. ET Jan. 5, 2018 | Updated 3:33 p.m. ET Jan. 5, 2018



*(Photo: Scott Olson, Scott Olson, Getty Images)*

Shares of Barnes & Noble stock plunged in the wake of a report that the one-time book store titan's sales dipped 6.4% during the crucial holiday season.

Barnes & Noble's stock price was down 14.15% to $5.58 a share in afternoon trading. Sales overall amounted to $953 million, but fewer visitors to the retailer's stores led to sales at locations open at least a year dropping 6.4% as compared to that same period in 2016. E-commerce sales were also listless, dipping 4.5%.

**More:** Barnes & Noble urged to sell itself (/story/money/2017/07/25/barnes-noble-urged-sell-itself/507766001/)

**More:** Barnes & Noble Education shares plunge on earnings miss (/story/money/2017/08/30/barnes-noble-education-shares-plunge-earnings-miss/615691001/)

Book sales, the retailer's bread and butter, dropped 4.5%, but the chain's other offerings didn't fare much better, with sales of DVDs, music and gifts declining as well.

That bleak holiday performance has led Barnes & Noble to forecast that store sales for the full year will be down in the mid single-digit range.

The retailer says that it will continue to get costs under control as part of a turnaround strategy to revive its revenue at a time when shoppers increasingly turn to Amazon to purchase what they read.

## Subscribe for only $9.⁹⁹/month

Start My Subscription (https://offers.usatoday.com/specialoffer?gps-source=BEAZ999EN&utm_medium=onsite&utm_source=BEAZ&utm_campaign=BE

Read or Share this story: https://usat.ly/2lZLc5D

# EXHIBIT B

4/5/2018                              Theaters taking hits from movie viewing at home, weak box office

# Theaters taking hits from movie viewing at home, weak box office

Mike Snider, USA TODAY    Published 5:03 p.m. ET Aug. 2, 2017 | Updated 8:05 p.m. ET Aug. 2, 2017



*(Photo: Sony Pictures Animation, AP)*

Is Netflix killing the multiplex? Wall Street apparently thinks so.

Shares of AMC Entertainment (AMC (https://www.usatoday.com/money/lookup/stocks/AMC/)) shares fell 27% to $15.18 Wednesday — hitting an all-time low of $15.15 at one point — after the nation's largest movie theater chain said it would report a net loss for the April-June period of between $174.5 million and $178.5 million, compared to profit of $24 million during the same period a year ago.

Other movie chains' shares also took hits Wednesday. Shares of the nation's second-largest chain, Regal Entertainment Group (RGC (https://www.usatoday.com/money/lookup/stocks/RGC/)), were down about 5% to $18.19. Cinemark (CNK (https://www.usatoday.com/money/lookup/stocks/CNK/)) saw its shares fall 5% to $37.82, while IMAX (IMAX (https://www.usatoday.com/money/lookup/stocks/IMAX/)) shares dipped 8% to $20.27.

"There are concerns that box office attendance is declining, both as a result of weaker than expected performance of some releases but perhaps more importantly because of less interest in movie-going by consumers," said Christopher Vollmer, global entertainment and media analyst with consulting firm PricewaterhouseCoopers.

And a weak summer box office lineup isn't helping.

Compared to moviegoing, consumers last year spent even more (an estimated $11.9 billion) on subscription streaming services such as Netflix and digital movies delivered on demand via services such as Apple's iTunes and Google Play, PwC estimates. This year, consumer spending on Net video is projected to hit $13.6 billion, surpassing box office by more than $2 billion, PwC estimates.

"Because of their heavy emphasis on high quality, original video entertainment, the growth of (streaming) SVOD services is having an impact on all the traditional video businesses: pay TV, home video/DVD, and theatrical," Vollmer said.

The biggest problem, says Michael Pachter, analyst with Wedbush Securities, is 2017's slate of films has not matched the record pace of last year's, which resulted in an all-time box office high (/story/life/movies/2017/01/02/2016-record-box-office-year-finding-dory-rogue-one/95879192/) of $11.37 billion.

For instance, June's highest-grossing film, *Wonder Woman*, has taken in about $360 million in just over its first month, while *Finding Dory* grossed about $450 million over about the same period last year, according to BoxOfficeMojo.com. And *Spider-Man: Homecoming*, at $282.5 million in July, has fallen short of last July's *The Secret Life of Pets*, with $308 million over its first four weeks.

Poor performing films are driving AMC's dour forecasts, the company says. The U.S. box office for April-June fell 4.4%, compared to the same quarter of the year in 2016. And AMC expects a "challenging" environment in the current July-September third quarter, it said in an announcement Tuesday.

To address long-term concerns, Hollywood and theater owners have been discussing a shortening of the traditional three-month "window" between a film's theatrical release and its availability for on-demand purchase at home. "We said many times that if there is an arrangement that impacts a change in windows that grows the overall pie and provides us long-term financial protection then that is something we would be willing to participate in," said Regal CEO Amy Miles last week during the company's earnings call. Regal is also expecting a weaker third-quarter box office.

AMC said it would cut costs into 2018 through strategic pricing, promotional incentives, adjusting scheduling practices, reductions in operating hours and better staffing.

4/5/2018                        Theaters taking hits from movie viewing at home, weak box office



Even the bonafide hit film 'Wonder Woman,' hasn't been able to help the 2017 box office keep pace with last year's record box office high of $11.37 billion. *(Photo: Warner Bros.)*

## U.S. ENTERTAINMENT SPENDING
Actual and projected consumer spending on theater movies, Internet videos (in millions):

● CINEMA[1]  ● INTERNET[2]



1 — Cinema figures include box office and cinema advertising
2 — Net video includes streaming subscription and digital downloads
**SOURCE** PricewaterhouseCoopers
George Petras, USA TODAY



Also to entice more into the theaters, movie chains have added recliner seats, better screens and sound, and improved menus with food and alcohol to increase revenue from those in attendance.

Wall Street's reaction to cinema stocks is a wrong-headed bear thesis "that no one is ever going to go to the movies again," Pachter says. "Being down 4% from an all-time record box office is just not a big deal."

**More:** 'Dunkirk' conquers 'Emoji,' 'Atomic Blonde' to top box office for a second weekend (/story/life/movies/2017/07/30/dunkirk-conquers-emoji-atomic-blonde-top-box-office-again/523712001/)

https://www.usatoday.com/story/money/business/2017/08/02/movie-theaters-getting-pinched-sluggish-box-office-movies-viewing-home/532256001/

4/5/2018                           Theaters taking hits from movie viewing at home, weak box office

**More:** 'Rogue One' propels Disney to historic $7 billion global box office mark (/story/money/business/2016/12/19/rogue-one-propels-disney-historic-7-billion-global-box-office-mark/95626550/)

*Follow USA TODAY reporter Mike Snider on Twitter:* @MikeSnider (http://twitter.com/MikeSnider).

Read or Share this story: https://usat.ly/2vuzWW7

# EXHIBIT C

4/5/2018                                                            Print Story

   **Print Story**          Printed from ChicagoBusiness.com

## Clybourn Corridor holds up amid shaky retail market

By Alby Gallun March 14, 2018

The business of owning retail real estate keeps getting tougher, but it could be worse for landlords with store space in the city's second-largest shopping district.

After rising for two years, the retail vacancy rate for the Clybourn Corridor fell to 10.3 percent last year, down from **10.9 percent** in 2016, according to a survey by Stone Real Estate, a Chicago-based retail brokerage.

While it has become harder to find chains that want to open more stores, the area, which is surrounded by some of the wealthiest residential neighborhoods in the city, still offers the density and demographics that make retailers drool.

"There's still decent activity but a lot of people are being pickier," said Stone Principal Jason Gustaveson.

Many retailers are retrenching as they adjust to life in the Amazon era. With more shoppers buying online, the outlook for brick-and-mortar retail space is dimming, **forcing many landlords to adapt** by filling their space with tenants less vulnerable to the e-commerce threat.

Many national retail chains have closed stores by the dozens, a trend that's expected to continue with the likely liquidation of Toys R Us and expected bankruptcy of Claire's Stores.

But in a Darwinian market, dense and wealthy urban submarkets like the Clybourn Corridor will continue to attract retailers. The shopping district, which extends out from the intersection of North and Clybourn avenues, encompasses 2.6 million square feet of retail space, second only to North Michigan Avenue, the area's biggest retail destination, at 3.0 million square feet. But unlike the Magnificent Mile, which attracts tourists, the Clybourn Corridor mainly caters to shoppers who live nearby, Gustaveson said.

The Clybourn Corridor's 2017 vacancy rate was still elevated, up from 10.1 percent in 2015 and 6.4 percent in 2014, according to Stone. And dealmaking slowed considerably: Retailers signed just five leases there last year, down from 13 in 2016 and 20 in 2015, according to Stone. Net asking rents for the area were flat, at $48.85 per square foot.

"It's kind of spotty and in certain segments," Gustaveson said of the market.

*More:*

*Clybourn Corridor rents on rise in 2016*

*Retail landlords tread water in rough seas*

*Want to build a shopping center? Good luck with that.*

As apparel retailers have struggled, discount chains like Nordstrom Rack, DSW and Saks Off-Fifth have moved in to North and Clybourn. Landlords have also filled their empty space with restaurants and service retailers like My Eye Doc and Club Pilates. Service businesses have accounted for nearly half the leases signed in the area the past two years, according to Stone.

More shifts could be in store for the next year or so. More than 100,000 square feet of occupied retail space in the corridor is currently being marketed for lease, much of it occupied by fashion and apparel retailers, according to Stone. The available space includes a 12,100-square-foot Express store in the North Avenue Collection, 913-949 W. North Ave.

4/5/2018                                                                            Print Story

Some of the tenants may be balking at renewing their leases at high rents, betting they may be able to get a
better deal if they wait.

"They probably do good volume there, but they're probably not making a lot of money due to high rents,"
Gustaveson said. "They're saying 'Landlord, if you think you can get that rent, then I think I'm going to let my
term expire.'"

The Clybourn Corridor has filled in with stores over the past few decades, drawing retailers that want to be
close to high-income residents of Lincoln Park, Bucktown, Old Town and other North Side neighborhoods. The
most recent big retail project, NewCity, a 360,000-square-foot development anchored by a Mariano's grocery
store, opened in 2016.

But Gustaveson doesn't expect a lot of retail construction in the neighborhood in the near future, good news for
landlords.

"There's enough existing space on the market that people are able to backfill other space," he said. At the same
time, "rents are not spiking where new development makes a lot of sense."

Longer term, retailers and landlords will be paying attention to the bigger development trends unfolding in the
area. **To the south**, the city is the process of selling parcels where the notorious Cabrini-Green housing project
once stood. In February 2017, city officials **picked a development team** to build 482 units of mixed-income
housing on a 6.9-acre site at Larrabee Street and Clybourn Avenue.

To the west, developers are quickly gobbling up land along the Chicago River with plans to build new office and
residential towers in the longtime industrial corridor. With more people living and working in the area, more
retailers will want to be there too—even in the Amazon era.

Order                                                                    (Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Webster Place Athletic Club

v.

Ramco-Webster Place, LLC

No. 18-CH-4248

### ORDER

This matter coming to be heard on plaintiff's motion to escrow rent with the Clerk of the Court, all parties being duly notified, counsel for plaintiff present, the Court being fully advised in the premises, it is hereby ordered:

(1) defendant has 28 days to answer or respond to the motion to escrow, to May 22, 2018

(2) plaintiff has 28 days to reply in support of the motion to Escrow, to June 19, 2018

(3) hearing is set for July 25, 2018 at 10:30

(4) courtesy copies in advance per standing order of Court

Attorney No.: 41704

Name: M Milan

Atty. for: Plaintiff

Address: 330 N. Wabash, Ste 2100

City/State/Zip: Chicago, IL 60611

Telephone: 312 840-7000

ENTERED:

Dated: _____

Judge Anna Helen Demacopoulos

APR 24 2018

Judge                    Circuit Court - 2002    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Firm I.D. 59917

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION – COUNTY DEPARTMENT

|  |  |  |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2018-CH-04248 |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company Registered to do business in Illinois, | ) ) ) ) | Honorable Anna H. Demacopoulos Calendar 13 |
| Defendant. | ) ) | |

## **APPEARANCE**

Honigman Miller Schwartz and Cohn LLP hereby appears as attorneys for Defendant

Ramco-Webster Place, LLC.

Dated: May 7, 2018

Respectfully submitted,

_____
One of the Attorneys for Defendant Ramco-
Webster Place, LLC

William B. Berndt
wberndt@honigman.com
Helen M. Hapner
hhapner@honigman.com
HONIGMAN MILLER SCHWARTZ AND COHN LLP
155 N. Wacker Drive, 31st Floor
Chicago, Illinois 60606
Tel:  (312) 701-9300
Fax:  (312) 701-9335

27598833.1

## CERTIFICATE OF SERVICE

I, Helen M. Hapner, an attorney, hereby certify that I caused a copy of the foregoing

**Appearance** to be served by e-mail and U.S. Mail, postage prepaid, on May 7, 2018 upon the

following:

> Aaron H. Stanton
> (astanton@burkelaw.com)
> Madeleine W. Milan
> (mmilan@burkelaw.com)
> Burke, Warren, MacKay & Serritella, P.C.
> 330 North Wabash Avenue, 22nd Floor
> Chicago, Illinois 60611-7000
> Telephone: (312) 840-7000

Helen M. Hapner

2

Firm I.D. 59917

FILED-CH
CLERK OF THE CIRCUIT COURT
2018 MAY -7 PM 3: 40

DOROTHY BROWN          CLERK

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION – COUNTY DEPARTMENT

| | |
|---|---|
| WEBSTER PLACE ATHLETIC CLUB ) | |
| LLC, an Illinois limited liability company, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2018-CH-04248 |
| ) | |
| RAMCO-WEBSTER PLACE, LLC, a ) | Honorable Anna H. Demacopoulos |
| Delaware limited liability company ) | Calendar 13 |
| Registered to do business in Illinois, ) | |
| ) | |
| Defendant. ) | |

### NOTICE OF MOTION

To:    See Attached Certificate of Service

On *May 21*, 2018, at *10* (a.m.)/p.m., or as soon thereafter as counsel

may be heard, the undersigned will appear before the Honorable Anna H. Demacopoulos, or any

judge sitting in her stead, in Room 2502 of the Richard J. Daley Center, Chicago, Illinois, and

shall then and there present **Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to**

**735 ILCS 5/2-615**, a copy of which is attached hereto and hereby served upon you.


Dated: May 7, 2018                          Respectfully submitted,

                                            *Helen Hapner*
                                            One of the Attorneys for Defendant Ramco-
                                            Webster Place, LLC

                                            William B. Berndt
                                            wberndt@honigman.com
                                            Helen M. Hapner
                                            hhapner@honigman.com
                                            HONIGMAN MILLER SCHWARTZ AND COHN LLP
                                            155 N. Wacker Drive, 31st Floor
                                            Chicago, Illinois 60606
                                            Tel:   (312) 701-9300
                                            Fax:   (312) 701-9335

27599290.1

## CERTIFICATE OF SERVICE

I, Helen M. Hapner, an attorney, hereby certify that I caused a copy of the foregoing

**Notice of Motion** to be served by e-mail and U.S. Mail, postage prepaid, on May 7, 2018 upon

the following:

> Aaron H. Stanton
> (astanton@burkelaw.com)
> Madeleine W. Milan
> (mmilan@burkelaw.com)
> Burke, Warren, MacKay & Serritella, P.C.
> 330 North Wabash Avenue, 22nd Floor
> Chicago, Illinois 60611-7000
> Telephone: (312) 840-7000

Helen M. Hapner

2

Firm I.D. 59917

FILED-CH

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CHANCERY DIVISION – COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB | ) | |
| LLC, an Illinois limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2018-CH-04248 |
| | ) | |
| RAMCO-WEBSTER PLACE, LLC, a | ) | Honorable Anna H. Demacopoulos |
| Delaware limited liability company | ) | Calendar 13 |
| Registered to do business in Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT PURSUANT TO 735 ILCS 5/2-615**

In its Complaint, Plaintiff Webster Place Athletic Club ("WPAC") wrongly complains

that Defendant Ramco-Webster Place, LLC ("Ramco") has breached its obligations under the

terms of a commercial lease. WPAC's Complaint does not mention that WPAC is hundreds of

thousands of dollars behind in its rent payments to Ramco and is wrongfully occupying and

operating its leased premises rent-free. That is the real reason that WPAC brought this lawsuit

and seeks rescission of the Lease – WPAC's complaints about "breaches" by Ramco are a

pretext for WPAC to vitiate the Lease, and avoid its debts.

WPAC has brought two claims: (1) declaratory judgment; and (2) rescission. Of course,

the "claims" brought by WPAC are actually remedies that are available if WPAC could allege

and prove a breach of contract claim. By seeking only remedies – and not actually bringing a

breach of contract claim – WPAC tried to hide its inability to plead an essential element of a

breach of contract claim:  that the plaintiff has performed its obligations under the Lease.

27560380.2

WPAC's attempt to artfully plead around its failure to pay rent fails as a matter of law. WPAC's failure to allege that it has performed its obligations under the Lease dooms its declaratory judgment claim.

WPAC's claim for rescission is equally deficient because WPAC fails to allege that it will repay all past due rent owed to Ramco if the Lease is rescinded. Under Illinois law, a plaintiff seeking rescission of a contract must allege that it stands ready to pay for all benefits it received under that contract, including paying for its use and occupancy of the leased premises for the past four months. And, since WPAC does not allege that it will pay for its past use and occupancy of the leased premises, which, as of April 1, 2018, totaled almost $400,000, WPAC's claim for rescission fails to state a claim on which relief can be granted.

The Court should dismiss WPAC's Complaint in its entirety.

## LEGAL STANDARD

735 ILCS § 5/2-615(a) provides for the dismissal of an action where the pleading or a portion thereof is "substantially insufficient in law." Motions to dismiss under this section attack the legal sufficiency of a pleading as a result of defects apparent on the face of the pleading. *See Johnson v. Matrix Fin. Svcs. Corp.*, 354 Ill. App. 3d 684, 688 (1st Dist. 2004). Because Illinois is a fact-pleading jurisdiction, "[a] pleading is subject to challenge under Section 2-615 where it fails to allege facts that identify the essential elements of a cause of action." *Vernon v. Schuster*, 179 Ill. 2d 338, 344 (1997) (affirming dismissal of claim by the Circuit Court, holding "[a] plaintiff must allege facts sufficient to bring his or her claim within the scope of the cause of action asserted"); *see also Urbaitis v. Commonwealth Edison*, 143 Ill. 2d 458, 475 (1991) (affirming dismissal by Circuit Court where pleading demonstrated the plaintiff could not establish essential elements of cause of action).

2

## ARGUMENT

## I.    WPAC DOES NOT STATE A CLAIM FOR DECLARATORY JUDGMENT.

WPAC's claim for "declaratory judgment" is a disguised claim for breach of contract, but

WPAC has not alleged the elements of that claim.  As a result, WPAC's declaratory judgment

claim must be dismissed as a matter of law.

"Declaratory judgment actions are used in contract disputes to determine parties' rights

under a contract *before the contract is claimed to have been breached.*"  *Brainerd & Bridges v.

Weingeroff Enterprises, Inc.*, No. 85 C 493, 1985 WL 2543, at *3 (N.D. Ill. Sept. 16, 1985)

(emphasis added).  The *Brainerd* court explained that a declaratory judgment count is not

appropriate when a party alleges that a contract *has* been breached.  *Id.*  Rather, those claims

amount to breach of contract.[1]

Here, WPAC alleges, again and again, that Ramco has already breached the Lease.  (*See

generally* Compl.).  Accordingly, its claims sound in breach of contract, not declaratory

judgment.

Moreover, WPAC has not alleged, and cannot allege, the essential elements of a breach

of contract claim, because it has not alleged performance of its obligations under the contract.

*See Golbeck v. Johnson Blumberg & Assocs., LLC*, No. 16-CV-6788, 2017 WL 3070868, at *5-7

(N.D. Ill. July 19, 2017) (granting defendant's motion to dismiss breach of contract claim where

plaintiff did not plead substantial performance under the contract).  WPAC cannot make this

allegation – as it is months behind in its rent payments and has been using the premises rent-free

since January 2018.

---

[1] *See also Eyman v. McDonough Dist. Hosp.*, 245 Ill. App. 3d 394, 396 (3d Dist. 1993) (granting motion to dismiss declaratory judgment action where plaintiff sought nonliability for past breach of contract); *Bryant v. Jackson Nat. Life Distributors, LLC*, No. 12 C 9391, 2013 WL 1819927, at *1 (N.D. Ill. Apr. 30, 2013) (applying Illinois law) (finding declaratory judgment action improper where the alleged breach of contract already occurred).

3

In response, WPAC may assert that it is merely asking for an interpretation of its obligations under the Lease, which would be the proper subject of a declaratory judgment action. But, that argument would contradict the allegations of WPAC's own Complaint. Count I, for declaratory judgment, seeks a Declaration that the Lease is terminated due to *past breaches of contract* by Ramco. (Compl. ¶¶ 51-54).

WPAC cannot avoid the pleading requirements for a breach of contract claim by recharacterizing its claim as seeking a declaratory judgment. Illinois courts have explained that "[b]y filing suit for a declaratory judgment, one does not obviate the need for setting forth sufficient facts as will establish a cause of action. A declaratory judgment action is strictly procedural in itself and does not serve to create any new substantive rights." *McDonald v. Cty. Bd. of Kendall Cty.*, 146 Ill. App. 3d 1051, 1054 (2d Dist. 1986). Accordingly, because WPAC's declaratory judgment claim seeks relief based on a contractual breach, it must establish a substantive basis to those rights, and plead all of the elements necessary to support a claim for breach of contract.

In order to establish a breach of contract claim, WPAC must allege and establish that it has performed its obligations under the Lease. WPAC has not alleged such facts, and thus has not properly alleged that it is entitled to the relief it seeks through a declaratory judgment. *Id.* at 1054 (party seeking declaratory judgment must "allege facts that, if proved, would entitle petitioner to relief").

The Court should dismiss Count I of the Complaint as a matter of law.

## II.    **WPAC DOES NOT STATE A CLAIM FOR RESCISSION.**

In its rescission claim, WPAC yet again tries to avoid its obligation to pay rent, and fails again to allege the essential elements of its claim. Under Illinois law, "[a] party seeking rescission must restore the other party to the status quo existing at the time the contract was

made." *Horwitz v. Sonnenschein Nath & Rosenthal LLP*, 399 Ill. App. 3d 965, 974 (1st Dist. 2010). "Restoration of the status quo … requires the rescinding party to account for any benefits received from the other party under the contract." *Id.* at 974-75 (noting that the plaintiff had properly alleged that "he was 'ready, willing and able' to restore defendant's consideration, including retirement benefits").

WPAC has not alleged facts that demonstrate rescission will restore the status quo prior to the entry of the Lease, because WPAC has failed to commit to pay for the past-due rent it owes to Ramco for its use and occupancy of the leased premises since January 2018, which, as of April 2018, totaled almost $400,000. WPAC admits that it has occupied the premises since August 1, 2015 (Compl. ¶ 18), and is continuing to occupy the premises (Compl. ¶ 1). Yet, in seeking rescission, WPAC fails to commit to "account for any benefits" received by WPAC under the Lease, including the use of the premises, in seeking rescission. Rather, WPAC wrongly suggests that "the status quo can be restored if rescission is granted because Tenant will vacate the Premises and restore possession of the Premises to Landlord." (Compl. ¶ 65.) That is incorrect as a matter of law – as WPAC remains in the Premises, and has not been paying rent. WPAC has not alleged that it is "ready, willing and able" to pay for all benefits it has accepted under the Lease, and thus its claim for rescission fails.

This Court should dismiss Count II, for rescission, as a matter of law.

## CONCLUSION

For the reasons stated above, Ramco respectfully requests that this Court dismiss WPACs' Complaint for failure to state a claim.

Dated: May 7, 2018

Respectfully submitted,

*Helen Hapner*

One of the Attorneys for Defendant Ramco-Webster
Place, LLC

William B. Berndt
wberndt@honigman.com
Helen M. Hapner
hhapner@honigman.com
HONIGMAN MILLER SCHWARTZ and COHN LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
Tel:    (312) 701-9300
Fax:    (312) 701-9335

## CERTIFICATE OF SERVICE

I, Helen M. Hapner, an attorney, hereby certify that I caused a copy of the foregoing

**Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to 735 ILCS 5/2-615** to be

served by e-mail and U.S. Mail, postage prepaid, on May 7, 2018 upon the following:

Aaron H. Stanton
(astanton@burkelaw.com)
Madeleine W. Milan
(mmilan@burkelaw.com)
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-7000
Telephone: (312) 840-7000


_____

Helen M. Hapner

Firm I.D. 59917

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION – COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2018-CH-04248 |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company Registered to do business in Illinois, | ) ) ) ) | Honorable Anna H. Demacopoulos Calendar 13 |
| Defendant. | ) | |

## APPEARANCE

Honigman Miller Schwartz and Cohn LLP hereby appears as attorneys for Defendant

Ramco-Webster Place, LLC.

Dated: May 7, 2018

Respectfully submitted,

*Helen Hapner*

One of the Attorneys for Defendant Ramco-Webster Place, LLC

William B. Berndt
wberndt@honigman.com
Helen M. Hapner
hhapner@honigman.com
HONIGMAN MILLER SCHWARTZ AND COHN LLP
155 N. Wacker Drive, 31st Floor
Chicago, Illinois 60606
Tel:   (312) 701-9300
Fax:   (312) 701-9335

27598833.1

## CERTIFICATE OF SERVICE

I, Helen M. Hapner, an attorney, hereby certify that I caused a copy of the foregoing

**Appearance** to be served by e-mail and U.S. Mail, postage prepaid, on May 7, 2018 upon the

following:

> Aaron H. Stanton
> (astanton@burkelaw.com)
> Madeleine W. Milan
> (mmilan@burkelaw.com)
> Burke, Warren, MacKay & Serritella, P.C.
> 330 North Wabash Avenue, 22nd Floor
> Chicago, Illinois 60611-7000
> Telephone: (312) 840-7000

Helen M. Hapner

2

Order                                                           (Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Webster Athletic Place, LLC

v.                                    No. 2018-CH-4247

Ramco

AGREED                    **ORDER**

This matter coming to be heard on
defendant's 735 ILCS 5/615 motion to Dismiss,
all parties being duly notified and present, the
court being fully advised in the premises,
it is hereby ordered:

plaintiff is granted twenty-eight (28) days to
respond, to June 18, 2018;

defendant is granted twenty-one (21) days to
reply, to July 9, 2018

hearing July 25, 2018 at 10:30 a.m.

courtesy copies (via email pdf format) due upon
filing

Attorney No.: 41704

Name: M Milan / BLUM & S

Atty. for: Plaintiff                    **ENTERED:**

Address: 330 N. Wabash, 2100

City/State/Zip: Chicago, IL 60611    Dated: _____    Judge Anna Helen
                                                            Demacopoulos
Telephone: 312 840 7000                                     MAY 21 2018
                                        _____    _____
                                        Judge           Judge's No.
                                                Circuit Court - 2002

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Firm I.D. 59917

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

WEBSTER PLACE ATHLETIC CLUB            )
LLC, an Illinois limited liability company,   )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )        Case No. 2018-CH-04248
                                       )
RAMCO-WEBSTER PLACE, LLC, a            )        Honorable Anna H. Demacopoulos
Delaware limited liability company     )        Calendar 13
Registered to do business in Illinois, )
                                       )
          Defendant.                   )

### NOTICE OF FILING

PLEASE TAKE NOTICE that on May 22, 2018, we filed with the Clerk of the Circuit

Court of Cook County, Illinois, County Department, Chancery Division, **Ramco-Webster Place,**

**LLC's Response to Plaintiff's Motion to Escrow Contested Withheld Rent with the Clerk**

**of the Court**, a copy of which is attached and hereby served upon you.

Dated: May 22, 2018                        Respectfully submitted,

                                           One of the Attorneys for Defendant Ramco-
                                           Webster Place, LLC

                                           William B. Berndt
                                           wberndt@honigman.com
                                           Helen M. Hapner
                                           hhapner@honigman.com
                                           HONIGMAN MILLER SCHWARTZ AND COHN LLP
                                           155 N. Wacker Drive, 31st Floor
                                           Chicago, Illinois 60606
                                           Tel:   (312) 701-9300
                                           Fax:   (312) 701-9335

27758489.1

## CERTIFICATE OF SERVICE

I, Helen M. Hapner, an attorney, hereby certify that I caused a copy of the foregoing

**Notice of Filing** and **Ramco-Webster Place, LLC's Response to Plaintiff's Motion to Escrow**

**Contested Withheld Rent with the Clerk of the Court** to be served by e-mail and U.S. Mail,

postage prepaid, on May 22, 2018 upon the following:

> Aaron H. Stanton
> (astanton@burkelaw.com)
> Madeleine W. Milan
> (mmilan@burkelaw.com)
> Burke, Warren, MacKay & Serritella, P.C.
> 330 North Wabash Avenue, 22nd Floor
> Chicago, Illinois 60611-7000

Helen M. Hapner

Firm I.D. 59917

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DIVISION – COUNTY DEPARTMENT

| | | |
|---|---|---|
| WEBSTER PLACE ATHLETIC CLUB LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2018-CH-04248 |
| RAMCO-WEBSTER PLACE, LLC, a Delaware limited liability company Registered to do business in Illinois, | ) ) ) ) | Honorable Anna H. Demacopoulos Calendar 13 |
| Defendant. | ) ) | |

## RAMCO-WEBSTER PLACE, LLC'S RESPONSE TO PLAINTIFF'S MOTION TO ESCROW CONTESTED WITHHELD RENT WITH THE CLERK OF THE COURT

Webster Place Athletic Club LLC's ("WPAC") Motion to Escrow Rent with the Clerk of

the Court ("Motion") must be denied for three reasons.

First, WPAC's Motion fails because the relief it seeks is completely inconsistent with the

relief WPAC seeks through its Complaint. Through its Motion, WPAC asks the Court to allow

WPAC to pay rent due to Defendant Ramco-Webster Place, LLC ("Ramco") into escrow.

WPAC's Motion implies that it has asserted some right to recover those payments from escrow

at the end of this lawsuit. However, WPAC is still occupying the premises owned by Ramco,

*and has not brought a claim for damages in this lawsuit.* Rather, WPAC has only brought

claims for declaratory judgment and rescission. As a result, there is no circumstance, based on

the Complaint that WPAC filed, where WPAC would have the right to withhold or recover the

rent to be escrowed. WPAC thus lacks standing to seek a mandatory injunction requiring Ramco

to escrow rent to be paid by WPAC.

Second, WPAC's Motion fails to offer any support for the extraordinary relief it seeks.

The Illinois Supreme Court has held that a tenant seeking an Order requiring the escrow of rent

must demonstrate irreparable harm will occur if the rent is not placed in escrow. *Kanter &*
*Eisenberg v. Madison Assocs.*, 116 Ill. 2d 506, 516 (1987). WPAC's Motion ignores that legal
standard. Indeed, WPAC fails to cite a single case in support of its position.

Third, WPAC fails to offer any competent evidence supporting its Motion. Rather,
WPAC's Motion is based on the false premise that the long-term viability of Ramco is
"tenuous." (Mot. at 4.) WPAC does not support that allegation with evidence of any kind.
Instead, WPAC's Motion cites three news articles that do not even mention WPAC or the
Webster Place Shopping Center ("Shopping Center"), when WPAC rents space from Ramco –
let alone have any bearing whatsoever on the financial stability of Ramco. WPAC fails to offer a
shred of evidence that demonstrates irreparable harm.

Both the law and the facts demonstrate that WPAC's Motion is baseless. This Court
should deny WPAC's Motion in its entirety.

## ARGUMENT

**I.      WPAC Has Not Articulated Any Basis To Withhold Rent From Ramco.**

WPAC Motion is nonsensical – as it requests relief that it is not entitled to under the
claims asserted in its Complaint. WPAC is in possession of the leased premises, and offers no
excuse why rent should be withheld from Ramco while this lawsuit proceeds.

The premise of WPAC's Motion – that Ramco has breached the lease, and thus WPAC is
not required to pay rent – is directly contrary to Illinois law. Even if a landlord fails to make
repairs or otherwise breaches a lease, the tenant must pay rent while it is in possession of the
premises. *See Poulos v. Reda*, 165 Ill. App. 3d 793, 798–99 (1st Dist. 1987) ("The general rule
in Illinois is that the obligation to pay the rent and the covenant to make repairs are separate and
independent covenants and that the failure to make the promised repairs does not discharge the
obligation to pay rent"). WPAC's Complaint does not articulate any reason the Court should